**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GLOBAL PARTNERS LP<br><br>Plaintiff,<br><br>vs.<br><br>TGC, L.P. and MBI HOLDINGS, LLC<br><br>Defendants. | Case No. 1:20-cv-10346 |

**DECLARATION OF JAMES ROBERT BENNETT IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND IN THE ALTERNATIVE, TO DISMISS**

1. My name is James Robert Bennett. I am over 21 years of age and am fully competent to make this Declaration. The facts stated in this Declaration are true and correct and, unless otherwise stated, within my personal knowledge. I am making this Declaration in support of Defendants' Motion to Compel Arbitration and in the Alternative, to Dismiss (the "Motion").

2. I currently am President at TGC, L.P. ("TGC"). I have been TGC's elected board member of Basin Transload, LLC ("Basin") since February 1, 2013. I have been with Basin since our effective date of organization on November 13, 2008.

3. As a board member of Basin for over seven years, I am knowledgeable and familiar with Basin's operations and Global Partners's role in operating and managing Basin.

4. Basin provides logistics and transloading services (the transfer of materials from one mode of transportation to another) for crude oil, natural gas liquids, and other industrial materials for the Bakken region.

5. Global Partners is an oil marketer who purchases and ships oil for other energy participants. To do so, Global Partners requires transloading services to move the oil out of the

tanks. Global Partners often used Basin as that transloading service prior to entering into the LLC Agreement.

6. Basin has two rail sites: the Stampede rail stop in Columbus, North Dakota ("Stampede"), and the Republic rail stop in Beulah, North Dakota ("Beulah"), from which it provides transloading services. Global Partners is the marketer at both sites. Global Partners decided to invest in transloading assets and purchased the tanks at Stampede from Basin. Basin owns the remainder of the transloading assets at Stampede. At Beulah, however, Basin owns all of the transloading assets, including the tanks.

7. Around 2012, Global Partners began expressing interest in buying in to Basin. After negotiations with Global Partners's top executives, including its chief executive officer ("CEO") and president, TGC, MBI Holdings, LLC ("MBI"), and Global Operating LLC ("Global Operating") entered into the LLC Agreement on February 1, 2013. Global Operating owns 60% of Basin's membership interests. TGC and MBI each own 20% of the membership interests in Basin.

**Global Partners's Control Over Global Operating:**

8. Global Operating is Global Partners's wholly-owned subsidiary.

9. Global Partners and Global Operating share an address in Waltham, Massachusetts.

10. It is my understanding that almost all of Global Partners's executives have a similar role at Global Operating.

11. Global Partners negotiates on behalf of Global Operating. For example, when discussing possible buy out solutions, TGC and MBI engaged with Global Partners's general

counsel and CEO. Global Partners's CEO was the final say regarding the possible buy out solutions of the member's LLC interests.

12. I receive correspondence regarding Basin from Global Partners's executives, including its general counsel and CEO. This correspondence is on Global Partners's letterhead, not Global Operating's letterhead. I also receive emails regarding Basin from Global Partners's executives, sent from Global Partners's email address, and not Global Operating's email address.

13. Confusingly, Global Partners and Global Operating constantly refer to themselves collectively as "Global."

14. At all times, I understood that my dealings regarding Basin were with "Global," meaning Global Partners LP, Global Partners, and Global Operating. These three names all have the same meaning to me.

**Global Partners's Control Over Basin:**

15. After the LLC Agreement was executed, Global Operating elected Global Partners's chief executive officer ("CEO") as its controlling member and chairman of the board of directors of Basin.

16. Global Operating also appointed Global Partners's own executive team to become the executive team of Basin. This includes Basin's chief financial officer ("CFO") (also the CFO of Global Partners) and Basin's chief operating officer ("COO") (also the COO of Global Partners). It is my understanding that the president of Basin, Bill Davidson, has senior vice president roles at both Global Partners and Global Operating.

17. Global Partners dominates the Basin board meetings. At times there are as many as ten representatives from Global Partners present at these meetings. To my knowledge those individuals have no official role with Global Operating, but often participate in the decision

making process for Global Operating. In contrast, TGC and MBI only have their respective board members present, and sometimes one or two additional representatives.

18. I have received Basin board meeting notices and agendas from Global Partners.

19. As part of the LLC Agreement, the parties also entered into a Shared Services Agreement. Under this agreement, Global Partners acts as the operator and marketer of Basin, and also oversees the legal services. In its role as operator and marketer, Global Partners brings in the contracts for Basin.

