# EXHIBIT A

*Execution Version*

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# BASIN TRANSLOAD, LLC

**Dated as of February 1, 2013**

# TABLE OF CONTENTS

## ARTICLE I
## THE COMPANY; DEFINITIONS


Section 1.1 Term ..... 1
Section 1.2 Purpose of the Company; Powers ..... 1
Section 1.3 Name of the Company ..... 1
Section 1.4 Principal Place of Business; Registered Offices ..... 1
Section 1.5 Definitions ..... 1


## ARTICLE II
## RESPONSIBILITIES OF THE MEMBERS


Section 2.1 Responsibilities of the Members ..... 2
Section 2.2 No State Law Partnership; Liability to Third Parties ..... 2
Section 2.3 No Power to Bind Company or Another Member ..... 2
Section 2.4 Ownership ..... 3
Section 2.5 Limitation of Liability; Indemnification ..... 3


## ARTICLE III
## MANAGEMENT OF THE COMPANY


Section 3.1 Management ..... 4
Section 3.2 Company Board ..... 4
Section 3.3 Removal and Replacement of Directors ..... 4
Section 3.4 Meetings of the Company Board ..... 5
Section 3.5 Notice of Company Board Meetings ..... 6
Section 3.6 Actions by the Company Board ..... 6
Section 3.7 Action by Directors Without a Meeting ..... 6
Section 3.8 Annual Budgets ..... 6
Section 3.9 Bank Financings ..... 7
Section 3.10 Arm's Length Pricing ..... 7


## ARTICLE IV
## FISCAL YEAR; BOOKS OF ACCOUNT; FINANCIAL REPORTS


Section 4.1 Fiscal Year ..... 7
Section 4.2 Books of Account ..... 7
Section 4.4 Reports ..... 7
Section 4.5 Accounts ..... 8


## ARTICLE V
## CAPITAL CONTRIBUTIONS; FAILURE TO CONTRIBUTE; CAPITAL ACCOUNTS


Section 5.1 Capital Contributions ..... 8
Section 5.2 Special Contributions ..... 8

Section 5.3 Failure to Contribute ..... 9
Section 5.4 Capital Accounts ..... 10

ARTICLE VI
RESTRICTIONS ON TRANSFERS

Section 6.1 Generally ..... 10
Section 6.2 Permitted Transfers ..... 11
Section 6.3 Right of First Refusal ..... 11
Section 6.4 Drag Along Right ..... 12
Section 6.5 Special Purchase Right ..... 13
Section 6.6 Documentation; Validity of Transfers ..... 14
Section 6.7 Substituted Members ..... 14

ARTICLE VII
DISTRIBUTIONS; ALLOCATIONS

Section 7.1 Allocations for Capital Account Purposes ..... 14
Section 7.2 Allocations for Tax Purposes ..... 17
Section 7.3 Other Allocation Rules ..... 18
Section 7.4 Distributions ..... 18

ARTICLE VIII
TAX MATTERS

Section 8.1 Tax Status ..... 19
Section 8.2 Tax Elections ..... 19
Section 8.3 Tax Matters Member ..... 19
Section 8.4 Tax Returns ..... 20

ARTICLE IX
DISSOLUTION, WINDING-UP AND TERMINATION

Section 9.1 Dissolution ..... 20
Section 9.2 Winding-Up and Termination ..... 21

ARTICLE X
MISCELLANEOUS

Section 10.1 Governing Law ..... 22
Section 10.2 Dispute Resolution ..... 22
Section 10.3 Notices ..... 24
Section 10.4 Inuring Clause ..... 25
Section 10.5 Waiver of Partition of Company Property ..... 25
Section 10.6 Amendments ..... 25
Section 10.7 Counterparts ..... 25
Section 10.8 Entire Agreement ..... 26
Section 10.9 Waivers ..... 26

Section 10.10 Severability ....................26
Section 10.11 Interpretation ....................26
Section 10.12 Further Assurances ....................26

ARTICLE XI
CONSTRUCTION

Section 11.1 Construction ....................26

<u>Exhibits and Schedules</u>:

Exhibit A Definitions

Schedule 3.2 Initial Directors

# LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT (this "***Agreement***") of BASIN TRANSLOAD, LLC, a Delaware limited liability company (the "***Company***"), is adopted, executed and entered to as of February 1, 2013 (the "***Effective Date***") by and among TGC, L.P., a Montana limited partnership ("***TGC***"), MBI Holdings, LLC, a North Dakota limited liability company ("***MBI***") and Global Operating LLC, a Delaware limited liability company ("***Global***").

## WITNESSETH:

**WHEREAS**, contemporaneously with the execution of this Agreement, the Company is being converted to a limited liability company pursuant to the Act by the filing of a Certificate of Conversion and a Certificate of Formation with the Secretary of State of the State of Delaware; and

**WHEREAS**, the Members are entering into this Agreement to, among other things, (a) set forth the governance and operating procedures of the Company and (b) set forth their respective rights and obligations with respect to the Company.

**NOW, THEREFORE**, for and in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I
## THE COMPANY; DEFINITIONS

Section 1.1 Term. The Company's existence shall be perpetual, unless and until it is dissolved in accordance with Article XI.

Section 1.2 Purpose of the Company; Powers. The Company has been formed for the purpose of engaging in any business and activities permitted by the Act and approved by the Company Board. The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to, or in furtherance of, the foregoing.

Section 1.3 Name of the Company. The name of the Company is "Basin Transload, LLC" and all business and affairs of the Company must be conducted in that name or such other names that comply with Law as the Company Board may approve.

Section 1.4 Principal Place of Business; Registered Offices. The principal place of business of the Company shall be in Waltham, Massachusetts or such other place as the Company Board may approve (the "***Principal Office***"). The Company shall maintain registered offices in other states as may be required by Law.

Section 1.5 Definitions. In this Agreement, all capitalized terms used but not defined herein shall have the meanings set forth on Exhibit A.

## ARTICLE II
## RESPONSIBILITIES OF THE MEMBERS

Section 2.1 Responsibilities of the Members.

(a) Except as expressly provided in the Business Opportunity Agreement, each Member and its Affiliates may engage, without the consent or approval of any other Member or the Company, in any business, business opportunities, transactions, ventures or other arrangements of any nature or description, including a business that may be competitive with or the same as or similar to the business of the Company, regardless of the geographic location of such business, all without any duty or obligation to account to any other Member or the Company in connection therewith. To the extent that, at law or in equity, a Member (or its Director, if applicable) has any fiduciary or other duty to the Company or any other Member, such Member's duties will be limited to those expressly set forth in this Agreement, in the Business Opportunity Agreement and as otherwise created by the implied contractual covenant of good faith and fair dealing. To the extent that, at law or in equity, any Member (or its Director, if applicable) has any fiduciary or other duty to the Company or any other Member pursuant to this Agreement or Law, such Member (or its Director, if applicable) shall not be liable to the Company or any other Member for breach of fiduciary duty for the Member's (or its Director's, if applicable) good faith reliance on the provisions of this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, (i) a Member (through its Director, if applicable, or otherwise) shall be permitted to vote its Member Interest in its own self-interest and (ii) except as expressly provided in the Business Opportunity Agreement, (A) the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to any Member, (B) no Member that (directly or through an Affiliate) acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Company shall have any duty to communicate or offer such opportunity to the Company or any other Member, and such Member shall not be liable to the Company, to any other Member or to any other Person for breach of any fiduciary or other duty by reason of the fact that such Member pursues or acquires such opportunity or information and (C) neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other businesses, investments or activities of a Member or to the proceeds derived therefrom.

Section 2.2 No State Law Partnership; Liability to Third Parties. The Members intend that the Company shall be a limited liability company and, without limiting the provisions of Section 4.3, Article VII and Article VIII with respect to United States federal income tax treatment (and other tax treatment consistent therewith), the Company shall not be a state law partnership (including a limited partnership) or joint venture, and no Member shall be a state law partner or joint venturer of any other Member, for any purposes, and this Agreement may not be construed to suggest otherwise. No Member shall be liable for the debts, obligations or liabilities of the Company solely by reason of being a Member.

Section 2.3 No Power to Bind Company or Another Member. No Member nor any of its Affiliates may take any action purporting to bind the Company, any other Member or any other Member's Affiliates, except as provided in this Agreement. All actions undertaken by the Members and their respective Affiliates, or any of them, are at their sole risk and expense except

for actions (and/or obligations) to the extent, if any, that the Company expressly ratifies (or assumes, as applicable) such actions and/or obligations in accordance with this Agreement. Subject to the immediately preceding proviso, no Member (nor any of its respective Affiliates) is an agent, employee, contractor, vendor, representative or (except for tax purposes) partner of any other Member or its Affiliates by virtue of its execution of this Agreement, and no Member (nor any of its respective Affiliates) may hold itself out as such.

Section 2.4 Ownership. Title to assets, whether tangible, intangible, real, personal or mixed, of the Company shall be deemed to be owned by the Company as an entity, and no Member shall individually have any direct ownership in property of the Company. Title to any or all of the assets of the Company shall be held in the name of the Company.

Section 2.5 Limitation of Liability; Indemnification.

(a) Limitation of Liability. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE MEMBERS AND THE COMPANY EXPRESSLY AGREE THAT NONE OF THE MEMBERS OR THE COMPANY SHALL BE LIABLE TO ANY PERSON (INCLUDING THE COMPANY OR ANY OTHER MEMBER), FOR ANY EXEMPLARY, PUNITIVE, INDIRECT, CONSEQUENTIAL, REMOTE OR SPECULATIVE DAMAGES OR LOST PROFITS; *PROVIDED, HOWEVER*, THAT THE FOREGOING LIMITATIONS SHALL NOT APPLY TO DAMAGES PAYABLE WITH RESPECT TO THIRD PARTY CLAIMS FOR WHICH A MEMBER OR THE COMPANY IS OBLIGATED TO PROVIDE INDEMNIFICATION PURSUANT TO THIS SECTION 2.5.