20. Global Partners has used this role to its advantage, regardless of whether its actions are in the best interest of Basin. For example, prior to Global Partners buying in to Basin, Basin had an exclusive contract with United Energy Trading ("UET"). UET, like Global Partners, is an oil marketer and therefore Global Partners's competitor. Once Global Partners took over operations, it decided it did not want to honor that exclusive agreement and drove UET out of the site. It used its majority control over Basin and its insight into UET's customer information, through Basin, to do so, even though TGC and MBI tried to fight it. This severely damaged Basin's reputation. Various customers no longer want to do business with Basin because of its association with Global Partners. Even though the UET fall out happened years ago, Basin is still having trouble securing customers because of Global Partners's immense involvement in Basin. The oil and gas community is small and Global Partners's bad reputation impacts Basin's ability to do business.

21. Global Partners focuses its marketing efforts at Stampede because it owns the tanks at the Stampede site and thus receives more profit when oil is run through Stampede than when oil is run through Beulah. I believe that the reason why this decision was made by Basin (through its Global Partners-dominated leadership) was to benefit Global Partners with higher

profits, not to benefit Basin itself. In fact, this strategy has harmed Basin by depriving it of revenue.

22. Global Partners uses its control over Basin to the disadvantage of Basin. For example, as a marketer, Global Partners trades and delivers oil, and must make arrangements for the transportation and storage of the oil in order to get it to its end market, a refinery. Global Partners is incentivized to lower all of its interim costs, like transloading and storage rates, to increase its marketing profit. Basin provides these interim services. Because of its control over Basin, Global Partners has visibility into Basin's cost structure. Basin, however, has no visibility into Global Partners's marketing profits. Global Partners uses this control over Basin to lower the rates of transloading and storage it purchases from Basin, in order to increase its marketing cost. Basin must rely on Global Partners's representations that the rates it suggests are comparable to the market and beneficial to Basin, because Basin has no visibility on its own. Global Partners has also approached TGC and MBI after executing agreements to purchase storage and transloading services, and informed them that it cannot pay the rate of storage and transloading originally agreed to, using its control over Basin to lower the rates even more. I believe that Global Partners manipulates Basin in this way to increase its marketing profits, and does so without considering the repercussions its actions have on Basin.

23. Global Partners forces these contracts on to Basin through its majority voting share. There have been many times where Global Partners will execute a contract before even informing TGC and MBI.

**<u>The Tesoro Agreement and Mismanagement</u>:**

24. On April 3, 2014, Global Partners, on behalf of Basin, executed a Construction and Indemnity Agreement with Tesoro High Plains Pipeline Company LLC ("Tesoro") for the

Beulah site (the "Tesoro Agreement"). It is my understanding that sometime prior, Global Partners executed a similar agreement at the Stampede site. Part of the Tesoro Agreement required Basin to deliver some volume of crude petroleum to a certain destination during any 180 days within any period of twelve consecutive months, or else Tesoro could terminate the agreement and demand certain payment from Basin.

25. Global Partners's general counsel signed the Tesoro Agreement on behalf of Basin. He does not have a signatory role at Basin and does not execute documents on behalf of Basin. It is my understanding that he has never signed an agreement on behalf of Basin before. In fact, TGC and MBI were not aware that the document was executed by Global Partners's general counsel until after the agreement was signed.

26. Global Partners also executed a guarantee agreement with Tesoro on the same day, guaranteeing Basin's obligation to Tesoro if Basin did not pay.

27. While TGC and MBI were informed of these agreements, they were not provided with the specific details and were not provided with the contracts before they were executed.

28. Global Partners made representations to both TGC and MBI that, like other contracts, it would manage the Tesoro Agreement and Basin's obligations thereunder. With those assurances, TGC, MBI, and Global Partners entered into a side agreement, under which TGC and MBI agreed to reimburse Global Partners for certain payments made on behalf of Basin (the "Letter Agreement").

29. After some time passed, I noticed no volumes of crude petroleum had been run through the site under the Tesoro Agreement. Even though Global Partners, as marketer, controls the oil brought through the site, I questioned Global Partners at two different board meetings to make sure it fully understood Basin's obligations under the Tesoro Agreement.

30. On August 23, 2017, I received a call from Mark Romaine, Global Partners's COO, telling me Global Partners had received a default letter on the Tesoro Agreement in Beulah and that Global Partners did not know about the provision requiring certain volumes to be delivered within the given time frame. When I asked Mr. Romaine how they missed the provision, he said he did not know and needed to look into it more. Global Partners failed to deliver the minimum volumes of crude petroleum as required under the Tesoro Agreement and Tesoro had demanded payment from Basin.

31. The demand on August 23, 2017 from Tesoro was the first TGC, MBI, and Global Partners learned of Basin's obligation to deliver volumes of crude petroleum.

32. It is clear to me that Global Partners had no idea the minimum volume obligation existed in the Tesoro Agreement. The 180 day deadline under the Tesoro Agreement actually expired in February 2017. For months, Global Partners made no comments about any obligations under the Tesoro Agreement. In June 2017, Global Partners initiated a distribution of capital. I believe that if Global Partners was aware of the volume obligation under the Tesoro Agreement, that had already been triggered months earlier, it would not have made the distributions out of Basin and instead retained the capital to fund the Tesoro payment.