(b) Indemnification Obligations of the Indemnifying Member. Subject to Section 2.5(a), each Member (an "***Indemnifying Member***") shall INDEMNIFY, PROTECT, DEFEND, RELEASE and HOLD HARMLESS each other Member's Member Indemnified Parties from and against any and all Claims suffered by each other Member's Member Indemnified Parties as a result of, caused by, or arising out of any breach of any covenant of the Indemnifying Member under this Agreement. The indemnification obligations set forth in this Section 2.6(b) are limited to the acts of an Indemnifying Member, and do not extend to the acts of an Affiliate of the Indemnifying Member pursuant to the Shared Services Agreement.

(c) Indemnification Obligations of the Company. Subject to Section 2.5(a), the Company shall INDEMNIFY, PROTECT, DEFEND, RELEASE and HOLD HARMLESS, any Person from and against any and all Claims suffered by such Person, as a result of, caused by, or arising out of such Person's being (or being threatened to be made) a party to, or involved in, any threatened, pending or completed Action, or any appeal of any Action or any inquiry or investigation that could lead to any Action, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member of the Company or a Director (or a member of a committee of the Company Board), or while such Person is or was serving at the request of the Company Board as a director, officer, partner, venturer, member, trustee, employee, agent or similar functionary of another foreign or domestic entity or other enterprise, to the extent the Action relates to any such above-described relationships with, status with respect to, or representation of any such Person, to the fullest extent permitted by Law, as the same exists or may hereafter be amended; *provided, however*, that the Company shall have no defense or indemnity obligations to any Person under this Section 2.5(c) to the extent the Action

is covered by any indemnity made by such Person under Section 2.5(b). The Company shall advance expenses to, and reimburse the expenses of, any Person to which the Company owes any defense or indemnity obligation pursuant to this Section 2.5(c).

(d) Acknowledgment of Nature of Indemnification. THE MEMBERS EXPRESSLY ACKNOWLEDGE THAT THE INDEMNIFICATION PROVIDED IN THIS SECTION 2.5 (i) COULD INVOLVE INDEMNIFICATION FOR NEGLIGENCE OR UNDER THEORIES OF STRICT LIABILITY AND (ii) HAVE BEEN EXPRESSLY NEGOTIATED IN EVERY DETAIL, ARE INTENDED TO BE GIVEN FULL AND LITERAL EFFECT, AND SHALL BE APPLICABLE WHETHER OR NOT THE CLAIMS IN QUESTION ARISE OR AROSE FROM THE ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT, OTHER THAN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OF ANY INDEMNIFIED PERSON.

## ARTICLE III
## MANAGEMENT OF THE COMPANY

Section 3.1 Management. The management of the Company is fully vested in the Members, acting exclusively in their Member capacities. To facilitate the orderly and efficient management of the Company, the Members shall act collectively through a "committee of the whole" referred to herein as the "***Company Board***". The Company will not have "managers," as that term is used in the Act, it being understood that the Directors do not constitute "managers." Decisions or actions taken by the Company Board in accordance with the provisions of this Agreement shall constitute decisions or actions by the Company and shall be binding on each Member, Director and (if applicable) employee or officer of the Company. Any Person dealing with the Company, other than a Member or a Member's Affiliate, may rely on the authority of the Company Board in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance with it, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Except as otherwise agreed by the Company Board, no Member shall have any unilateral right or authority to take any action on behalf of the Company or to bind or commit the Company. Except as otherwise expressly provided in this Agreement, each Member hereby (a) specifically delegates to the Company Board its rights and powers to manage and control the business and affairs of the Company in accordance with the provisions of Section 18-407 of the Act, and (b) revokes its right to bind the Company, as contemplated by the provisions of Section 18-402 of the Act.

Section 3.2 Company Board. The Company Board shall consist of one Director appointed by each Member that owns a Percentage Interest equal to or greater than five percent (5%). The initial Directors are set forth on Schedule 3.2. Each Director appointed to the Company Board shall serve until his or her successor is duly appointed or until his or her earlier death, removal or resignation. Any named executive officer of Global may act as an alternate Director for Global if its appointed Director is unavailable.

Section 3.3 Removal and Replacement of Directors. Each Member shall have the right, at any time and for any reason (or for no reason), to remove its Director. Should any Director be unwilling or unable to continue to serve, or otherwise cease to serve (including by reason of his or her involuntary removal), then the Member that appointed such Director shall be

entitled fill the resulting vacancy on the Company Board; *provided, however*, that any individual appointed as a Director by TGC or MBI (or their respective permitted transferees), other than the initial Directors set forth on Schedule 3.2, shall be subject to the consent of Global, such consent not to be unreasonably withheld or delayed. In the event that James R. Bennett is is unwilling or unable to continue to serve, or otherwise ceases to serve, as a Director, Global hereby consents to the appointment of Teresa Bottrell as a Director by TGC. In the event that James Arthaud is unwilling or unable to continue to serve, or otherwise ceases to serve, as a Director, Global hereby consents to the appointment of Tony Hauck as a Director by MBI, provided he is serving as Chief Financial Officer or other executive officer position of MBI at the time of such appointment.

Section 3.4 Meetings of the Company Board.

(a) Meetings of the Company Board shall be held at least quarterly and, otherwise, at the request of any Member that is represented by a Director, on at least five (5) Business Days' prior written notice.

(b) With respect to any action or decision requiring the approval of the Company Board, the attendance of Directors, present in person, by telephone (or similar communications equipment by means of which all persons participating in the meeting can hear each other) or represented by proxy, representing sufficient Percentage Interests for the approval of all decisions to be approved at such meeting shall constitute a quorum of the Company Board for the transaction of business with respect to such action or decision. Each Member agrees to use commercially reasonable efforts to cause its Director to attend each properly called meeting of the Company Board.

(c) Directors may participate in and hold a meeting of the Company Board by means of conference telephone, videoconference equipment or similar communications equipment by which all Persons participating in the meeting can hear each other, and participation in such manner in any such meeting constitutes presence in person at such meeting.

(d) A Director appointed by Global shall preside at all meetings of the Company Board, but any Director may submit any matter for consideration and approval or rejection by the Company Board. A secretary of the Company Board shall be appointed by Global to prepare minutes of meetings of the Company Board.

(e) Each Director shall have the full authority to act on behalf of the Member that appointed such Director. The action of a Director at a meeting (or through a written consent) of the Company Board shall bind the Member that appointed such Director, and the other Members shall be entitled to rely upon such action without further inquiry or investigation as to the actual authority (or lack thereof) of such Director.

(f) Each Member shall be solely responsible for all costs and expenses incurred by the Directors appointed by such Member in connection with their service as Directors, including all costs of traveling to and attending meetings of the Company Board. The Directors shall not receive any compensation from the Company for their service hereunder.

Section 3.5 Notice of Company Board Meetings. Written notice of all meetings of the Company Board must be given to all Directors at least five (5) Business Days' prior thereto. Any such notice, or waiver thereof, need not state the purpose of such meeting, except as may otherwise be required by Law. Attendance of a Director at a meeting (including pursuant to Section 3.4(c)) shall constitute a waiver of notice of such meeting, except where such Director attends the meeting for the sole purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Section 3.6 Actions by the Company Board. In any vote of the Company Board, each Director's vote shall equal the Percentage Interest of the Member that appointed such Director. Except as expressly provided in this Agreement, all decisions of the Company Board shall require the approval of Directors representing a majority of the Percentage Interests entitled to vote on such matter.

Section 3.7 Action by Directors Without a Meeting. To the extent permitted by Law, the Company Board may act without a meeting, without prior notice and without a vote so long as Directors representing sufficient Percentage Interests for the approval of such decision consent in writing or by electronic communication to the adoption of a resolution authorizing the action. The resolutions or written consents of the members of the Company Board shall be filed with the minutes of the proceeding of the Company Board. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.8 Annual Budgets.

(a) For each fiscal year, the activities and operations of the Company for such period shall be set forth in an annual operating budget (which operating budget shall include maintenance expenses, regardless of whether such expenses are capitalized for accounting purposes) and an annual capital budget (which capital budget shall include proposed expansion projects at the Company's existing facilities and proposed new projects at other locations, if applicable). Each such annual budget shall be subject to approval by the Company Board through the affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of the Percentage Interests of those Directors entitled to vote; *provided, however*, that any amendment to an approved annual operating or capital budget that individually (or in the aggregate with other amendments during the same fiscal year) represents less than twenty percent (20%) of the aggregate expenditures set forth in the original approved annual operating or capital budget shall require approval by the Company Board through the affirmative vote of one or more Directors representing a majority of the Percentage Interests of those Directors entitled to vote.

(b) The Directors shall use reasonable efforts to approve all expenditures and items in each annual operating and capital budget no later than December 31st of each calendar year prior to the beginning of the next succeeding calendar year. If the Company Board is unable to approve any or all of the expenditures and items in any annual operating and capital budget by such date, then until such approval is obtained, expenditures and items equal to the amounts therefor that were included in the immediately preceding calendar year's approved annual

operating or capital budget, as applicable, increased by twenty percent (20%), shall be considered the approved budgeted amounts.

Section 3.9 Bank Financings. Any bank financing to be obtained by the Company shall be subject to approval by the Company Board through the affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of the Percentage Interests of those Directors entitled to vote.

Section 3.10 Arm's Length Pricing. Subject to the Business Opportunity Agreement, if any Member engages in any business with the Company, such Member shall pay for any goods and services related to such business at the same rate and at the same time as any other customer of the Company. A Member shall not receive a more favorable rate or charge simply by reason of its status as a Member, unless such more favorable rate or charge is approved by the affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of the Percentage Interests of those Directors entitled to vote.

Section 3.11 Officers. The Company shall have such officers as may be designated from time to time by the Directors. Each officer so designated shall have all such powers and perform such duties as usually appertain to that office or as may be prescribed by the Directors. Each officer shall hold office until his successor shall be appointed and shall qualify or until his death or until he shall resign or shall be removed by the Directors. The salaries or other compensation, if any, of the officers shall be fixed from time to time by the Directors.