33. I attended a Basin board meeting through a conference call on August 24, 2017, just one day after Tesoro demanded payment from Basin. Global Partners's general counsel attempted to force Basin to make the Tesoro payment with scant explanation and no forewarning. TGC and MBI knew nothing about the payment and requested more information about the debt and an explanation about how it came about. Global Partners's general counsel got very frustrated and did not provide any more information. It is my belief that Global Partners

was attempting to get rid of the payment quickly because they knew they mismanaged the Tesoro Agreement.

34. It was very evident to me at that August 24, 2017 meeting that Global Partners's COO and CFO (also the COO and CFO of Basin) knew nothing about the volume obligation in the Tesoro Agreement, as they both asked questions about how the Tesoro default clause came about and about when Basin found out about it.

35. Basin did not have the adequate capital in its bank account to make the payment. It would have required a capital call to fund the demand.

36. Over the next several weeks it became increasingly clear to me that Global Partners wanted to immediately pay the Tesoro debt rather than follow Basin's corporate formalities to fund the payment.

37. Global Partners ultimately made the decision to make the payment through its guarantee with Tesoro without our consent to have Basin default on its obligation. In doing so, Global Partners completely skipped over the corporate formalities of Basin. Global Partners should have requested a capital call under the LLC Agreement, or allowed Basin to explore bankruptcy or restructuring options to fund the debt. Instead, Global Partners caused Tesoro to invoke the guarantee between itself and Tesoro.

38. I believe the reason why Global Partners did this was to benefit Global Partners, and not Basin. I believe that Global Partners was concerned about making the Tesoro payment quickly and quietly so as to get the debt off of its books and to avoid negative discussions in the market so close to year end. It is my understanding, through past dealings with Global Partners, that at this time Global Partners was also negotiating with banks. I believe that Global Partners wanted this large payment off the books so that there were no material items on the books that

would negatively affect the financial relationship with the banks or create any issues with year-end audits. So, instead of issuing a capital call, Global Partners made the payment under their guarantee agreement in an attempt to get the payment resolved as fast as it could.

39. I believe that Global Partners did this with its own interests in mind, without consideration of whether it was in Basin's best interest. Global Partners did this knowing it could turn around and attempt to request reimbursement from TGC and MBI under the Letter Agreement.

40. Global Partners did this even though it was their control over and mismanagement of Basin that created Basin's inability to meet the Tesoro volume obligation. One of the reasons Basin was not able to meet the Tesoro volume obligation is because of the damage Global Partners has done to Basin's reputation. Global Partners's severe mismanagement of Basin's relationship with UET contributed to the fact that Basin was not able to bring in new customers and meet the Tesoro obligation.

41. It is my understanding that Global Partners did not even record the Tesoro debt on Basin's books at all.

42. It is my belief that Global Partners constantly uses its power over Basin for its own benefit, and this is just one example of Global Partners excessive control and mismanagement.

**<u>Negotiations and Arbitration</u>:**

43. The Tesoro Agreement is just one example of Global Partners's mismanagement of Basin, but it was the action that pushed TGC and MBI over the edge. TGC and MBI engaged in negotiations with Global Partners to resolve the ongoing disagreements. TGC and MBI negotiated with Global Partners's general counsel and CEO over the course of two years. TGC

and MBI proposed several buy out or dissolution options in an attempt to resolve the Tesoro payment and fairly unwind the LLC.

44. Global Partners repeatedly proposed counteroffers and proposals that were much lower than a good faith valuation of Basin's assets. It became clear to TGC and MBI that Global Partners was not taking the negotiations seriously. This came to a head when Global Partners sent a letter on October 1, 2019 to TGC and MBI demanding payment under the Letter Agreement, the payment the parties were in the middle of negotiating.

45. Because it was clear the negotiations were no longer productive, TGC and MBI sent a notice of arbitration to Global Operating and Global Partners on January 31, 2020. TGC and MBI asked the Tribunal to assist in the ongoing negotiation and equitably dissolve Basin.

46. Global Partners has refused to participate in the arbitration proceeding even though it earlier told TGC and MBI that the equitable dissolution of Basin was subject to mandatory arbitration. On November 6, 2018, I received a letter from Global Partners's CEO in response to a suggestion of dissolving Basin. In that letter, Global Partners told TGC and MBI it would not dissolve Basin and that any disputes must be resolved through binding arbitration pursuant to the LLC Agreement and that Global Partners "fully expect[ed TGC and MBI] to comply with this section." The letter was sent on Global Partners's letterhead, and not Global Operating's letterhead.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 31, 2020.

James Robert Bennett