## ARTICLE IV
## FISCAL YEAR; BOOKS OF ACCOUNT; FINANCIAL REPORTS

Section 4.1 Fiscal Year. The fiscal year of the Company shall be the calendar year.

Section 4.2 Books of Account. The Company shall keep the books of account of the Company at the Principal Office, or at such other place or places as may be approved by the Company Board. The books of account shall be maintained on an accrual basis in accordance with GAAP, and shall show all items of investment, income and expense.

Section 4.3 Reports.

(a) The Company shall provide (or cause to be provided) the following financial information of the Company to the Members:

(i) an unaudited monthly income statement and balance sheet provided no later than forty-five (45) days following the end of each month;

(ii) an unaudited quarterly income statement, balance sheet, statement of changes in Members' capital and statement of cash flow within forty-five (45) days after the end of each fiscal quarter; and

(iii) an unaudited annual income statement, balance sheet, statement of changes in Members' capital and statement of cash flow within ninety (90) days after the end of each fiscal year.

(b) The financial statements set forth in Section 4.3(a) shall be prepared in accordance with GAAP (except as therein noted) and shall fairly present the financial position, financial results of operations, and changes in Members' capital. The Company shall bear the costs of preparing all of the financial statements and reports described in Section 4.3(a).

(c) The Company shall deliver to each Member such accounting and tax information and schedules as shall be necessary for the tax reporting purposes of such Member with respect to the relevant calendar year.

(d) In addition to the obligations under the foregoing provisions of this Section 4.3, the Company shall timely prepare and deliver (or cause to be timely prepared and delivered) to any Member, upon its request and at its expense, all financial statements, notes thereto and additional financial information as may be required, based on the advice of legal counsel, in order for such Member or an Affiliate of such Member to comply with any requirements under (i) the Securities Act (and the rules and regulations promulgated thereunder), (ii) the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder and (iii) any national securities exchange or automated quotation system.

Section 4.4 Accounts. The Company shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company's name with such financial institutions and firms that the Company Board determines.

## ARTICLE V
## CAPITAL CONTRIBUTIONS; FAILURE TO CONTRIBUTE; CAPITAL ACCOUNTS

Section 5.1 Capital Contributions.

(a) No Member shall be required to make any Capital Contribution other than (i) its respective Percentage Interest share of any amounts necessary to fund the operating budget, as amended, that has been approved pursuant to Section 3.8; (ii) its respective Percentage Interest share of any amounts necessary to fund any capital budget, as amended, that has been approved pursuant to Section 3.8 which approval included the affirmative vote of Directors representing one hundred percent (100%) of the Percentage Interests of those Directors entitled to vote, and (iii) its respective Percentage Interest share of any additional capital contributions approved by the affirmative vote Directors representing one hundred percent (100%) or more of the Percentage Interests of those Directors entitled to vote, including the affirmative vote of the Director appointed by such Member (each, a "Required Contribution").

(b) Each Member agrees to contribute to the Company (within five (5) Business Days of any capital call issued by the Company with respect thereto, which capital call may be given via electronic mail) all Required Contributions.

Section 5.2 Special Contributions. In the event that a Member whose Director did not vote in favor of a capital budget, as amended, that has been approved pursuant to Section 3.8 or

any other additional capital contributions approved by the affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of those Directors entitled to vote does not contribute its respective Percentage Interest share of any amounts necessary to fund such capital budget or such capital contributions, such Member shall be referred to herein as a "***Non-Participating Member***", any project for which there is a Non-Participating Member shall be referred to as a "***Special Project***"), any capital contributions by the other Members (the "***Participating Members***") for a Special Project shall be referred to as "***Special Contributions***" and the following provisions shall apply:

(a) All Special Contributions required to fund such Special Project shall be made by the Participating Members (pro rata in accordance with their respective Percentage Interests);

(b) All distributions attributable to (i) the incremental net revenues generated by such Special Project and (ii) the consideration received on a disposition of a Special Project shall be made to the Participating Members (pro rata in accordance with their respective Percentage Interests) until the distributions made to each such Participating Member equals three hundred percent (300%) of such Participating Member's Special Contributions with respect to such Special Project (the "***Trigger Event***");

(c) From and after the Trigger Event, for any Special Project, all distributions attributable to such Special Project shall be made to all of the Members pro rata in accordance with their respective Percentage Interests.

Section 5.3 Failure to Make Required Contributions.

(a) If a Member fails to contribute all or any portion of a Required Contribution that such Member (the "***Delinquent Member***") is required to make as provided in this Agreement, then, while such Member is a Delinquent Member, the non-Delinquent Members may (but shall have no obligation to) elect to advance the entire amount of the Delinquent Member's Required Contribution that the Delinquent Member failed to contribute as additional capital contributions by the non-Delinquent Members (in proportion to the respective Percentage Interests of the non-Delinquent Members), in which case the Delinquent Member's Percentage Interests shall be adjusted as set forth below:

(i) If at any time a non-Delinquent Member has contributed the amount of a Delinquent Member's Required Contribution that such Delinquent Member has failed to contribute, then each Member's Percentage Interest shall be recomputed by solving the following equation for "X" for each Member:

For each non-Delinquent Member, $X = (A + B + C) / (D + E)$

For each Delinquent Member, $X = C / (D + E)$

Where "X" is such Member's recomputed Percentage Interest; (A) "A" is equal to the amount (if any) of the Delinquent Member's Required Contribution that is contributed by such non-Delinquent Member; (B) "B" is equal to the amount of the requested Required Contribution made by such Member on its own behalf; (C) "C" is equal to the product (calculated immediately before such recomputation) of

(1) such Member's Percentage Interest and (2) the Fair Market Value of the Company's assets (net of any liabilities of the Company), (D) "D" is equal to the aggregate amount of the requested Required Contribution advanced by all Members (including the amount of the Delinquent Member's Required Contribution that is contributed by all non-Delinquent Members); and (E) "E" is the Fair Market Value of the Company's assets (net of any liabilities of the Company) calculated immediately before such recomputation.

(b) For the avoidance of doubt, a Non-Participating Member that does not contribute a Special Contribution with respect to a Special Project pursuant to Section 5.2 shall not be a Delinquent Member for purposes of this Section 5.3.

(c) If any Member is a Delinquent Member, then, in addition to the rights granted elsewhere in this Section 5.3, the Company and the non-Delinquent Members shall each have the right to exercise the following remedies with respect to the Delinquent Member:

(i) the Company or the non-Delinquent Members may at any time take such action (including instigating court Actions) as the Company or the non-Delinquent Members may deem appropriate to obtain payment by the Delinquent Member of the portion of the Delinquent Member's Required Contribution that the Delinquent Member failed to contribute, along with all costs and expenses associated with the collection thereof; and

(ii) the Company or the non-Delinquent Members may at any time exercise any other rights and remedies available under this Agreement or at law or in equity.

Section 5.4 Capital Accounts. The Company shall establish and maintain a separate Capital Account for each Member in accordance with the rules of Treasury Regulation section 1.704 1(b)(2)(iv). Each Member's Capital Account (a) shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the Book Value of property contributed by such Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Code Section 752) and (iii) allocations to such Member of Profits and any other items of income or gain allocated to such Member, and (b) shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Book Value of property distributed to such Member by the Company (net of liabilities secured by the distributed property that such Member is considered to assume or take subject to under Code Section 752), and (iii) allocations to such Member of Losses and any other items of loss or deduction allocated to such Member. On the transfer of all or part of a Member's Member Interest, the Capital Account of the transferor that is attributable to the transferred Member Interest shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE VI
## RESTRICTIONS ON TRANSFERS

Section 6.1 Generally.

(a) No Member may make a Transfer unless such Transfer is made in accordance with this Article VI and applicable Law.

(b) Any purported Transfer in breach of the terms of this Agreement shall be null and void *ab initio*, and the Company shall not recognize any such prohibited Transfer.

(c) The Members acknowledge and agree that a breach of any of the terms of this Article VI by a Member will likely cause irreparable injury to the Company and to the other Members for which monetary damages and other remedies at law are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of such Member to comply with the provisions of this Article VI and (ii) the uniqueness of the business of the Company and the relationship among the Members. Accordingly, the Members acknowledge and agree that the provisions of this Article VI may be enforced by specific performance.

Section 6.2 Permitted Transfers. Notwithstanding the provisions of Section 6.1, each Member shall have the right, without first receiving the written consent of the other Members, to Transfer all (but not less than all) of its Member Interests to an Affiliate of such Member (and upon any such Transfer of Member Interests, such Affiliate shall immediately become a Member). For the avoidance of doubt, the sale or transfer of all or substantially all of the assets or limited partnership interests of Global Partners LP shall not be considered a Transfer for purposes of this Agreement.

Section 6.3 Right of First Refusal.

(a) Any Member (a "***ROFR Transferor***") may make a Transfer (i) if such Transfer is pursuant to a Qualifying Offer and complies with the provisions of this Section 6.3 and the other restrictions and limitations contained in this Article VI or (ii) to any other Person under circumstances other than those described in clause (i) above or Section 6.2, if such ROFR Transferor receives the written consent of the other Members.

(b) Except with respect to Transfers according to the terms of Section 6.2 or 6.3(a)(ii), if a ROFR Transferor receives, and desires to accept, a Qualifying Offer from a ready, willing and able Transferee with respect to such ROFR Transferor's Member Interest, then such ROFR Transferor shall first offer to Transfer its Member Interest (the "***Subject Interest***") to the other Members. Such offer shall be made by an irrevocable written offer (the "***ROFR Transfer Notice***") to Transfer all of the Subject Interest and shall contain a copy of the executed definitive agreement, including the name of the Transferee, the price and the proposed closing date (which shall not be later than sixty (60) days following the expiration of the ROFR Option Period) and the other terms and conditions, for the transaction in which such ROFR Transferor proposes to Transfer the Subject Interest. The other Members shall have thirty (30) days (the "***ROFR Option Period***") after receipt of the ROFR Transfer Notice within which to advise such ROFR Transferor whether or not it will acquire the Subject Interest upon the terms and conditions contained in the ROFR Transfer Notice. If both other Members elect to acquire the Subject Interest upon the terms and conditions contained in the ROFR Transfer Notice, they will acquire such Subject Interest pro rata in accordance with their respective Percentage Interests.

(c) If the other Members decline to acquire all of the Subject Interest in accordance with this Section 6.3, then the ROFR Transferor may Transfer such Subject Interest to the Transferee named in the ROFR Transfer Notice delivered to the other Members upon the terms described in such ROFR Transfer Notice. If such Transfer does not occur in accordance with the terms of such ROFR Transfer Notice by the proposed closing date under the definitive agreement, then such attempted Transfer shall be null and void *ab initio* and such ROFR Transferor shall again be subject to the provisions of this Section 6.3.

(d) Upon the consummation of any Transfer of such ROFR Transferor's Member Interest pursuant to the provisions of this Section 6.3, the Transferee shall automatically become a party to and be bound by this Agreement and shall thereafter have all the obligations of a Member hereunder; *provided, however*, that such Transferee may only become a Substituted Member in accordance with the provisions of Section 6.7.

Section 6.4 Drag Along and Tag-Along Rights.

(a) If, at any time, Global elects to consummate a Transfer to any Person or Persons (other than any Affiliate Transfer) (collectively, a "***Drag-Along Transferee***") in a bona fide arm's length transaction or series of bona fide arm's-length related transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise) of all of Global's Membership Interests (a "***Drag-Along Sale***"), then:

(i) Global may, subject to the other provisions of this Section 6.4 and after first complying with the provisions of Section 6.3, require each other Member (each, a "***Drag-Along Co-Seller***") to Transfer all of such Member's Membership Interests (such rights being referred to as "***Drag-Along Rights***") in the manner set forth in this Section 6.4;

(ii) If Global does not exercise its Drag-Along Rights as provided in thie Section 6.4, then each other Member may, subject to the other provisions of this Section 6.4, require that Global cause the Drag-Along Transferee in such Drag-Along Sale to purchase all of such Member's Membership Interests (such rights being referred to as "***Tag-Along Rights***" and any Member that exercises such Tag-Along Rights being referred to as a "***Tag-Along Co-Seller***")

(iii) Subject to Section 6.4(b), each Drag-Along Co-Seller and Tag-Along Co-Seller, as applicable will Transfer its Membership Interests on substantially the same terms (other than aggregate price) and conditions applicable to, and for the same type of consideration payable to, Global, at the price calculated in accordance with Section 6.4(a)(iv); and

(iv) The aggregate purchase price payable for the Membership Interests purchased by a Drag-Along Transferee will be allocated among Global and any Drag-Along Co-Sellers or Tag-Along Co-Sellers, as applicable, participating in such Drag-Along Sale, subject to Section 6.4(b) below, based upon the respective Percentage Interests of the Members whose Membership Interests are being so Transferred.

(b) In connection with a Drag-Along Sale, each Drag-Along Co-Seller or Tag-Along Co-Seller participating in such sale shall execute such documents, and make such representations, warranties, covenants and indemnities, as are executed and made by Global. In connection with any Drag-Along Sale, each Member agrees to (i) consent to and raise no objections against the Drag-Along Sale or the process pursuant to which the Drag-Along Sale was arranged, (ii) waive and confirm such Member has no dissenter's rights, appraisal rights and other similar rights, (iii) subject to the foregoing provisions of this Section 6.4(b), take all actions reasonably required or requested by Global to consummate such Drag-Along Sale and (iv) subject to the foregoing provisions of this Section 6.4(b), comply with the terms of the documentation relating to the Drag-Along Sale.

(c) Prior to consummating any Drag-Along Sale, Global shall be required to give written notice (the "***Drag-Along Notice***") to each other Member within ten (10) Business Days after the end of the ROFR Option Period, which Drag-Along Notice shall indicate whether or not Global is exercising its Drag-Along Rights. If Global elects not to exercise its Drag-Along Rights, then each other Member shall have ten (10) Business Days to exercise their respective Tag-Along Rights. In the event that the material terms and/or conditions set forth in the Drag-Along Notice are thereafter amended, Global promptly (within 48 hours) will give written notice (an "***Amended Drag-Along Notice***") of the amended material terms and conditions of the proposed Transfer to each other Member. Each Drag-Along Notice and Amended Drag-Along Notice will set forth at least: (i) the name and address of the proposed Drag-Along Transferee, (ii) the proposed amount and form of consideration and terms and conditions of payment offered by the Drag-Along Transferee, and (iii) the other material terms of the proposed transaction including the expected closing date of the transaction if known by Global. All information concerning a proposed Drag-Along Sale, including information set forth in any Drag-Along Notice or Amended Drag-Along Notice shall be kept confidential by the Members (other than Global).

Section 6.5 Special Purchase Right.

(a) If (i) TGC or MBI undergoes a Change in Control Event or (ii) any Member (A) is dissolved and wound up, (B) has pledged its Member Interest under a Lien held by a third party and such third party initiates a foreclosure or equivalent proceedings (or a conveyance in lieu of such proceedings) on such Lien, or (C) becomes a Bankrupt Member, the affected Member shall be obligated to notify the other Members in writing, and the other Members shall have the right (in proportion to their respective Percentage Interests or in such other proportions as they may agree), by written notice delivered within sixty (60) days after notice of such event is sent by the affected Member (or at any time after such event has occurred and prior to such notice having been received) to acquire the entire Membership Interest owned by such Member (or its successors in interest) at a price equal to the Fair Market Value of such Membership Interest, and such affected Member (or its successors in interest) shall be obligated to sell its Membership Interest as provided in this Section 6.5.

(b) The Fair Market Value shall be determined as of the last day of the calendar month immediately preceding the event that triggered the sale purchase hereunder (the "***Determination Date***"); *provided, however, that* for purposes of determining the purchase price,

the Fair Market Value shall be reduced by any distributions made during the time period between the Determination Date and the closing of the purchase and sale.

Section 6.6 Documentation; Validity of Transfers. The Company shall not recognize for any purpose any purported Transfer of a Member Interest unless and until the applicable provisions of this Article VI have been satisfied and the Company has received a document in a form reasonably acceptable to the Company executed by both the transferring Member and the Transferee that (a) includes the notice address of the Transferee and such Person's agreement to be legally bound by this Agreement with respect to the Member Interest being obtained, and (b) contains a representation and warranty that (i) the Transfer was made in accordance with all Laws (including state and federal securities Laws) and the terms and conditions of this Agreement and (ii) the Agreement has been duly and validly authorized by such Person and constitutes a legal, valid and binding obligation of such Person, enforceable in accordance with its terms. Each Transfer (and, if applicable admission of a Transferee as a Substituted Member) complying with the provisions of this Article VI is effective against the Company as of the first (1st) Business Day of the month immediately succeeding the month in which (x) with respect to a Transfer of a Member Interest, the Company receives the document required by this Section 6.6 reflecting such Transfer and (y) the other requirements of Article VI have been met.

Section 6.7 Substituted Members.

(a) Persons, including Transferees, may be admitted to the Company as Substituted Members as provided under the terms of this Section 6.7. Except as expressly provided otherwise, any Transferee with respect to a Transfer made in accordance with this Article VI shall be admitted automatically as a Substituted Member upon compliance with this Article VI with respect to such Transfer, without the consent or approval of any other Person; *provided, however*, that any Transferee that is not already a Member at the time of the Transfer and acquires a Member Interest by foreclosure shall not be admitted as a Substituted Member without the written consent of the other Members.

(b) Upon becoming a Substituted Member, (i) such Substituted Member shall have all of the powers, rights, privileges, duties, obligations and liabilities of a Member, as provided in this Agreement and by Law with respect to the Member Interest so Transferred, and (ii) the Member who Transferred the Member Interest shall be relieved of all of the obligations and liabilities with respect to such Member Interest except those liabilities and obligations relating to such Member Interest that accrued prior to the applicable Transfer.

## ARTICLE VII
## DISTRIBUTIONS; ALLOCATIONS

Section 7.1 Allocations for Capital Account Purposes.

(a) Profits and Losses. After giving effect to the allocations provided in Section 7.1(b) and Section 7.1(c), and subject to Section 9.2(a)(iii)(C), Profits and Losses (and to the extent determined by the Company Board to be necessary to achieve the resulting Capital Account balances described below, any allocable items of gross income, gain, loss and expense includable in the computation of Profits and Losses) for each Allocation Period shall be allocated

among the Members during such Allocation Period, in such a manner as shall cause the Capital Accounts of the Members (as adjusted to reflect all allocations under Section 7.1(b) and Section 7.1(c) and all distributions through the end of such Allocation Period) to equal, as nearly as possible:

(i) the distribution (if any) that such Member would receive if, on the last day of the Allocation Period, (x) all Company assets were sold for cash equal to their Book Values, taking into account any adjustments thereto for such Allocation Period, (y) all Company liabilities were satisfied in full according to their terms (limited, with respect to each nonrecourse liability of the Company, to the Book Values of the assets securing such liability if such Book Value is less than such nonrecourse liability), and (z) all of the Company's cash on hand, including the net proceeds of such sale (after satisfaction of such liabilities), is distributed in full pursuant in accordance with Section 7.4, minus

(ii) the sum of (x) the amount, if any, which such Member would be obligated to contribute to the capital of the Company immediately after such sale, (y) such Member's share of Minimum Gain (if any) as computed immediately prior to such sale and (z) such Member's share of Member Nonrecourse Debt Minimum Gain (if any), as computed immediately prior to such sale.

(b) Special Allocations. Notwithstanding any other provision of this Section 7.1, the following special allocations shall be made for such Allocation Period in the following order and priority:

(i) Nonrecourse Deductions shall be allocated to the Members in accordance with Percentage Interests.

(ii) Member Nonrecourse Deductions attributable to Member Nonrecourse Debt shall be allocated to the Members bearing the Economic Risk of Loss for such Member Nonrecourse Debt as determined under Treasury Regulation Section 1.704-2(b)(4). If more than one Member bears the Economic Risk of Loss for such Member Nonrecourse Debt, the Member Nonrecourse Deductions attributable to such Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the Economic Risk of Loss. This Section 7.1(b)(ii) is intended to comply with the provisions of Treasury Regulation Section 1.704-2(i) and shall be interpreted consistently therewith.

(iii) Notwithstanding any other provision hereof to the contrary, if there is a net decrease in Minimum Gain for an Allocation Period (or if there was a net decrease in Minimum Gain for a prior Allocation Period and the Company did not have sufficient amounts of income and gain during prior periods to allocate among the Members under this Section 7.1(b)(iii)), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in such Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(g)(2)). This Section 7.1(b)(iii) is intended to constitute a minimum gain chargeback under Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(iv) Notwithstanding any provision hereof to the contrary except Section 7.1(b)(iii) (dealing with Minimum Gain), if there is a net decrease in Member Nonrecourse Debt Minimum Gain for an Allocation Period (or if there was a net decrease in Member Nonrecourse Debt Minimum Gain for a prior Allocation Period and the Company did not have sufficient amounts of income and gain during prior periods to allocate among the Members under this Section 7.1(b)(iv), items of income and gain shall be allocated to each Member in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treasury Regulation Section 1.704-2(i)(4)). This Section 7.1(b)(iv) is intended to constitute a partner nonrecourse debt minimum gain chargeback under Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(v) Notwithstanding any provision hereof to the contrary except Section 7.1(b)(i) and Section7.1(b)(ii), no Losses or other items of loss or expense shall be allocated to any Member to the extent that such allocation would cause such Member to have a deficit balance in its Adjusted Capital Account (or increase any existing deficit balance in its Adjusted Capital Account) at the end of such Allocation Period. All Losses and other items of loss and expense in excess of the limitation set forth in this Section 7.1(b)(v) shall be allocated to the Members who do not have a deficit balance in their Adjusted Capital Accounts in proportion to their relative positive Adjusted Capital Accounts but only to the extent that such Losses and other items of loss and expense do not cause any such Member to have a deficit in its Adjusted Capital Account.

(vi) Notwithstanding any provision hereof to the contrary except Section 7.1(b)(iii) and Section 7.1(b)(iv), a Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) shall be allocated items of income and gain (consisting of a pro rata portion of each item of income, including gross income, and gain for the Allocation Period) in an amount and manner sufficient to eliminate any deficit balance in such Member's Adjusted Capital Account as quickly as possible; *provided*, *however*, that an allocation pursuant to this Section 7.1(b)(vi) shall be made only if and to the extent that such Member would have deficit Adjusted Capital Account balance after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.1(b)(vi) were not in this Agreement. This Section 7.1(b)(vi) is intended to constitute a qualified income offset under Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(vii) In the event that any Member has a deficit balance in its Adjusted Capital Account at the end of any Allocation Period, such Member shall be allocated items of Company gross income and gain in the amount of such deficit as quickly as possible; *provided*, *however*, that an allocation pursuant to this Section 7.1(b)(vii) shall be made only if and to the extent that such Member would have a deficit balance in its Capital Account after all other allocations provided for in this Article VII have been tentatively made as if Section 7.1(b)(vi) and this Section 7.1(b)(vii) were not in this Agreement.

(viii) To the extent an adjustment to the adjusted tax basis of any Company properties pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant

to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as the result of a distribution to any Member in complete liquidation of such Member's Member Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) if such Section applies, or to the Member to whom such distribution was made if Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4) applies.

(c) Priority Allocations. All items of income, gain, loss, deduction and credit attributable to any Non-Consent Project shall be allocated to the Members (other than to any Non-Consenting Member(s) with respect to such Non-Consent Project) in accordance with the Member's respective Special Contributions to such Non-Consent Project until such time as the Trigger Event with respect to such Non-Consent Project pursuant to Section 5.2 shall have occurred.

Section 7.2 Allocations for Tax Purposes.

(a) Except as otherwise provided herein, for federal income tax purposes, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Section 7.1(a), Section 7.1(b) and Section 7.1(c), except as otherwise provided in this Section 7.2.

(b) In accordance with Code Section 704(c) and the applicable Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value. In the event the Book Value of any property is adjusted pursuant to clause (b) or (d) of the definition of Book Value, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the applicable Treasury Regulations thereunder. For purposes of such allocations, the Company shall elect the remedial allocation method described in Treasury Regulation Section 1.704-3(d).

(c) Any (i) recapture of depreciation or any other item of deduction shall be allocated, in accordance with Treasury Regulations Sections 1.1245-1(e) and 1.1254-5, to the Members who received the benefit of such deductions (taking into account the effect of remedial allocations), and (ii) recapture of grants credits shall be allocated to the Members in accordance with applicable law.

(d) Tax credits of the Company shall be allocated among the Members as provided in Treasury Regulation Sections 1.704 (b)(4)(iii) and 1.704 1(b)(4)(viii).

(e) Allocations pursuant to this Section 7.2 are solely for purposes of U.S. federal, state, and local taxes and, except as otherwise specifically provided, shall not affect, or in any

way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

Section 7.3 Other Allocation Rules.

(a) All items of income, gain, loss, deduction and credit allocable to an interest in the Company that may have been Transferred shall be allocated between the Transferor and the Transferee based on the portion of the fiscal year during which each was recognized as the owner of such interest, without regard to the results of Company operations during any particular portion of that year and without regard to whether cash distributions were made to the Transferor or the Transferee during that year; provided, however, that this allocation must be made in accordance with a method permissible under Code Section 706 and the Treasury Regulations thereunder.

(b) The Members' proportionate shares of the "excess nonrecourse liabilities" of the Company, within the meaning of Treasury Regulation Section 1.752-3(a)(3), shall be allocated to the Members in accordance with Percentage Interests.

(c) The definition of Capital Account set forth in Section 5.4 and the allocations set forth in Section 7.1(b) and Section 7.2 are intended to comply with the Treasury Regulations. If the Company Board determines that the determination of a Member's Capital Account or the allocations to a Member are not in compliance with the Treasury Regulations, the Company Board is authorized to make any appropriate adjustments.

Section 7.4 Distributions.

(a) Subject to Section 7.4(b), the Company shall make distributions of cash (or other property) at such time or times (if any) as the Company Board determines in its sole discretion to the Members in accordance with Percentage Interests.

(b) Notwithstanding Section 7.4(a), distributions attributable to a Special Project shall be made to the Members in accordance with Section 5.2.

(c) The Company shall, subject to the availability of proceeds (as determined by the Company Board in good faith), make cash distributions to each Member on the Tax Distribution Date with respect to each fiscal year to the extent of the required Tax Distribution, if any for such fiscal year. The Company may, subject to the availability of proceeds (as determined by the Company Board in good faith), make advanced distributions to the Members on a quarterly basis based upon estimates of the required Tax Distribution in a manner sufficient to permit the Members to satisfy their quarterly estimated tax payment obligations. All quarterly tax distributions to a Member shall be treated as advances of, and shall offset, the cash distribution payable to the Member (pursuant to this Section 7.4(c)) on the next Tax Distribution Date. Any distributions made pursuant to this Section 7.4(c) to a Member shall be treated as an advance payment of, and shall reduce, the amounts otherwise distributable to such Member pursuant to Section 7.4(a) in subsequent distributions. Notwithstanding anything else in this Agreement, any Tax Distributions to the Members shall at all times be made in accordance with Percentage Interests.

(d) The Company may withhold distributions or portions thereof if it is required to do so by any applicable rule, regulation or law, and each Member hereby authorizes the Company to withhold from and pay on behalf of or with respect to such Member any amount of U.S. federal, state, local or foreign taxes that the Company Board determines that the Company is required to withhold and pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement. Any amounts withheld pursuant to this Section 7.4(d) shall be treated as having been distributed to such Member for all purposes of this Agreement at the time such withholding is made.

## ARTICLE VIII
## TAX MATTERS

Section 8.1 Tax Status. It is the intention of the Members that the Company be classified as a partnership for U.S. federal and state income tax purposes. Unless otherwise approved by the Company Board, neither the Company nor any Member shall make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state Law or to be classified as other than a partnership pursuant to Treasury Regulation section 301.7701-3.

Section 8.2 Tax Elections. The Company shall make the following elections on the appropriate forms or tax returns:

(a) to adopt the calendar year as the Company's fiscal year, if permitted under the Code;

(b) to adopt the accrual method of accounting;

(c) an election pursuant to Code section 754; for clarification, such election shall be made on the initial federal Form 1065 filed by the Company after the Effective Date; and

(d) any other election the Company Board may deem appropriate and in the best interests of the Company.

Section 8.3 Tax Matters Member.

(a) The "***Tax Matters Member***" of the Company pursuant to section 6231(a)(7) of the Code shall be Global, if Global is a Member, or if not, as selected by the Company Board. The Tax Matters Member shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of section 6231(a)(8) of the Code and shall inform each Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the twentieth (20th) Business Day after (or if applicable, such shorter period as may be required by the appropriate statutory or regulation provisions) becoming aware thereof and, within that time, shall forward to the other Members copies of all significant written communications it may receive in that capacity. The Tax Matters Member may not take any action contemplated by sections 6222 through 6231 of the Code without the consent of the Company Board, other than such action as may be required by applicable law. Any reasonable, documented cost or expense incurred by the Tax Matters

Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(b) The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Board of Directors. The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the consent of such Member. Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3)) shall notify the other Members of such settlement agreement and its terms within fifteen (15) days from the date of the settlement.

(c) No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members. If the Company Board consents to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within thirty (30) days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf. Any Member intending to file a petition under Code Sections 6226 or 6228 or any other Code section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(d) If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Member's intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

Section 8.4 Tax Returns. The Company shall prepare and timely file all U.S. federal, state and local and foreign tax returns required to be filed by the Company. Unless otherwise determined by the Tax Matters Member, any income tax return of the Company shall be prepared by an accounting firm selected by the Tax Matters Member. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver to each Member as soon as applicable after the end of each calendar year, but in any event before February 15 of the subsequent year, U.S. federal, state and local income tax Schedule K-1s together with such additional information as may be required by the Members (or their owners) in order to file their individual returns reflecting the Company's operations.

## ARTICLE IX
## DISSOLUTION, WINDING-UP AND TERMINATION

Section 9.1 Dissolution. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each, a "***Dissolution Event***"):

(a) An affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of the Percentage Interests of those Directors entitled to vote; and

(b) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

Section 9.2 Winding-Up and Termination. On the occurrence of a Dissolution Event, the Members agree that Global shall act as the liquidator and the winding up of the Company shall occur in accordance with the following:

(a) The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Company expense, including reasonable compensation to the liquidator if approved by an affirmative vote of one or more Directors representing sixty-seven percent (67%) or more of the Percentage Interests of those Directors entitled to vote. Until final distribution, the liquidator shall continue to operate the properties of the Company with all of the power and authority of the Board. The steps to be accomplished by the liquidator are as follows:

(i) as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made of the assets, liabilities and operations of the Company;

(ii) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(iii) all remaining assets of the Company shall be distributed to the Members as follows:

(A) the liquidator may sell any or all property of the Company, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members;

(B) with respect to all property of the Company that has not been sold, the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(C) Cash and other property of the Company shall be distributed among the Members in accordance with Section 7.4(a) and Section 7.4(b). If the foregoing distributions to the Members do not equal the Members' respective positive Capital Account balances as determined after giving effect to the foregoing adjustments and to all adjustments attributable to allocations of Profits and Losses (or any items thereof) during the taxable year in question and all adjustments attributable to contributions and distributions of money and

property effected prior to such distribution, then the allocations of Profits and Losses (or any items thereof) provided for in this Agreement shall be adjusted to the maximum extent possible to produce a Capital Account balance for each Member that corresponds to the amount of the distribution to such Member.

(b) The costs of winding up shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Company Board. All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses and liabilities theretofore incurred or for the payment of which the Company has committed prior to the date of termination. The distribution of cash or property to a Member in accordance with the provisions of Article IV and this Section 9.2 shall constitute a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its share of all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 18-502(b) of the Act.

(c) On completion of such final distribution, (i) the liquidator shall file a Certificate of Cancellation with the Secretary of State of the State of Delaware and take such other actions as may be necessary to terminate the existence of the Company and (ii) this Agreement shall automatically terminate, and be of no further force and effect, without any further action of any Member.

## ARTICLE X
## MISCELLANEOUS

Section 10.1 Governing Law. Except as provided in Section 10.2, this Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware without reference to the choice of Law principles thereof.

Section 10.2 Dispute Resolution.

(a) Arbitration. Any Dispute shall be finally resolved by binding arbitration in accordance with the CPR Rules except as otherwise set forth below. The Member commencing arbitration shall deliver to the other Members and to the CPR a Notice of Arbitration in accordance with CPR Rule 3. The arbitration shall be governed by United States Arbitration Act, 9 U.S.C. § 116.

(i) Selection of Arbitrator(s).

(A) If the amount claimed in the Notice of Arbitration is less than $1,000,000, such Dispute shall be resolved by a single independent and impartial arbitrator. If the Members are unable to agree upon a mutually-acceptable arbitrator within thirty (30) days of the date of the Notice of Arbitration, the arbitrator shall be appointed in accordance with Rule 6.4 of the CPR Rules.

(B) If the amount claimed in the Notice of Arbitration is $1,000,000 or more, or if specific performance or declaratory relief is sought, the Dispute shall be resolved by a panel of three independent and impartial arbitrators. The Member initiating the arbitration shall

appoint an arbitrator in its Notice of Arbitration; the responding Member (or Members) shall appoint an arbitrator in its notice of defense, which is due thirty (30) days after receipt of the Notice of Arbitration. If any Member fails or refuses to timely nominate an arbitrator within the time permitted, such arbitrator shall be appointed in accordance with CPR Rule 6. Within thirty (30) days of the appointment of the second arbitrator, the two party-appointed arbitrators shall appoint the third arbitrator, who shall act as the chair of the arbitration panel. The third arbitrator shall be appointed from the CPR Panel of Distinguished Neutrals, Energy, Oil and Gas Panel. The arbitrators, acting by majority vote, shall resolve all Disputes between the Members.

(ii) Confidentiality. To the fullest extent permitted by law, the arbitration proceedings and award shall be maintained in confidence by the Members.

(iii) Place of Arbitration. The place of arbitration shall be Chicago, Illinois. Any action in connection therewith shall be exclusively brought in the Court of Chancery of the State of Delaware. Each of the Members consents to the exclusive jurisdiction of such court in any such suit, action or proceeding, and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Each Member agrees that service of process on such Member as provided in Section 10.3 will be deemed effective service of process on such Member.

(iv) Conduct of the Arbitration. The arbitration shall be conducted in accordance with the CPR Rules and in a manner that effectuates the Members' intent that disputes be resolved expeditiously and with minimal expense. If the amount claimed in the Notice of Arbitration is less than $1,000,000, the arbitrator shall endeavor to commence the arbitration hearing within one hundred twenty (120) days of the arbitrator's appointment. If the amount claimed in the Notice of Arbitration is $1,000,000 or more, or if specific performance or declaratory relief is sought, the arbitration panel shall endeavor to commence the arbitration hearing within one hundred eighty (180) days of the appointment of the third arbitrator.

(v) Interim Relief. Any Member may apply to the arbitrator(s) seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Any Member also may, without waiving any remedy under this agreement, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy).

(vi) Discovery. The arbitrator(s), upon a showing of good cause, may require and facilitate such limited discovery as it shall determine is appropriate in the circumstances, taking into account the needs of the parties, the burden on the parties, and the desirability of making discovery limited, expeditious, and cost-effective. The arbitrator(s) may issue orders to protect the confidentiality of proprietary information, trade secrets and other sensitive information disclosed in discovery.

(vii) Arbitration Award. The arbitrator(s) shall endeavor to issue a reasoned, written award within thirty (30) days of the conclusion of the arbitration hearing. The arbitrator(s) shall have the authority to assess some or all of the costs and expenses of the arbitration proceeding (including the arbitrator(s)' fees and expenses) against any or all of the Members. The arbitrator(s) shall also have the authority to award attorneys' fees and expenses to the prevailing Member. In assessing the costs and expenses of the arbitration and/or awarding attorneys' fees and expenses, the arbitrator(s) shall consider the relative extent to which any Member has prevailed on the disputed issues and the relative importance of those issues. Under no circumstances shall the arbitrator(s) award exemplary, punitive, indirect, consequential, remote or speculative damages or lost profits; *provided, however*, that the foregoing limitations shall not apply to damages payable with respect to third party claims for which a Member or the Company is obligated to provide indemnification pursuant to Section 2.6. IN ENTERING INTO THIS ARTICLE X, THE MEMBERS ARE KNOWINGLY AND VOLUNTARILY WAIVING THEIR RIGHTS TO A JURY TRIAL.

Section 10.3 Notices. Unless otherwise provided herein, all notices, requests, consents, approvals, demands and other communications to be given hereunder will be in writing and will be deemed given upon (a) confirmed delivery by a reputable overnight carrier or when delivered by hand; (b) actual receipt; (c) the expiration of four (4) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective Members listed below at the following addresses (or such other address for a Member as will be specified by like notice); (d) delivery by facsimile, with receipt confirmed, to a Member, at the address or facsimile number set forth below (or at such other address or facsimile number as such Member shall designate by like notice) or (e) delivery by electronic mail to a Member at the electronic mail address set forth below (or at such other address as such Member shall designate by like notice); *provided*, that in the case of any notice delivered by electronic mail, the notifying Member shall send notice by facsimile, hand, courier or overnight delivery service the following Business Day:

If to TGC:
TGC, L.P.
3529 Gabel Road
P.O. Box 80284
Billings, MT 59108
Telephone: (406) 652-8238
Facsimile: (406) 652-8320
Attn: James R. Bennett

with a copy to:

Kevin C. Sweeney, Esq.
Hendrickson Law Firm, P.C.
Suite 324, 208 N. Broadway
P.O. Box 2502
Billings, MT 59103-2502
Telephone: (406) 245-6238

Facsimile: (406) 245-6253

If to MBI
MBI Holdings, LLC
PO Box 458
Belfield, ND 58622
Attn: Jim Anthard
Fax: __________
Email: __________

If to Global
Global Operating LLC
800 South Street, Suite 200
Waltham, MA 02453
Telephone: 781-398-4368
Facsimile: 781-398-9368
Attn: William G. Davidson

with a copy to:

Global Operating LLC
800 South Street, Suite 200
Waltham, MA 02453
Telephone: 781-398-4205
Facsimile: 781-398-9205
Attn: Sean T. Geary

Section 10.4 Inuring Clause. This Agreement shall inure to the benefit of and be binding upon the Members and their respective permitted successors and assigns. This Agreement is solely for the benefit of the Members and their respective permitted successors and assigns and, solely with respect to Section 2.6, for the benefit of the Member Indemnified Parties, and no provisions of this Agreement shall be deemed to confer on any other Persons any remedy, claim, liability, cause of action or other right except as expressly provided herein.

Section 10.5 Waiver of Partition of Company Property. Each Member hereby expressly and irrevocably waives any right to bring (or maintain) any Action for partition with respect to any of the Company's assets or properties.

Section 10.6 Amendments. All amendments to this Agreement must be in writing and signed by all of the Members.

Section 10.7 Counterparts. This Agreement may be executed by facsimile or electronic mail exchange of pdf signature pages and in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each Member and delivered (including by facsimile or electronic mail exchange of pdf signature pages) to the other Member.

Section 10.8 Entire Agreement. This Agreement, the Exhibits and Schedules attached hereto, and the documents and agreements to be delivered hereunder, constitute the entire agreement between the Members with respect to the subject matter hereof, and there are no agreements, understandings, representations or warranties between the Members other than those set forth or referred to herein and therein. Except as set forth in Section 2.6, this Agreement is not intended to confer upon any Person not a Member any rights or remedies hereunder.

Section 10.9 Waivers. A Member may, only by an instrument in writing, waive compliance by any other Member with any term or provision of this Agreement. The waiver by any Member of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach. Except as otherwise expressly provided herein, no failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by a Member, and no course of dealing between the Members, shall constitute a waiver of any such right, power or remedy.

Section 10.10 Severability. In the event any of the provisions hereof are held to be invalid or unenforceable under Laws, the remaining provisions hereof will not be affected thereby. In such event, the Members hereto agree and consent that such provisions and this Agreement will be modified and reformed so as to effect the original intent of the Members as closely as possible with respect to those provisions which were held to be invalid or unenforceable.

Section 10.11 Interpretation. In the event an ambiguity or questions of intent or interpretation arises with respect to this Agreement, this Agreement shall be construed as if it was drafted jointly by the Members, and no presumption or burden of proof shall arise favoring or disfavoring any Member by virtue of the authorship of any provisions of this Agreement.

Section 10.12 Further Assurances. The Members agree that, from time to time, each of them will execute and deliver, or cause to be executed and delivered, such further agreements and instruments and take such other action as may be necessary to effectuate the provisions, purposes and intents of this Agreement.

## ARTICLE XI
## CONSTRUCTION

Section 11.1 Construction.

(a) All article, section and exhibit references used in this Agreement are to articles, sections and exhibits of and to this Agreement unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b) If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neuter genders and vice versa. The term "includes" or "including" shall mean "including without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder"

and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular section or article in which such words appear. The phrase "ordinary course of business" shall mean, with respect to a particular Person, the ordinary course of business of such Person consistent with past practice in all material respects. All references to Laws refer to such Laws as they may be amended from time to time, and references to particular provisions of a Law include any corresponding provisions of any succeeding Law.

(c) The Parties acknowledge that each Member and its attorneys have reviewed this Agreement and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting Member, or any similar rule operating against the drafter of an agreement, shall not be applicable to the construction or interpretation of this Agreement.

(d) The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

(e) All references to currency and "$" herein shall be to, and all payments required hereunder shall be paid in, United States dollars.

(f) All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP, as of the date of the statement to which such term refers.

*Signature Page Follows*

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed by their duly authorized representatives, effective as of the Effective Date.

**TGC, L.P.**

By: Diamond B Companies, Inc.
Its: General Partner

By:____________________________
Name:
Title:

**MBI HOLDINGS, LLC**

By:____________________________
Name:
Title:

**GLOBAL OPERATING LLC**

By:____________________________
Name:
Title:

IN WITNESS WHEREOF, the Members have caused this Agreement to be executed by their duly authorized representatives, effective as of the Effective Date.

**TGC, L.P.**

By: Diamond B Companies, Inc.
Its: General Partner

By:________________________
Name:
Title:

**MBI HOLDINGS, LLC**

By: ________________________
Name:
Title:

**GLOBAL OPERATING LLC**

By: William G. Davidson
Name: William G. Davidson
Title: Senior Vice President

**EXHIBIT A**
**Definitions**

"***Act***" means the Delaware Limited Liability Company Act, together with any successor statute, as amended from time to time.

"***Action***" shall mean any action, suit, arbitration, inquiry, proceeding, investigation, condemnation, or audit by or before any court or other Governmental Entity.

"***Adjusted Capital Account***" means the Capital Account maintained for each Member, (g) increased by any amounts that such Member is obligated to restore or is treated as obligated to restore under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5), and (h) decreased by any amounts described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) with respect to such Member. The foregoing definition of "Adjusted Capital Account" is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2 and shall be interpreted consistently therewith.

"***Affiliate***" shall mean with respect to an entity, any other entity controlling, controlled by or under common control with such entity. As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise; *provided*, *however*, that any references to in this Agreement to an "Affiliate" shall not include the Company.

"***Agreement***" shall have the meaning given such term in the introductory paragraph.

"***Allocation Period***" means any period (a) commencing on the date hereof or the day following the end of a prior Allocation Period and (b) ending on the last day of each fiscal year, the day preceding any day in which an adjustment to the Book Value of the Company's properties pursuant to clause (b) of the definition of Book Value occurs, or any other date determined by the Company Board.

"***Amended Drag-Along Notice***" shall have the meaning given such term in Section 6.4(c).

"***Assumed Tax Liability***" means, with respect to any Member for any fiscal year, the product of (a) such Member's allocable share of the Company's U.S. federal taxable income (determined without regard to (i) any taxable gains or losses arising from the sale of substantially all the assets of the Company or liquidation of the Company, (ii) any deductions of a Member attributable to adjustments to the basis of the property of the Company made pursuant to Section 743(b) of the Code or (iii) any income, gain, loss or deductions allocated to such Member pursuant to Section 7.1(c), in such fiscal year and all prior fiscal years less the U.S. federal taxable loss allocated by the Company to such Member in such fiscal year and all prior fiscal years, multiplied by (b) forty percent (40%).

"***Bankrupt Member***" means any Member:

(a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer seeking for such Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Member in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of such Member or of all or any substantial part of such Member's properties; or

(b) against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and ninety (90) days have expired without dismissal thereof or with respect to which, without such Member's consent or acquiescence, a trustee, receiver, or liquidator of such Member or of all or any substantial part of such Member's properties has been appointed and sixty (60) days have expired without such appointments having been vacated or stayed, or sixty (60) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"***Book Value***" means, with respect to any property of the Company, such property's adjusted basis for U.S. federal income tax purposes, except as follows:

(a) (a) The initial Book Value of any property contributed by a Member to the Company shall be the Fair Market Value as of the date of such contribution;

(b) The Book Values of all properties shall be adjusted to equal their respective Fair Market Values in connection with (i) the acquisition of an interest (or additional interest) in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution to the Company or in exchange for the performance of more than a *de minimis* amount of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company, (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g)(1) (other than pursuant to Code Section 708(b)(1)(B)), or (iv) any other event to the extent determined by the Board of Directors to be permitted and necessary to properly reflect Book Values in accordance with the standards set forth in Treasury Regulation Section 1.704-1(b)(2)(iv)(q); *provided*, *however*, that adjustments pursuant to subclauses (i) and (ii) of this clause (b) shall be made only if the Company Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c) The Book Value of property distributed to a Member shall be adjusted to equal the Fair Market Value as of the date of such distribution;

(d) The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Code Section 734(b) or Code

Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m) and clause (g) of the definition of Profits or Losses or Section 7.1(b)(viii); *provided, however*, that the Book Value of property shall not be adjusted pursuant to this clause (d) to the extent that the Company Board reasonably determines an adjustment pursuant to clause (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

If the Book Value of property has been determined or adjusted pursuant to clauses (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Profits and Losses and other items allocated pursuant to Article VII.

"***Business Day***" shall mean any day other than a Saturday, a Sunday or a day on which banks in New York City are authorized or required by law to be closed.

"***Business Opportunity Agreement***" shall mean the Business Opportunity Agreement dated as of the Effective Date among TGC, MBI, Global, James R. Bennett, James Arthaud, Basin Transload of Wyoming, LLC and Bakken Transload, LLC.

"***Capital Account***" shall mean the capital account maintained for each Member pursuant to Section 5.4.

"***Capital Contribution***" shall mean, with respect to any Member, the amount of money and the initial Book Value of any property contributed to the Company by such Member, in accordance with Article V. Any reference to the Capital Contributions of a Member will include the Capital Contributions made by a predecessor holder of such Member's Member Interest to the extent the Capital Contribution was made in respect of Member Interests transferred to such Member.

"***Change of Control Event***" shall mean (a) in the case of TGC, (i) the death or incapacity of both of James R. Bennett and Teresa Bottrell or (ii) any event that causes TGC no longer to be an Affiliate of either James R. Bennett or Teresa Bottrell; and (b) in the case of MBI, (i) the death or incapacity of both of James Arthaud and Tony Hauck (provided, however, that in the event Tony Hauck ceases to serve as Chief Financial Officer or other executive officer position of MBI, such event shall be deemed an incapacity of Tony Hauck) or (ii) any event that causes MBI no longer to be an Affiliate of either James Arthaud or Tony Hauck

"***Claim***" shall mean any and all debts, losses, liabilities, duties, claims, damages, obligations, payments (including those arising out of any demand, assessment, settlement, judgment or compromise relating to any actual or threatened Action), costs and reasonable expenses, including any reasonable attorneys' fees and any and all reasonable expenses whatsoever and howsoever incurred in investigating, preparing, or defending any Action, in all cases, whether matured or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, known or unknown.

"***Code***" shall mean the United States Internal Revenue Code of 1986, as amended.

"***Company***" shall have the meaning given such term in the introductory paragraph.

"***Company Board***" shall have the meaning given such term in Section 3.2.

"***Costs***" shall have the meaning given such term in Section 5.3(b)(ii).

"***CPR***" shall mean the International Institute for Conflict Prevention and Resolution.

"***CPR Rules***" shall mean the CPR's Rules for Non-Administered Arbitration.

"***Delinquent Member***" shall have the meaning given such term in Section 5.3(a).

"***Depreciation***" means, for each Allocation Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to property for such Allocation Period, except that (a) with respect to any property the Book Value of which differs from its adjusted tax basis for federal income tax purposes and which difference is being eliminated by use of the remedial allocation method pursuant to Treasury Regulation Section 1.704-3(d), Depreciation for such Allocation Period shall be the amount of book basis recovered for such Allocation Period under the rules prescribed by Treasury Regulation Section 1.704-3(d)(2), and (b) with respect to any other property the Book Value of which differs from its adjusted tax basis at the beginning of such taxable year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Allocation Period bears to such beginning adjusted tax basis; provided, that if the adjusted tax basis of any property at the beginning of such Allocation Period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Company Board.

"***Determination Date***" shall have the meaning given such term in Section 6.5(b).

"***Director***" shall mean a member of the Company Board.

"***Dispute***" shall mean any claim, counterclaim, demand, cause of action, dispute, disagreement or any other controversy arising out of or relating in any way to this Agreement (including the breach hereof), the subject matter of this Agreement, or the transactions contemplated pursuant to this Agreement.

"***Dissolution Event***" shall have the meaning given such term in Section 9.1.

"***Drag-Along Co-Seller***" shall have the meaning given such term in Section 6.4(a)(i).

"***Drag-Along Notice***" shall have the meaning given such term in Section 6.4(c).

"***Drag-Along Rights***" shall have the meaning given such term in Section 6.4(a)(i).

"***Drag-Along Sale***" shall have the meaning given such term in Section 6.4(a).

"***Drag-Along Transferee***" shall have the meaning given such term in Section 6.4(a).

"***Economic Risk of Loss***" shall have the meaning set forth in Treasury Regulation section 1.752 2(a).

"***Effective Date***" shall have the meaning given such term in the introductory paragraph.

"***Fair Market Value***" shall mean the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller. For purposes of Sections 5.3(a) and 6.5, Fair Market Value shall be determined by a qualified, independent valuation expert chosen by the Company Board.

"***GAAP***" shall mean generally accepted accounting principles in the United States promulgated by the Financial Accounting Standards Board, or its predecessors or successors, consistently applied.

"***Governmental Entity***" shall mean any court, governmental department, commission, council, board, agency, bureau or other instrumentality of the United States of America, any foreign jurisdiction, or any state, provincial, county, municipality or local governmental unit thereof, including any taxing authority.

"***Indemnifying Member***" shall have the meaning given such term in Section 2.6(b).

"***Law***" shall mean all applicable laws, statutes, rules, regulations, codes (including the Code), ordinances, permits, variances, judgments, injunctions, orders and licenses of a Governmental Entity having jurisdiction over the assets or the properties of the Company or the Members and the operations thereof.

"***Lending Member***" shall have the meaning given such term in Section 5.3(b).

"***Lien***" shall mean any lien, mortgage, pledge, condemnation award, expropriation award, encumbrance, lease, sublease, preferential purchase right, option, conditional sales contract, security interest or encumbrance of any nature whatsoever.

"***Member***" and "***Members***" shall mean TGC, MBI and Global and any Person hereafter admitted to the Company as a Member, as provided in this Agreement; *provided*, *however*, that such term shall not include any Person that has ceased to be a Member in the Company.

"***Member Indemnified Parties***" shall mean, with respect to each Member, the Company, such Member and its Affiliates and any of such Member's and its Affiliates' respective directors, officers, employees, agents, managers, members and legal representatives.

"***Member Interest***" shall mean, with respect to any Member, such Member's respective member interest in the Company.

"***Member Nonrecourse Debt***" shall have the meaning assigned to the term "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4).

"***Member Nonrecourse Debt Minimum Gain***" shall have the meaning assigned to the term "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2).

"***Member Nonrecourse Deductions***" shall have the meaning assigned to the term "partner nonrecourse deduction" in Treasury Regulation Section 1.704-2(i)(1).

"***Minimum Gain***" shall have the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

"***Non-Participating Member***" shall have the meaning given such term in Section 5.2.

"***Nonrecourse Deduction***" shall have the meaning assigned to that term in Treasury Regulation Section 1.704-2(b).

"***Obligations***" shall have the meaning given such term in Section 5.3(b)(ii).

"***Participating Member***" shall have the meaning given such term in Section 5.2.

"***Percentage Interest***" shall mean (a) with respect to the Member Interest owned by Global, sixty percent (60%), (b) with respect to the Member Interest owned by TGC, twenty percent (20%); (c) with respect to the Member Interest owned by MBI, twenty percent (20%); and (d) with respect to the Member Interest owned by any other Person admitted as a Member in accordance with the terms and provisions of this Agreement, such Person's Member Interest in the Company as of the effective date of such Person's admission as a Member, in each case, as such Member Interests may change from time to time as a result of permitted Transfers or otherwise.

"***Person***" shall mean any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, incorporated organization or Governmental Entity.

"***Principal Office***" shall have the meaning given such term in Section 1.4.

"***Profits or Losses***" means, for each Allocation Period, an amount equal to the Company's taxable income or loss for such taxable period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a) Any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits or Losses" shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits and Losses," shall be subtracted from such taxable income or loss;

(c) In the event that the Book Value of any asset is adjusted pursuant to clause (b) or clause (c) of the definition of Book Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Book Value of the asset) or an item of loss (if the adjustment decreases the Book Value of the asset) from the disposition of such asset and shall, except to the extent allocated pursuant to Section 7.1(b) or Section 7.1(c), be taken into account for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(e) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation;

(f) To the extent an adjustment to the adjusted tax basis of any asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Account balances as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses; and

(g) Any items that are allocated pursuant to Section 7.1(b) or Section 7.1(c) shall not be taken into account in computing Profits and Losses.

"***Qualifying Offer***" shall mean an offer to purchase the Member Interest of a Member if it meets all of the following criteria:

(i) the offer is contained in an executed, definitive agreement, is in good faith and at arm's-length, is from a Person that is not an Affiliate of the transferring Member, and is to purchase all (but not less than all) of the Member Interest;

(j) the offer is for a price payable solely in cash (and includes no consideration other than cash);

(k) the offer is not subject to any material conditions such as financing (other than customary closing conditions);

(l) the offer is expressly subject to the rights of the other Member hereunder; and

(m) the proposed Transferee is a principal, identified in the offer, and not an agent acting on behalf of an undisclosed principal and the offer is not assignable other than to such proposed Transferee's Affiliates.

"***Required Contribution***" shall have the meaning given such term in Section 5.1(a).

"***ROFR Option Period***" shall have the meaning given such term in Section 6.3(b).

"***ROFR Transfer Notice***" shall have the meaning given such term in Section 6.3(b).

"***ROFR Transferor***" shall have the meaning given such term in Section 6.3(a).

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time.

"***Shared Services Agreement***" shall mean the Shared Services Agreement dated as of the Effective Date among the Company, Global Companies LLC and Diamond B Companies, Inc.

"***Special Contribution***" shall have the meaning given such term in Section 5.2.

"***Special Project***" shall have the meaning given such term in Section 5.2.

"***Subject Interest***" shall have the meaning given such term in Section 6.3(b).

"***Tag-Along Co-Seller***" shall have the meaning given such term in Section 6.4(a)(ii).

"***Tag-Along Rights***" shall have the meaning given such term in Section 6.4(a)(ii).

"***Tax Distribution***" means, with respect to any Member for any fiscal year, the excess, if any, of (a) the Assumed Tax Liability of such Member as of such fiscal year, over (b) the amount of distributions made to such Member pursuant to Section 7.4(a) during such Fiscal Year and all prior fiscal year plus the amount of distributions made to such Member pursuant to Section 7.4(c) with respect to all prior fiscal years.

"***Tax Distribution Date***" means, with respect to each fiscal year, March 15 of the first fiscal year following the end of such fiscal year.

"***Tax Matters Member***" shall have the meaning given such term in Section 8.3(a).

"***Transfer***" shall mean any voluntary or involuntary sale, assignment, transfer, conveyance, exchange, bequest, devise, gift or any other alienation (in each case, with or without consideration) of any rights, interests or obligations with respect to the Member Interest of a Member (but excluding the granting of a Lien thereon). "Transferred" and "Transferring" shall have correlative meanings.

"***Transferee***" shall mean any Person that receives a Member Interest through a Transfer.

"***Treasury Regulations***" means the regulations promulgated by the U.S. Department of the Treasury under the Code, as they may be amended from time to time.

"***Trigger Event***" shall have the meaning given such term in Section 5.2(b).

"***UCC***" shall have the meaning given such term in Section 5.3(b)(v).

Section 10.8 Entire Agreement. This Agreement, the Exhibits and Schedules attached hereto, and the documents and agreements to be delivered hereunder, constitute the entire agreement between the Members with respect to the subject matter hereof, and there are no agreements, understandings, representations or warranties between the Members other than those set forth or referred to herein and therein. Except as set forth in Section 2.6, this Agreement is not intended to confer upon any Person not a Member any rights or remedies hereunder.

Section 10.9 Waivers. A Member may, only by an instrument in writing, waive compliance by any other Member with any term or provision of this Agreement. The waiver by any Member of a breach of any term or provision of this Agreement shall not be construed as a waiver of any subsequent breach. Except as otherwise expressly provided herein, no failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by a Member, and no course of dealing between the Members, shall constitute a waiver of any such right, power or remedy.

Section 10.10 Severability. In the event any of the provisions hereof are held to be invalid or unenforceable under Laws, the remaining provisions hereof will not be affected thereby. In such event, the Members hereto agree and consent that such provisions and this Agreement will be modified and reformed so as to effect the original intent of the Members as closely as possible with respect to those provisions which were held to be invalid or unenforceable.

Section 10.11 Interpretation. In the event an ambiguity or questions of intent or interpretation arises with respect to this Agreement, this Agreement shall be construed as if it was drafted jointly by the Members, and no presumption or burden of proof shall arise favoring or disfavoring any Member by virtue of the authorship of any provisions of this Agreement.

Section 10.12 Further Assurances. The Members agree that, from time to time, each of them will execute and deliver, or cause to be executed and delivered, such further agreements and instruments and take such other action as may be necessary to effectuate the provisions, purposes and intents of this Agreement.

## ARTICLE XI
## CONSTRUCTION

Section 11.1 Construction.

(a) All article, section and exhibit references used in this Agreement are to articles, sections and exhibits of and to this Agreement unless otherwise specified. The schedules and exhibits attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b) If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neuter genders and vice versa. The term "includes" or "including" shall mean "including without limitation." The words "hereof," "hereto," "hereby," "herein," "hereunder"

**SCHEDULE 3.2**
**Initial Directors**

MBI initial Director - James Arthaud

TGC initial Director – James R. Bennett

Global initial Director – Eric Slifka