# EXHIBIT B

# CONSTRUCTION AND INDEMNITY AGREEMENT

[Beulah Tie-In]

This CONSTRUCTION AND INDEMNITY AGREEMENT (Agreement") is entered into as of April ~~March~~ 3, 2014 ("Effective Date"), by and between:

TESORO HIGH PLAINS PIPELINE COMPANY LLC, a Delaware limited liability company ("THPP")

and

BASIN TRANSLOAD, LLC, a Delaware limited liability company ("Basin"),

and THPP and Basin are sometimes referred to individually as a "Party", and collectively as the "Parties."

## RECITALS

**WHEREAS**, Basin owns the Specified Tank (defined below) located at the Beulah Rail Facility (defined below) which Basin will h use for the receipt, storage and distribution of product pursuant to transloading services agreements with its customers; and

**WHEREAS**, THPP owns a Pipeline System (defined below) in the state of North Dakota that presently is not connected to the Beulah Rail Facility; and

**WHEREAS**, Basin has requested that THPP undertake a capital investment project to construct certain new facilities, modify certain existing facilities, and make other improvements on the Pipeline System in order to build a new portion of the Pipeline System from the existing Zap Block Valve (defined below) to a new tie-in point at the Beulah Rail Facility, which tie-in point will be established as a new destination point on the Pipeline System, as shown on the attached Exhibit A; and

**WHEREAS**, Basin expects to derive economic benefits as a result of enabling the Beulah Rail Facility to receive crude oil from the Pipeline System, thereby permitting deliveries of crude petroleum that previously could not be delivered by pipeline to the Beulah Rail Facility; and

**WHEREAS**, as an inducement to THPP and in consideration for THPP's commitment to undertake design, engineering and construction of the THPP Facilities (defined below) and to maintain, during the term of this Agreement, the connection between the Pipeline System and the Beulah Rail Facility, Basin has agreed to indemnify THPP for the Actual Costs of the THPP Facilities and an Agreed Return (as such terms are defined below) on the terms and conditions set forth herein below; and

**WHEREAS**, for and consideration of such indemnity obligation from Basin and the performance by Basin of their other obligations hereunder, THPP is willing to undertake the capital investment project to construct the THPP Facilities and to perform its other obligations hereunder.

**NOW, THEREFORE,** in consideration of the covenants and obligations contained herein, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties, the Parties agree as follows:

## 1. DEFINITIONS

Capitalized terms used throughout this Agreement have the meanings set forth below, unless otherwise specifically defined herein.

"Actual Costs" means the total of all costs and expenses incurred by THPP to design, engineer, procure, construct, install, equip, test, commission and start-up the THPP Facilities, including, without limitation, legal expenses, overhead expenses attributable to the THPP Facilities and costs and expenses of obtaining Permits and easements therefor. Actual Costs expressly exclude allocations of general and administrative costs (e.g., senior management salaries), management fees and mark-ups on third party invoices.

"Affiliate" means an entity that controls, is controlled by or is under common control with, another Person, whether directly or indirectly. For such purpose, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"Agreed Return" means a rate of return equal to twelve percent (12%) of THPP's Actual Costs minus any THPP Revenues previously received.

"Agreement" has the meaning set forth in the Preamble.

"Applicable Law" means any applicable statute, law, regulation, ordinance, rule, determination, judgment, rule of law, order, decree, permit, approval, concession, grant, franchise, license, requirement, or any similar form of decision of, or any provision or condition of any permit, license or other operating authorization issued by any Governmental Authority having or asserting jurisdiction over the matter or matters in question, whether now or hereafter in effect.

"Barrel" means a volume equal to 42 U.S. gallons of 231 cubic inches each, at 60 degrees Fahrenheit under one atmosphere of pressure.

"Basin Payment Default" has the meaning given in Section 7(b)(ii).

"Beulah Lateral" has the meaning given in Section 2(a).

"Beulah Rail Facility" means Basin Transload, LLC's existing crude petroleum rail transloading facility near Beulah, in Mercer County, ND.

"Beulah Tie-In Point" has the meaning given in Section 2(b).

"bpd" means Barrels per day.

"Business Day" means a day, other than a Saturday or Sunday, on which banks in New York, New York are open for the general transaction of business.

"Conditions Precedent" has the meaning given in Section 3(a).

"Confidential Information" means all confidential, proprietary or non-public information of a Party relating to or disclosed in connection with the subject matter of this Agreement, whether set forth in a writing, orally or in any other manner, including all non-public information and material of such Party and/or any of its Affiliates (and of companies with which such Party or any of its Affiliates has entered into confidentiality agreements) that another Party obtains knowledge of or access to, including non-public information regarding products, processes, business strategies and plans, facilities, assets, customer

lists, research and development programs, computer programs, hardware configuration information, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), trade secrets, schematics and other technical, business, marketing and product development plans, revenues, expenses, earnings projections, forecasts, strategies, and other non-public business, technological, and financial information.

"Credits" has the meaning given in Section 7(b)(i).

"Default" has the meaning given in Section 11(a).

"Estimated Amount" has the meaning given in Section 5(a).

"Excess Costs" has the meaning given in Section 5(b).

"Force Majeure" means an event or circumstance that is beyond the reasonable control of a Party that prevents such Party from performing an obligation under this Agreement, including Acts of God, earthquakes, floods, landslides, civil disturbances, sabotage, acts of public enemies, war, blockages, insurrections, riots, epidemics, storms, ice, acts of Governmental Authorities, labor disputes and disruptions, fires, explosions, breakdowns or failure of pipe, plant, machinery or equipment, unavoidable delays in obtaining Permits, easements, equipment or machinery, and other causes , whether or not similar to those listed above, beyond the reasonable control of a Party.

"Governmental Authority" means any federal, state, local or foreign government or any provincial, departmental or other political subdivision thereof, or any entity, body or authority exercising executive, legislative, judicial, regulatory, administrative or other governmental functions or any court, department, commission, board, bureau, agency, instrumentality or administrative body of any of the foregoing.

"Guarantor" means Global Partners LP, a Delaware limited partnership and the indirect owner of 60% of the issued and outstanding membership interests of Basin.

"Guaranty" means the unconditional, irrevocable guarantee of Basin's obligations hereunder executed by the Guarantor in the form of Addendum "B" to this Agreement, and includes any replacement Guaranty provided pursuant to Section 8(c).

"Indemnified Amount" has the meaning given in Section 7(a).

"Independent Expert" has the meaning given in Section 5(b).

"Permits" means all necessary consents, permits, licenses, tariffs, certificates and other approvals from Governmental Authorities having jurisdiction.

"Person" means any individual, partnership, limited partnership, joint venture, corporation, limited liability company, limited liability partnership, trust, unincorporated organization or Governmental Authority or any department or agency thereof.

"Phase 1 Actual Costs" means that portion of the Actual Costs that are attributable to the Phase 1 THPP Facilities.

"Phase 1 Capacity" is defined in Section 2(a).

"Phase 1 Commencement Date" means the date on which the Phase 1 THPP Facilities are complete and ready for start-up, and all necessary Permits that are required for the operation thereof have been issued in final form that is acceptable to THPP, in its reasonable discretion.

"Phase 1 THPP Facilities" is defined in Section 2(d).

"Phase 2 Actual Costs" means that portion of the Actual Costs that are attributable to the Phase 2 THPP Facilities.

"Phase 2 Capacity" is defined in Section 2(a).

"Phase 2 Commencement Date" means the date on which the Phase 2 THPP Facilities are complete and ready for start-up, and all necessary Permits that are required for the operation thereof have been issued in final form that is acceptable to THPP, in its reasonable discretion.

"Phase 2 Notice" is defined in Section 2(d).

"Phase 2 Termination" is defined in Section 4(c).

"Phase 2 THPP Facilities" is defined in Section 2(d).

"Pipeline System" means the THPP pipeline (excluding gathering pipelines) located in North Dakota.

"Receiving Party Personnel" has the meaning set forth in Section 15(d).

"Recovery Period" has the meaning given in Section 7(a).

"Related Agreements" means the agreements described in Section 3(a) (i), (ii), (iii).and (iv)

"Relevant Period" has the meaning given in Section 7(b)(i).

"Revenue Deficiency" has the meaning given in Section 7(b)(i).

"Specified Tank" means a certain 140,000 barrel crude oil storage tank at the Beulah Rail Facility, that will be utilized by Basin for the receipt, storage and distribution of crude oil pursuant to transloading services agreements with its customers.

"Term" has the meaning given in Section 9(a).

"THPP" has the meaning set forth in the Preamble.

"THPP Facilities" has the meaning given in Section 2(d).

"THPP Revenues" means the aggregate fees received by THPP (excluding fees for drag reducing agent) for transporting crude petroleum from any origin on the Pipeline System (having a tariff destination to the Beulah Tie-In Point) to the Beulah Tie-In Point, for the account of all shippers, including Basin.

"Zap Block Valve " means that certain existing block gate valve on the Pipeline System located at milepost #55.78 in T 143N, R 89W, Sec. 1, Mercer County, ND, also known as the "North Knife River" block gate valve.

## 2. CONSTRUCTION OF THPP FACILITIES

Subject to fulfillment of the Conditions Precedent in Section 3(a) and the provisions of Section 3, THPP (or its contractors) will design, engineer, procure, construct, install, test, commission, own, operate and maintain, at its cost and expense:

(a) approximately 4.1 miles of 10" crude oil pipeline from the Zap Block Valve to the Beulah Tie-In Point, with capacity to transport at least (i) 10,000 bpd of crude petroleum (meeting the THPP tariff quality specifications) from the Dunn Center Station to the Beulah Tie-In Point on and after the Phase 1 Commencement Date ("Phase 1 Capacity"), and (ii) at Basin's election if exercised pursuant to Section 2.(d) below, 40,000 bpd of crude petroleum (meeting the THPP tariff quality specifications, and cumulative of the Phase 1 Capacity) from the Dunn Center Station to the Beulah Tie-In Point on and after the Phase 2 Commencement Date ("Phase 2 Capacity"), together with all piping, pumps, valves, instruments and other equipment necessary to interconnect such lateral pipeline with the Pipeline System but excluding any private tankage ("Beulah Lateral"),

(b) all piping, pumps, valves, pipeline custody transfer meters, instruments and other equipment necessary to tie-in the Beulah Lateral to a pig receiver at the Beulah Rail Facility in T 144N, R 88W, Sec. 19, Mercer County, ND ("Beulah Tie-In Point"); and to monitor, measure, and control the flow of crude oil from the Pipeline System into at the Beulah Tie-In Point, and

(c) at Basin's election pursuant to Section 2.(d) below, modifications of THPP's existing Dunn Center Station at T 143N R 89W Sec. 1, including installation of one (1) new centrifugal pump with a VFD, with two (2) booster pumps with VFD's, motors, associated piping and enlarging control building to house the new VFD's, and a 80,000 to 120,000 shell barrel tank. The project will include piping, valves, instruments and other equipment necessary to meet the Phase 2 Capacity.

(d) The facilities described in Sections 2(a)(i) and 2(b) are referred to herein as the "Phase 1 THPP Facilities", and the facilities described in Sections 2(a)(ii) and 2(c) are referred to herein as the "Phase 2 THPP Facilities", and all such facilities are collectively referred to as the "THPP Facilities." THPP will diligently proceed with construction of the Phase 1 THPP Facilities, subject to completion of required engineering, construction and ROW acquisition, and as otherwise provided in this Agreement. THPP's construction of the Phase 2 THPP Facilities will be at Basin's election, exercised by delivering written notice to THPP (the "Phase 2 Notice") on or before the date which is three months after the date on which THPP first delivers crude oil to the Beulah Tie-In Point utilizing the Phase 1 THPP Facilities. THPP shall have no obligation to proceed with construction or design of the Phase 2 THPP Facilities unless and until Basin sends the Phase 2 Notice requesting that THPP proceed with the construction of such Phase 2 THPP Facilities on the terms set forth in this Agreement. Notwithstanding the above, if Basin does not elect to have the THPP proceed with construction of the THPP Phase 2 Facilities, nothing contained herein shall limit or restrict THPP's rights to make such modifications and improvements on its pipeline system as it deems appropriate, so long as THPP is able to perform its obligations hereunder with respect to the THPP Phase 1 Facilities.

(e) Basin shall design, engineer, procure, construct, install, test, commission, own, operate and maintain, at its cost and expense, all piping, pumps, valves, and other equipment necessary to tie-in the Beulah Tie-In Point to the Specified Tank.

## 3. CONDITIONS PRECEDENT

(a) The obligations of THPP to design, engineer, construct, procure, and install the THPP Facilities are subject to the following conditions precedent ("Conditions Precedent"):

(i) execution and delivery by Basin and THPP of a Connection Agreement, substantially in the form of Addendum A attached hereto, addressing THPP's and Basin's respective rights and responsibilities with respect to the design interface and physical tie-in of the THPP Facilities with the Specified Tank at the Beulah Rail Facility; custody transfer issues and other operational matters;

(ii) execution and delivery by Basin of an Easement Agreement substantially in the form of Exhibit "B" to Addendum A attached hereto;

(iii) upon request by THPP, the provision by Basin or its Affiliates, as applicable, of licenses for THPP and its contractors to go on the property of Basin or its Affiliates (as applicable) for the purpose of performing THPP's obligations under this Agreement and for the future operation, maintenance, repair, replacement and removal of the THPP Facilities thereon;

(iv) execution and delivery by Global Partners LP of the Guaranty in the form to Addendum B;

(v) THPP is satisfied, in its reasonable discretion, that all necessary non-exclusive rights of way, easements and other interests in real property necessary for the THPP Facilities have been obtained by Basin and are freely assignable to THPP without additional consideration) on terms that are acceptable to THPP.

(vi) THPP is satisfied, in its sole discretion, that all Permits necessary to design, construct, procure, install, test, commission, own, operate and maintain the THPP Facilities have been received (or will be timely received) on terms that are acceptable to THPP;

(vii) receipt and acceptance by Basin on terms acceptable to Basin or its Affiliate and reasonably acceptable to THPP, of all Permits necessary for the installation, construction, ownership, operation and maintenance by THPP or its contractors, of that portion of the THPP Facilities that will be on the property of Basin, and such Permits are freely assignable to THPP without additional consideration;

(vii) receipt, by each of THPP and Basin of any necessary corporate management and/or Board of Directors' approval to perform their respective obligations hereunder and under the Connection Agreement; and

(viii) solely with respect to the Phase 2 THPP Facilities, receipt by THPP of Basin's Phase 2 Notice.

**4. PHASE 1 AND PHASE 2 COMMENCEMENT DATES**

(a) The anticipated Phase 1 Commencement Date is November 1, 2014, and the anticipated Phase 2 Commencement Date is 365 days after THPP's receipt of the Phase 2 Notice from Basin, and each such date shall be extended due to delays in satisfying Conditions Precedents, Force Majeure, the inability of a Party, after using commercially reasonable efforts, to obtain any Permit, or by agreement of the Parties. Each Party shall notify the other Parties upon becoming aware of any event or circumstance that is reasonably likely to delay the Phase 1 or Phase 2 Commencement Date, whereupon such date will be extended on a day-for-day basis due to any of the events or circumstances described in the first sentence of this Section 4(a); however, no Party shall have any right or remedy against the other Parties (including those arising under Section 11) if the actual Phase 1 Commencement Date or the Phase 2 Commencement Date is earlier or later than the anticipated date specified above, except for those expressly provided under Section 4(b) and 4(c) below.

(b) Notwithstanding Section 4(a), if the Phase 1 Commencement Date has not occurred by January 1, 2015, or as or as such date may be extended by Force Majeure or other events listed under Section 4(a) above as allowing an extension, then either THPP or Basin may, by giving 60 days prior written notice to the other Party, terminate this Agreement and the Related Agreements at the end of such 60-day period, provided that the Party giving such notice of termination (including its Affiliates) is not the cause of such delay; and provided further that if the Phase 1 Commencement Date occurs prior to the end of such 60-day period, then such notice shall be null and void.

(c) (i) If the Phase 2 Election is not received by THHP on or before the date which is three months after the date on which THPP first delivers crude oil to the Beulah Tie-In Point utilizing the Phase 1 THPP Facilities, then this Agreement and the Related Agreements shall automatically terminate with respect to the Phase 2 THPP Facilities only. (ii) If the Phase 2 Commencement Date has not occurred within 365 days after THPP's receipt of the Phase 2 Notice, as such date may be extended by Force Majeure or other events listed under Section 4(a) above as allowing an extension, then either THPP or Basin may, by giving 60 days prior written notice to the other Party, terminate this Agreement and the Related Agreements with respect to the Phase 2 THPP Facilities only, at the end of such 60-day period; provided that if the Phase 2 Commencement Date occurs prior to the end of such 60-day period, then such notice shall be null and void. A termination under either clause (i) or (ii) above shall be the "Phase 2 Termination". The Parties acknowledge that, if the Phase 2 Termination occurs, this Agreement and the Related Agreements will nevertheless continue in effect with respect to the Phase 1 THPP Facilities. THPP shall have no liability for failing to undertake and complete the Phase 2 THPP Facilities within 365 days of THPP's receipt of the Phase 2 Notice, and Basin's sole remedy for such failure shall be the exercise of its termination rights pursuant to this Section 4(c). Basin shall have no liability for failing to exercise the Phase 2 Notice on or before the date which is three months after the date on which THPP first delivers crude oil to the Beulah Tie-In Point utilizing the Phase 1 THPP Facilities and THPP's sole remedy for such failure shall be the Phase 2 Termination pursuant to this Section 4(c).

## 5. COST OF THE THPP FACILITIES

(a) THPP estimates that its Actual Costs to obtain Permits and easements for, and to complete and render the THPP Facilities operational, will be approximately $25,000,000 (Twenty Five Million Dollars) ("Estimated Amount"), with the Phase 1 THPP Facilities anticipated to comprise approximately fifty-two percent (52%) of the Actual Costs (or approximately $13,000,000, the "Phase I Estimated Amount"), and the Phase 2 THPP Facilities anticipated to comprise approximately forty-eight percent (48%) of the Actual Costs (or approximately $12,000,000, the "Phase 2 Estimated Amount").

(b) THPP will exercise commercially reasonable efforts to limit Actual Costs for each of the Phase 1 THPP Facilities and the Phase 2 THPP Facilities to the Phase 1 and Phase 2 Estimated Amounts, as applicable; however, if, at any time before the Phase 1 Commencement Date or the Phase 2 Commencement Date, THPP determines that Actual Costs will exceed the Phase 1 or Phase 2 Estimated Amount, as applicable, THPP will notify Basin, whereupon THPP and Basin will discuss appropriate steps to minimize any such increase(s). However, the determination of the appropriate costs to be incurred will be made by THPP provided that any increase in appropriate costs in excess of twenty-five percent (*25%*) of either the Phase 1 or Phase 2 Estimated Amount ("Excess Costs") will require the mutual agreement of the Parties. If THPP and Basin are unable to reach agreement on any Excess Costs, then either Basin or THPP may, by giving written notice to the other within thirty (30) days after THPP has notified Basin of such Excess Costs, request that the matter be referred to a mutually agreeable independent engineering firm, having relevant experience in the design and construction of petroleum pipelines in North Dakota ("Independent Expert"). The Independent Expert will determine if the Excess Costs (or any portion) are reasonably necessary (i) to enable the THPP Facilities to comply with (A) Applicable Laws or Permits, or (B) prudent, sound and generally accepted current practices, market

conditions, standards and procedures applicable to similar facilities in the U.S. petroleum pipeline industry, or (ii) due to current market conditions. To the extent that the Independent Expert finds any Excess Costs are reasonably necessary to satisfy (i) or (ii) above, then such Excess Costs will be deemed to be approved by THPP and Basin (and to the extent it does not so find, such Excess Costs will not be allowed hereunder, but the related work may nevertheless be undertaken at THPP's cost if it so elects). The decision of the Independent Expert will be binding upon both THPP and Basin and the costs of the Independent Expert will be shared equally by THPP and Basin. Notwithstanding the foregoing, any Excess Costs that are attributable to increased costs above those included in the Estimated Amount that are payable to an Affiliate of Basin that provided goods, services or other items as a contractor of THPP in connection with the THPP Facilities, will not require the agreement of Basin or require submission to an Independent Expert in order to be allowed hereunder.

(c) Within ninety (90) days of completion of construction of the Phase 1 THPP Facilities and the Phase 2 THPP Facilities (if applicable), respectively, THPP will notify Basin of the Phase 1 Actual Costs and the Phase 2 Actual Costs, and provide supporting information reasonably requested by Company to confirm the same. In addition, THPP will allow Basin to conduct an audit of THPP's relevant books and records, at the cost and expense of Basin and using Basin's internal accounting resources and/or a reputable accounting firm reasonably acceptable to THPP, in order to verify the Actual Costs. For purposes of clarity, if the Phase 2 Termination occurs, then no costs for the THPP Phase 2 Facilities will be included in the Actual Costs.

## 6. THPP'S OBLIGATIONS FOLLOWING COMPLETION OF THE THPP FACILITIES

(a) Beginning on the Phase 1 Commencement Date and during the Term, THPP will make transportation services available to shippers from points of origin on the Pipeline System to the Beulah Tie-In Point as a destination on the Pipeline System, in accordance with all Applicable Laws and THPP's applicable tariff(s) in effect from time to time.

(b) As further consideration for Basin's indemnity obligation under Section 7, THPP hereby agrees that upon completion of the THPP Facilities and for the duration of the Term, THPP will (except to the extent excused by Force Majeure or the acts or omissions of Basin, Basin's Affiliates or others for which THPP is not legally responsible):

(i) maintain at all times a pipeline connection between the Beulah Lateral and the Beulah Tie-In Point, with the capability to deliver at least (A) the Phase 1 Capacity from the Dunn Center Station to the Beulah Tie-In Point beginning on the Phase 1 Commencement Date, and (B) unless the Phase 2 Termination occurs, at least the Phase 2 Capacity from the Dunn Center Station to the Beulah Tie-In Point beginning on the Phase 2 Commencement Date,

(ii) operate and maintain the THPP Facilities in a manner consistent with industry standards and practices and THPP's tariff rules and regulations currently in effect (a copy of which has previously been provided to Company) and incorporated herein by reference, as such rules and regulations may be modified from time to time, and

(iii) maintain appropriate tariffs in place for shipments to the Beulah Tie-In Point as a destination point on the Pipeline System. Any increases in the applicable tariffs during the Term will be in accordance with FERC's indexing methodology, and THPP may file to adjust its FERC and NDPSC tariff rates annually based on the FERC inflationary index for interstate and intrastate pipelines. If, at any time during the Term the FERC ceases to maintain an indexing methodology applicable to such tariffs, then the applicable tariff rates shall be increased by a percentage equal to the positive change in the Producer Price Index Finished Goods (PPI-FG) as reported by the U.S. Bureau of Labor Statistics for the

twelve (12) Month period preceding the reporting date) plus any additional amount (whether a percentage or fixed amount) permitted by the FERC indexing methodology last in effect. In no event will the tariff rates be decreased as a result of any such adjustment.

**7. BASIN'S INDEMNITY OBLIGATION; OTHER OBLIGATIONS OF BASIN FOLLOWING COMPLETION OF THE THPP FACILITIES.**

(a) **AS CONSIDERATION FOR THPP'S AGREEMENTS UNDER SECTIONS 2 AND 6, BASIN GUARANTEES THAT DURING THE FIVE YEAR PERIOD AFTER THE PHASE 2 COMMENCEMENT DATE ("RECOVERY PERIOD"), THE THPP REVENUES WILL AT LEAST BE EQUAL TO THE SUM OF THE ACTUAL COSTS PLUS THE AGREED RETURN (THE "INDEMNIFIED AMOUNT"); PROVIDED HOWEVER, THAT ANY THPP REVENUES RECEIVED DURING THE PERIOD FROM THE PHASE 1 COMMENCEMENT DATE TO THE PHASE 2 COMMENCEMENT DATE SHALL BE CREDITED AGAINST (AND REDUCE) THE INDEMNIFIED AMOUNT; AND PROVIDED FURTHER, THAT IF THE PHASE 2 TERMINATION OCCURS, THEN THE "RECOVERY PERIOD" SHALL MEAN THE FIVE YEAR PERIOD AFTER THE PHASE 1 COMMENCEMENT DATE, AND THE "INDEMNIFIED AMOUNT" SHALL MEAN THE SUM OF THE PHASE 1 ACTUAL COSTS PLUS THE AGREED RETURN THEREON.**

(b) **BASIN HEREBY AGREES TO INDEMNIFY AND HOLD THPP HARMLESS FOR THE INDEMNIFIED AMOUNT IN ACCORDANCE WITH THE FOLLOWING PROVISIONS:**

(i) Subject to Section 8(c) and within (A) 30 days after the end of the Recovery Period or (B) upon the earlier termination of this Agreement under Section 9(b) or pursuant to Section 11 due to a Default of Basin, THPP will notify Basin of: (x) the aggregate amount of THPP Revenues received during the period from the Phase 1 Commencement Date until the last day of the Recovery Period or the earlier termination of this Agreement, (the "Relevant Period"), including any Credits; (y) the calculation of the Indemnified Amount, and (z) whether there is a Revenue Deficiency, and if so, the amount of the Revenue Deficiency. "Revenue Deficiency" means the amount (if any) by which the Indemnified Amount exceeds the THPP Revenues during the Relevant Period. In calculating the Revenue Deficiency, the THPP Revenues shall be increased by the amount of any Credits. "Credits" means any THPP Revenues that were not received by THPP during the Relevant Period due to (1) THPP's breach of, or unexcused failure to provide services in accordance with any applicable THPP tariff, or (2) THPP's inability, due to the occurrence of proration under THPP's tariff, to ship volumes nominated by Basin and any other shippers (up to the Phase 1 Capacity after the Phase 1 Commencement Date and up to the Phase 2 Capacity after the Phase 2 Commencement Date as applicable) from the Dunn Center Station to the Beulah Tie-In Point, or (3) Force Majeure (as defined herein) on the Pipeline System. In calculating the amount of Credits (if any) to be applied to the THPP Revenues, THPP shall multiply (AA) any volumes nominated by shippers to the Beulah Tie-In Point in accordance with the applicable tariff(s) during any month of the Relevant Period but that were not shipped (on a monthly average basis) due to any of the reasons described in (1), (2), and (3) above, times (BB) a deemed rate of $1.15 per barrel, escalated in accordance with FERC-approved indexing methodology or as otherwise provided in Section 6(b)(iii).

(ii) If there is a Revenue Deficiency, then Basin shall pay THPP the amount of the Revenue Deficiency, by electronic transfer of good and sufficient immediately available funds, to THPP's account indicated in THPP's notice, within fifteen (15) days after receipt of such notice from THPP, failing which Basin shall be in default of this Agreement ("Basin Payment Default") and THPP shall be entitled to exercise its remedies under the Guaranty and Section 11.

(c) Except to the extent excused by Force Majeure or the acts or omissions of THPP, THPP's Affiliates or others for which THPP is legally responsible, during the Term, Basin will maintain connectivity between the Specified Tank at the Beulah Rail Facility and the Beulah Lateral at the Beulah Tie-In Point, with the capability to receive from THPP at the Beulah Tie-In Point, at least the Phase 1 Capacity each day on and after the Phase 1 Commencement Date, and, as applicable, at least the Phase 2 Capacity each day on and after the Phase 2 Commencement Date.

(d) The foregoing obligations of Basin shall be deemed to be fully satisfied, released and discharged, and the provisions of Section 8 shall cease to apply, on the day (if any) on which the THPP Revenues (adjusted for any Credits) are equal to the Indemnified Amount. If such event occurs before the expiration of the Recovery Period, THPP will notify Basin as soon as reasonably possible upon becoming aware, and in such event, this Agreement shall nevertheless continue in effect until the last day of the Term; *provided however*, that the obligations of Basin under this Section 7 and the obligations of Basin under Section 8 shall terminate on the date specified in THPP's notice.

**8. REPRESENTATIONS OF BASIN; SECURITY FOR BASIN'S INDEMNITY OBLIGATIONS**

(a) Basin represents, warrants and covenants to THPP that:

(i) Basin is the owner of the Beulah Rail Facility and the Specified Tank , and has full right and authority to enter into and perform its obligations under this Agreement, the Connection Agreement and the Easement Agreement, and

(ii) Commencing on the Phase 1 Commencement Date, Basin will operate and maintain the Beulah Rail Facility in a manner consistent with industry standards and practices; and

(iii) Commencing on the Phase 2 Commencement Date, if applicable, Basin will operate and maintain the Beulah Rail Facility in a manner consistent with industry standards and practices.

(b) Basin represents, warrants and covenants to THPP that:

(i) Commencing on the Phase 1 Commencement Date, Basin will maintain at all times a physical connection between the Specified Tank at the Beulah Rail Facility and the Beulah Lateral, with the capability to receive at least the Phase 1 Capacity (meeting quality specifications in THPP's tariffs) into the Beulah Rail Facility from the Beulah Lateral, and will operate and maintain the Specified Tank at the Beulah Rail Facility in a manner consistent with industry standards and practices; and

(ii) Commencing on the Phase 2 Commencement Date, as applicable, Basin will maintain at all times a physical connection between the Specified Tank at the Beulah Rail Facility and the Beulah Lateral, with the capability to receive at least the Phase 2 Capacity (meeting quality specifications in THPP's tariffs) into the Beulah Rail Facility from the Beulah Lateral, and will operate and maintain the Specified Tank at the Beulah Rail Facility in a manner consistent with industry standards and practices.

(iii) the Guaranty constitutes security for Basin's indemnity obligations under Section 7, and shall remain in full force and effect until such time as the Indemnified Amount is fully recovered by THPP in accordance with this Agreement. If, at any time, (A) Basin ceases to be a partially-owned indirect subsidiary of Guarantor, or (B) a Default described in Section 11(a)(ii) occurs in relation to Guarantor, or (C) THPP reasonably determines that the credit or financial responsibility of Guarantor is impaired, unsatisfactory or unacceptable, or (D) any of Guarantor's representations and warranties under

the Guaranty ceases to be true and correct, then upon request by THPP (in THPP's discretion and without prejudice to its other rights and remedies), Basin shall immediately provide substitute security for its indemnity obligation under Section 7, in form, amount and substance acceptable to THPP and from an entity acceptable to THPP, acting in good faith, failing which Basin shall be in Default. If such substitute security is requested and provided, references herein to the "Guaranty" shall be deemed to include such substitute security, and references to the "Guarantor" shall be deemed to include the provider of such substitute security. At Basin's election at any time before the Indemnified Amount is fully recovered by THPP in accordance with this Agreement, Basin may provide a demand letter of credit in form, substance and issued by a banking institution reasonably satisfactory to THPP equal to the then-outstanding balance of the Indemnified Amount (a "Letter of Credit") in lieu of the Guaranty. If such a Letter of Credit is provided, references herein to the "Guaranty" shall be replaced with references to such Letter of Credit, references to the "Guarantor" shall be deleted and the Guaranty shall be terminated and of no further force and effect after the effective date of such Letter of Credit.

(iv) As of the Effective Date at all times until the Indemnified Amount is recovered by THPP in accordance with this Agreement, there is and will be (A) no valid defense to the payment on the due date of the Indemnified Amount or Revenue Deficiency, as applicable, and (B) no valid right of offset or counterclaim on the part of Basin with regard to the Indemnified Amount or Revenue Deficiency, as applicable.

(c) If the Phase 2 Termination occurs, then the Guaranty Cap (as defined in the Guaranty) will be reduced to thirteen million dollars ($13,000,000), and Basin will cause the Guarantor to issue a replacement Guaranty to THPP (in the form of Addendum B), reflecting such revised amount. Upon THPP's receipt of such replacement Guaranty, the original Guaranty will be deemed to be cancelled and thereafter null and void.

(d) Upon termination of this Agreement by THPP pursuant to Section 9(b) or if a Default occurs in relation to Basin, THPP may immediately make demand upon the Guarantor and exercise its rights under the Guaranty. Basin agrees to pay or reimburse THPP for all its costs and expenses incurred in connection with the enforcement or preservation of THPP's rights hereunder (including, without limitation, reasonable attorney's fees).

**9. TERM; SURVIVAL**

(a) Unless terminated earlier in accordance with another provision hereof, the term of this Agreement ("Term") shall commence on the Effective Date and shall continue until (i) the expiration of the fifth (5th) annual anniversary of the Phase 2 Commencement Date, or (ii) if the Phase 2 Termination occurs, until the fifth (5th) annual anniversary of the Phase 1 Commencement Date, whereupon it shall automatically expire unless extended by written agreement of the Parties. The expiration or termination of this Agreement shall be without prejudice to the rights of the Parties arising prior to such expiration or termination, and shall not release any Party from any liability or obligation arising prior to such expiration or termination, including without limitation, the indemnity obligation of Basin under Section 7 and the rights of THPP under Sections 7 and 8 which expressly survive such termination or expiration until THPP receives an amount equal to the Revenue Deficiency determined in accordance with Section 7(a)(i).

(b) Notwithstanding any provision hereof to the contrary, if, following the Phase 1 Commencement Date, no volumes of crude petroleum are delivered at the Beulah Tie-In Point destination during any 180 days within any period of twelve consecutive months, and the reason therefor is not due to the fault of THPP or its Affiliates or Force Majeure affecting the Pipeline System, then THPP shall have the right to immediately terminate this Agreement and exercise its rights under Sections 7 and 8 and receive the Revenue Deficiency, if any, from Basin.

## 10. LIMITATION ON LIABILITY

Notwithstanding anything to the contrary contained herein, no Party shall be liable or responsible to any other Party or such other Party's Affiliates for any consequential, incidental, or punitive damages, or for loss of profits or revenues (collectively referred to as "special damages") incurred by such Party or its Affiliates that arise out of or relate to this Agreement, regardless of whether any such claim arises under or results from contract, tort, or strict liability; *provided* that the foregoing limitation is not intended and shall not affect special damages imposed in favor of unaffiliated Persons that are not Parties to this Agreement.

## 11. DEFAULT; TERMINATION

(a) A Party shall be in default under this Agreement (each a "Default") if:

(i) the Party materially breaches any provision of this Agreement or any of the Related Agreements, and such breach is not cured within sixty (60) days after notice thereof (which notice shall describe such breach in reasonable detail) is received by such Party from THPP (if the breaching Party is Basin) or from Basin (if the breaching party is THPP); or

(ii) the Party (A) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar Applicable Law, or has any such petition filed or commenced against it; (B) makes an assignment or any general arrangement for the benefit of creditors; (C) otherwise becomes bankrupt or insolvent (however evidenced); or (D) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or

(iii) in relation to Basin, a Basin Payment Default occurs under Section 7(a)(ii) or in relation to Basin, there is a breach of any of Basin's representations, warranties or covenants under Section 8 .

(b) If a Default occurs in relation to THPP, then Basin may: (1) terminate this Agreement and the Related Agreements upon notice to THPP; (2) withhold any payments due to THPP under this Agreement and any Related Agreements (but not any THPP tariffs); and/or (3) pursue any other remedy permitted by this Agreement, the Related Agreements, at law or in equity, including the remedies of Basin in Sections 7 and 8 in the event of a Default by THPP. If a Default occurs in relation to Basin, then THPP may: (1) terminate this Agreement and the Related Agreements upon notice to Basin; (2) withhold any payments due to Basin under this Agreement and any Related Agreements (but not any THPP tariffs); and/or (3) pursue any other remedy permitted by this Agreement, the Related Agreements, at law or in equity, including the remedies of THPP in Sections 7 and 8 in the event of a Default by Basin.

## 12. FORCE MAJEURE

Neither THPP nor Basin shall be liable to the other for failure or delay in performing an obligation under this Agreement to the extent that such failure or delay is due to Force Majeure. In the event either THPP or Basin must invoke the provisions of this Section, such Party shall use its best efforts to provide the other Party, in writing (telex, fax or other electronic communications acceptable) with as much advance notice as is possible, stating the underlying circumstances of the particular causes(s) of Force Majeure, and the expected duration thereof. Each of THPP and Basin shall use reasonable diligence to cure or correct any condition of Force Majeure affecting performance by such Party, *provided however*, that no Party shall be obligated to settle any strikes or labor disputes on terms it deems unsatisfactory.

## 13. ASSIGNMENT

(a) Basin shall not assign any of its respective rights or obligations under this Agreement without THPP's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that (x) Basin may assign this Agreement to an Affiliate, and (y) Basin may assign this Agreement without THPP's consent in connection with a sale of the Beulah Rail Facility, so long as the transferee: (i) agrees to assume all obligations of Basin under this Agreement, including without limitation, the indemnities provided herein, and all obligations of Basin under the Related Agreements, and (ii) is financially and operationally capable of fulfilling the terms of this Agreement, which determination shall be made by THPP in its reasonable judgment and (iii) the Guarantor continues to remain liable under the Guaranty unless THPP agrees, in its sole discretion, to accept a replacement guaranty, substantially in the form of the Guaranty, from a substitute guarantor. As a condition for approving any such assignment, THPP may require that Basin shall continue to remain liable for their respective obligations under Sections 7 and 8, and that the Guarantor shall continue to remain liable under the Guaranty. In addition, Basin shall be permitted to make a collateral assignment of this Agreement solely to secure financing.

(b) THPP shall not assign any of its rights or obligations under this Agreement without the prior written consent of Basin, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that (i) THPP may assign this Agreement without such consent in connection with a sale by THPP of the Pipeline System so long as the transferee: (A) agrees to assume all of THPP's obligations under this Agreement; (B) is financially and operationally capable of fulfilling the terms of this Agreement; and (ii) THPP shall be permitted to make a collateral assignment of this Agreement solely to secure financing for THPP.

(c) Any assignment that is not undertaken in accordance with the provisions set forth above shall be null and void *ab initio*. A Party making any assignment shall promptly notify the other Party of such assignment, regardless of whether consent is required. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and references to any Person herein include the successors and permitted assigns thereof.

## 14. NOTICES

All notices, requests, demands, and other communications hereunder will be in writing and will be deemed to have been duly given: (i) if by transmission by facsimile or hand delivery, when delivered; (ii) if mailed via the official governmental mail system, five (5) Business Days after mailing, provided said notice is sent first class, postage pre-paid, via certified or registered mail, with a return receipt requested; (iii) if mailed by an internationally recognized overnight express mail service such as Federal Express, UPS, or DHL Worldwide, one (1) Business Day after deposit therewith prepaid; or (iv) if by e-mail one Business Day after delivery with written receipt of successful transmission to the recipient's email address generated by the sender's equipment. All notices will be addressed to the Parties at the respective addresses as follows:

<u>If to Basin, to</u>:

**Routine Operational and Scheduling Purposes:**
Basin Transload, LLC
Attn: Ray Sheldon
3529 Gabel Road
P.O. Box 80284
Billings, MT

Phone: 406-855-5008
Facsimile:
e-mail: rsheldon@basintransload.com

**All Other Notices and Communications**:
Basin Transload, LLC
Attn: Mark Romaine
800 South Street
Suite 200
Waltham, MA 02453
Phone: 781-398-4000
Facsimile: 781-398-9000
e-mail: mromaine@globalp.com

with a copy to:

Basin Transload, LLC
Attn: General Counsel
800 South Street
Suite 200
Waltham, MA 02453
Phone: 781-398-4211
Facsimile: 781-398-9211
e-mail: efaneuil@globalp.com

If to THPP, to:

**Routine Operational and Scheduling Purposes:**
Tesoro High Plains Pipeline Company LLC
11071 32nd St SW
P. O. Box 1207
Dickinson, ND 58601
Attention: Jodie Lindley, Supervisor Scheduling and Inventory
Phone: 701-225-8973 x 103
Email: Jodie.L.Lindley@tsocorp.com

**All Other Notices and Communications**:
Tesoro High Plains Pipeline Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 778259
Attention: Danielle Mendez, Contracts Administrator-Logistics
Phone: 210-626-6529
Fax: 210-579-4517
Email: danielle.c.mendez@tsocorp.com

With a copy to:

Tesoro High Plains Pipeline Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention: General Counsel

Phone: (210) 283-2280
Fax No.: (210) 283-2833

or to such other address or to such other person as either Party will have last designated by notice to the other Party.

**15. CONFIDENTIAL INFORMATION**

(a) Obligations. Each Party shall use reasonable efforts to retain the other Parties' Confidential Information in confidence and not disclose the same to any third party nor use the same, except as authorized by the disclosing Party in writing or as expressly permitted in this Section 15. Each Party further agrees to take the same care with the other Parties' Confidential Information as it does with its own, but in no event less than a reasonable degree of care. Excepted from these obligations of confidence and non-use is that information which:

(i) is available, or becomes available, to the general public without fault of the receiving Party;

(ii) was in the possession of the receiving Party on a non-confidential basis prior to receipt of the same from the disclosing Party;

(iii) is obtained by the receiving Party without an obligation of confidence from a third party who is rightfully in possession of such information and, to the receiving Party's knowledge, is under no obligation of confidentiality to the disclosing Party;

(iv) is independently developed by the receiving Party without reference to or use of the disclosing Party's Confidential Information; or

(v) is necessary in order to enforce the terms and conditions of this Agreement.

For the purpose of this Section 15, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by, or underlies, more general information in the public domain or in the possession of the receiving Party.

(b) Required Disclosure. Notwithstanding Section 15(a), if the receiving Party becomes legally compelled to disclose the Confidential Information by a court, Governmental Authority or Applicable Law, or is required to disclose by the listing standards of the New York Stock Exchange, any of the disclosing Party's Confidential Information, the receiving Party shall promptly advise the disclosing Party of such requirement to disclose Confidential Information as soon as the receiving Party becomes aware that such a requirement to disclose might become effective, in order that, where possible, the disclosing Party may seek a protective order or such other remedy as the disclosing Party may consider appropriate in the circumstances. The receiving Party shall disclose only that portion of the disclosing Party's Confidential Information that it is required to disclose and shall cooperate with the disclosing Party in allowing the disclosing Party to obtain such protective order or other relief.

(c) Return of Information. Upon written request by the disclosing Party, all of the disclosing Party's Confidential Information in whatever form shall be returned to the disclosing Party upon termination of this Agreement or destroyed with destruction certified by the receiving Party, without the receiving Party retaining copies thereof except that one copy of all such Confidential Information may be retained by a Party's legal department solely to the extent that such Party is required to keep a copy of such Confidential Information pursuant to Applicable Law and the receiving Party shall be entitled to

retain any Confidential Information in the electronic form or stored on automatic computer back-up archiving systems during the period such backup or archived materials are retained under such Party's customary procedures and policies; provided, however, that any Confidential Information retained by the receiving Party shall be maintained subject to confidentiality pursuant to the terms of this Section 15, and such archived or back-up Confidential Information shall not be accessed except as required by Applicable Law.

(d) Receiving Party Personnel. The receiving Party will limit access to the Confidential Information of the disclosing Party to those of its employees, attorneys, and contractors that have a need to know such information in order for the receiving Party to exercise or perform its rights and obligations under this Agreement (the "Receiving Party Personnel"). The Receiving Party Personnel who have access to any Confidential Information of the disclosing Party will be made aware of the confidentiality provision of this Agreement, and will be required to abide by the terms thereof. Any third party contractors that are given access to Confidential Information of a disclosing Party pursuant to the terms hereof shall be required to sign a written agreement pursuant to which such Receiving Party Personnel agree to be bound by the provisions of this Agreement, which written agreement will expressly state that it is enforceable against such Receiving Party Personnel by the disclosing Party.

(e) Survival. The obligation of confidentiality under this Section 15 shall survive the termination of this Agreement for a period of two (2) years.

## 16. MISCELLANEOUS

(a) Modification; Waiver. This Agreement may be terminated, amended or modified only by a written instrument executed by the Parties. Any of the terms and conditions of this Agreement may be waived in writing at any time by the Party entitled to the benefits thereof. No waiver of any of the terms and conditions of this Agreement, or any breach thereof, will be effective unless in writing signed by a duly authorized individual on behalf of the Party against which the waiver is sought to be enforced. No waiver of any term or condition or of any breach of this Agreement will be deemed or will constitute a waiver of any other term or condition or of any later breach (whether or not similar), nor will such waiver constitute a continuing waiver unless otherwise expressly provided.

(b) Entire Agreement. This Agreement, together with the Schedules, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

(c) Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Texas without giving effect to its conflict of laws principles. Each Party hereby irrevocably submits to the exclusive jurisdiction of any federal court of competent jurisdiction situated in the United States District Court for the Western District of Texas, San Antonio Division, or if such federal court declines to exercise or does not have jurisdiction, in the district court of Bexar County, Texas. The Parties expressly and irrevocably submit to the jurisdiction of said Courts and irrevocably waive any objection which they may now or hereafter have to the laying of venue of any action, suit or proceeding arising out of or relating to this Agreement brought in such Courts, irrevocably waive any claim that any such action, suit or proceeding brought in any such Court has been brought in an inconvenient forum and further irrevocably waive the right to object, with respect to such claim, action, suit or proceeding brought in any such Court, that such Court does not have jurisdiction over such Party. The Parties hereby irrevocably consent to the service of process by registered mail, postage prepaid, or by personal service within or without the State of Texas. Nothing contained herein shall affect the right to serve process in any manner permitted by law.

(d) Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile or portable document format (pdf)) for the convenience of the Parties hereto, each of which counterparts will be deemed an original, but all of which counterparts together will constitute one and the same agreement.

(e) Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be valid and effective under applicable law, but if any provision of this Agreement or the application of any such provision to any person or circumstance will be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision hereof, and the Parties will negotiate in good faith with a view to substitute for such provision a suitable and equitable solution in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

(f) No Third Party Beneficiaries. It is expressly understood that the provisions of this Agreement do not impart enforceable rights in anyone who is not a Party or successor or permitted assignee of a Party.

(g) WAIVER OF JURY TRIAL. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY PERFORMANCE OR FAILURE TO PERFORM OF ANY OBLIGATION HEREUNDER.

(h) Addenda. Each of the addenda attached hereto and referred to herein is hereby incorporated in and made a part of this Agreement as if set forth in full herein.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the Effective Date.

**BASIN TRANSLOAD, LLC**

By: ________________________

Name: ~~Mark Romaine~~ Edward J. Faneuil

Title: ~~Chief Operating Officer~~ Executive Vice President

**TESORO HIGH PLAINS PIPELINE COMPANY LLC**

By: ________________________

Name: ________________________

Title: ________________________

**EXHIBIT "A"**

To Construction and Indemnity Agreement
[Beulah Tie-In]
Between Tesoro High Plains Pipeline Company LLC
and Basin Transload, LLC



**ADDENDUM "A"**

To Construction and Indemnity Agreement
[Beulah Tie-In]
Between Tesoro High Plains Pipeline Company LLC
and Basin Transload, LLC

**Form of Connection Agreement between THPP and Basin**

**CONNECTION AGREEMENT**

This Connection Agreement ("Agreement") is made this 3rd day of April, 2014 by and among TESORO HIGH PLAINS PIPELINE COMPANY LLC, a Delaware limited liability company ("THPP"), having a place of business at 19100 Ridgewood Parkway, San Antonio, Texas 78259; and BASIN TRANSLOAD, LLC, a Delaware limited liability company ("Basin") having a place of business at c/o Global Companies LLC, 800 South Street, Suite 200, Waltham, MA 02453 (hereinafter, THPP and Basin shall collectively be referred to as the "Parties" and each individually as a "Party").

WHEREAS, (a) Basin owns a 140,000 barrel storage tank (the "Specified Tank") and related facilities (together with the Specified Tank, the "Basin Facilities") located at Basin's rail transloading facility near Beulah, North Dakota (such railroad transloading facility and the Basin Facilities being located approximately as shown on the attached Exhibit A), and (b) THPP is the owner and operator of an interstate crude oil pipeline in North Dakota (such pipeline and related facilities being located approximately as shown on the attached Exhibit A, the "THPP Pipeline");

AND, WHEREAS, Basin has requested that THPP undertake capital investments project to construct certain new facilities that will be owned and operated by THPP on Basin's property, modify certain existing facilities and make other improvements on the THPP Pipeline in relation to a tie-in to the Basin Facilities, pursuant to that certain Construction and Indemnity Agreement, dated ~~March~~ April 3, 2014, by and among THPP and Basin (the "Construction and Indemnity Agreement");

AND WHEREAS, the Parties desire to enter into this Agreement for the purpose of establishing a tie-in between the THPP Pipeline and the Basin Facilities;

NOW THEREFORE, in consideration of the foregoing premises, the receipt and sufficiency of which are hereby acknowledged by THPP and Basin, the Parties agree as follows:

1. **THPP Facilities**. Pursuant to separate, but related agreements (including without limitation the Construction and Indemnity Agreement), in order to facilitate the connection of the THPP Pipeline to the Basin Facilities, THPP will construct approximately four and one tenth (4.1) miles of 10-inch lateral pipeline from THPP's existing block gate valve at milepost #55.78 near Zap on the THPP Pipeline (the "Zap Block Valve"), to the Basin Facilities, having the capacity to transport at least (a) 10,000 barrels per day of crude oil (meeting the THPP tariff quality specifications) on and after the Phase 1 Commencement Date (as defined in the Construction and Indemnification Agreement) to the Tie-In Point (defined below), and (b), if Basin provides THPP with notice of its Phase 2 Election as provided under the Construction and Indemnity Agreement, 40,000 barrels per day of crude oil (meeting the THPP tariff quality

specifications) on and after the Phase 2 Commencement Date (as defined in the Construction and Indemnification Agreement), together with all piping, pumps, valves, pipeline custody transfer meters, instruments and other equipment (collectively, including the lateral pipeline, the "THPP Facilities") necessary to interconnect such lateral pipeline with the THPP Pipeline and the Specified Tank that will be owned and operated by THPP

2. **Tie-In; Easement; Access**.

(a) Beulah Tie-In Point. The Parties agree that during the term of this Agreement, the THPP Pipeline shall, pursuant to the terms and conditions of this Agreement, be tied into the Basin Facilities as shown on Exhibit A (such tie-in point being referred to hereinafter as the "Beulah Tie-In Point"). The connection point shall be the outlet flange of the first block valve downstream of the custody transfer meter skid. Following the Phase 1 Commencement Date, THPP and Basin will mutually agree and identify the exact location of the Beulah Tie-In Point , as generally described above, on construction drawings and by specific piece of equipment for the transition point from THPP's obligations with respect to the THPP Facilities and Basin's obligations with respect to the Basin Facilities.

(b) Easement and Licenses. Basin will grant to THPP an easement and license in the form of Exhibit B attached hereto.

(c) Access.

(i) Subject to subsection 2(c)(ii) below, Basin shall grant THPP and its employees, contractors, agents and representatives reasonable access to the Basin Facilities at all times during the Term for, among other things, provings tests, collection of samples, monitoring of receipts and deliveries, inspections of the Basin Facilities and the witnessing of tests of the Basin Facilities. THPP shall provide no less than forty-eight (48) hours written notice to Basin prior to THPP's requested inspections.

(ii) Basin may require THPP and each contractor to execute a reasonable access agreement that conforms to industry custom and practice. THPP and contractors must agree to comply with any such access agreement and the rules and procedures of the Basin Facilities, which shall be in standard industry form. THPP shall, and shall require its contractors to, comply with applicable law and carry all necessary liability and pollution insurance as may be required by law.

(iii) The activities of each Party and its employees and contractors shall be conducted in such a manner as to minimize interference with the other Party's operation of the THPP Facilities and Basin Facilities, as the case may be, and each Party shall coordinate with the other scheduling of all maintenance, repair, replacement and/or construction activities on the Basin property covered by the licenses prior to commencing such activities, provided however that each Party shall have the right to immediately undertake reasonable emergency activities required to protect public safety, health or the environment in connection with its activities. When accessing the Basin Facilities, employees and contractors of THPP and all individuals under the direction of or under contract to THPP shall be subject to and comply with all of Basin's safety and security policies as they may exist from time to time and are communicated to THPP, and shall follow recommended industry safety practices when present at the Basin Facilities. Basin shall have the right to evict and exclude any person who is not in compliance with such

policies. Basin shall have the right to designate reasonable points of ingress and egress to the Basin Facilities, as applicable, to be used to access the Basin Facilities. THPP may separately fence or enclose the above ground portions of the THPP Pipeline and THPP Facilities apart from the Basin Facilities without Basin's prior written approval. Any fences or gates removed during construction shall be promptly restored to their original condition. If THPP should install locked fences or other controlled access to the THPP Facilities, THPP shall provide Basin with keys, codes or other means to allow Basin's contractors and employees to have access to the THPP Facilities, and all Parties shall cooperate to maintain adequate security for the THPP Facilities. If Basin should install locked gates or other controlled access to the Basin Facilities, Basin shall provide THPP with keys, codes or other means to allow THPP's contractors and employees to have access to the Basin Facilities, and all Parties shall cooperate to maintain adequate security for the Basin Facilities.

(d) Status of Access Rights. THPP, and its employees and contractors obtaining access to the Basin Facilities, shall have the status of "licensees," and Basin shall owe to such persons and entities the duty of care owed to a licensee with respect to the condition of the Basin Facilities and warnings.

3. **Fees and Costs**. Each Party shall pay (or cause its Affiliates to pay) its own costs for installing, operating, maintaining, repairing and maintaining all of its pipelines, buildings, equipment and facilities contemplated under this Agreement, and otherwise performing its obligations and responsibilities under this Agreement. No Party shall have an obligation to pay any additional consideration to any other Party as a part of this Agreement, except for costs associated with the use of a contract prover as set forth in Section 6(b) of this Agreement.

4. **Power**. THPP shall be provided access to power via Basin's existing connection, subject to the guidelines of the local power company for allocating power to a third party and THPP shall be obligated to pay for such power obtained via Basin's existing connection. The license granted herein shall include the right to install power lines and electric meters for such operation, if necessary.

5. **Operation of the Tie-In**.

(a) THPP shall maintain the THPP Pipeline manifold, metering, sampling, and other equipment associated with the tie-in hereunder in a structurally fit and safe condition in full compliance with all local, state, and federal laws and regulations and permit requirements. Basin shall maintain the Basin Facilities associated with the tie-in hereunder in a structurally fit and safe condition in full compliance with all local, state, and federal laws and regulations and permit requirements.

(b) Crude oil delivery rates and schedules (including, but not limited to, specific times of deliveries hereunder) shall be as mutually agreed upon by THPP and Basin and in accordance with the operational needs of each Party. Total volumes delivered by THPP shall be consistent with the monthly nomination by Basin or its third party customers and applicable tariff procedures. All crude oil deliveries into and transportation through THPP's pipelines shall be subject to the terms of THPP's applicable tariffs, as they may exist from time to time.

(c) Basin recognizes and acknowledges that THPP reserves the right to monitor the Basin Facilities and the level in the Specified Tank or other destination point.

(d) THPP and Basin agree that if their operational needs related to the deliveries of crude oil to the Basin Facilities change, they shall meet and negotiate in good faith concerning mutually acceptable changes to operating, maintenance and other procedures.

(e) The Parties agree that deliveries of crude oil to the Basin Facilities via the THPP Pipeline shall be limited to no more than (1) 10,000 barrels per calendar day on and after the Phase 1 Commencement Date, and (ii) 40,000 barrels per calendar day on and after the Phase 2 Commencement Date, as applicable.

(f) Basin shall maintain physical connection to the Tie-In Point and shall not decommission the Specified Tank during the Term of this Agreement without prior written consent from THPP.

6. **Custody Transfer**. The procedures for custody transfer and the measuring of such delivered crude oil shall be in accordance with the following:

(a) A custody transfer meter for deliveries to the Basin Facilities shall be located at the Basin Facilities as part of the THPP Facilities. THPP shall install, own and operate said meter, and shall be responsible for the maintenance, repair and replacement of such meter, subject however, to the other provisions contained herein.

(b) THPP shall perform meter provings on THPP's custody transfer meter using THPP-owned provers. If a contract prover is used because a THPP owned prover is unavailable, the Parties agree to split the cost of the contract prover. Basin and THPP shall have the right to witness the proving of the delivery meters.

(c) THPP shall not be responsible for providing meter provings for Basin custody transfer receipts from or deliveries to non-THPP facilities.

(d) THPP shall maintain the THPP Pipeline delivery station in good operating condition and repair at all times. Should Basin determine at any time that the THPP custody transfer meter for delivery of crude oil into the Basin Facilities is not accurately measuring deliveries to API industry standards for custody transfer, Basin can submit at Basin's sole discretion a claim in writing to THPP. Such measurement claims shall be submitted within a timely manner and shall outline the reason for the claim, together with supporting data to substantiate the reason and justification for the measurement claim. THPP will review the written measurement claim from Basin and diligently investigate the custody transfer meter to determine if there is a measurement problem. THPP will use industry accepted operational and maintenance procedures to investigate the Basin claim, which could include calibration review of transmitters and meters, flow computer program review, meter factor review, source tank gauges and other similar reviews. Any errors or defects in the meters shall be immediately corrected. Once the measurement investigation has been completed, THPP will promptly submit the results of the investigation to Basin for their review. Should it be determined that the THPP meter has failed to accurately record the volumes of crude oil delivered, THPP will promptly submit in writing to Basin an explanation of the reason for the failure, a proposed custody transfer adjustment ticket and the justification for such custody transfer adjustment ticket. THPP will use accepted industry practices to determine the volume on the proposed custody transfer adjustment ticket. The proposed custody transfer adjustment ticket and supporting justification will be provided to Basin in writing once the investigation has been completed and the most accurate data to calculate the

volume has been determined. Basin and THPP will then negotiate in good faith to determine the most accurate method to account for the delivered volume into the Basin Facilities and the correct amount to include on a final custody transfer adjustment ticket, which shall be used to correct the volumes accounted for as being delivered by THPP into the Basin Facilities, subject to and consistent with the applicable THPP tariffs.

(e) THPP shall be required to maintain a BS&W monitor on all deliveries to the Basin Facilities. Basin shall have the right to inspect and set the THPP BS&W monitor, and then install Basin security seals on all THPP equipment related to custody transfer deliveries to the Basin Facilities under this agreement. THPP shall provide advance notice to Basin prior to breaking any seal and shall provide the opportunity for a Basin employee to be present when the seal is broken. Basin agrees to set the THPP BS&W monitor directly related to custody transfer deliveries to the Basin Facilities at 0.5% BS&W. THPP agrees not to deliver more than 0.3% water to the Basin Facilities under this agreement.

7. **Shut-in Rights and Emergencies**.

(a) THPP and Basin each shall at all times have the right, for the protection of persons, property or the environment, to shut-in the tie-in connection. THPP shall provide Basin with sufficient notice prior to shut-in to allow Basin adequate time to shut down the appropriate equipment and/or piping at the Basin Facilities, provided however that prior notice shall not be required in the event of emergencies, in which case THPP shall notify Basin as quickly as reasonably possible. Basin will have the right to shut down crude oil receipts at any time when operating conditions, accidents or emergencies warrant such action, and Basin shall provide reasonable prior notification to THPP to the extent possible. THPP and Basin shall each take appropriate shut-in action in the event of an actual or potential release of crude oil and provide immediate notification to the other Party. The Parties will cooperate with each other to minimize and/or mitigate the effect of unscheduled shut-ins.

(b) Basin shall respond to spills or releases of petroleum products or hazardous materials from the Basin Facilities in compliance with local, state and federal regulations. Basin shall notify THPP immediately when an incident involving the Basin Facilities occurs or there is eminent danger to personnel or the environment due to the integrity of the piping system. THPP shall respond to spills or releases of petroleum products or hazardous materials from the THPP Facilities in compliance with local, state and federal regulations. THPP shall notify Basin immediately when an incident involving the THPP Facilities occurs or there is eminent danger to personnel or the environment due to the integrity of the piping system.

(c) In the event of any emergency, Basin and THPP shall diligently cooperate in good faith to appropriately manage the emergency situation in a timely and effective manner. Such cooperation shall include, but not be limited to, providing necessary access to each Party and its contractors to the applicable portions of the Basin Facilities and the improvements, easements and licenses thereon, at such Party's sole cost, risk and liability, and provided further that such access shall remain subject to reasonable safety and security measures instituted by either Party. Basin shall be the primary responsible party under applicable laws and regulations for spills, discharges or releases of crude oil or other hazardous substances arising from the Basin Facilities, and THPP shall be the primary responsible party under applicable laws and regulations for spills, discharges or releases of crude oil or other hazardous substances arising from the other portions of the THPP Pipeline and the THPP Facilities, but such designation shall not restrict a Party's rights, if any, to contribution and/or indemnity.

8. **Indemnification.**

(a) Basin shall be responsible for and shall save, indemnify, defend and hold harmless the THPP Group, from and against all claims, suits, demands, proceedings, judgments, losses, damages, costs (including reasonable attorneys' fees and legal costs) expenses and liabilities in respect of:

(i) loss of or damage to property of the Basin Group whether owned, hired, leased or otherwise provided by the Basin Group; and

(ii) personal injury including death or disease to any employee or agent of the Basin Group; and

(iii) pollution, spills, leaks or releases of materials emanating from the property of the Basin Group, except to the extent caused by the negligence or misconduct of any member of the THPP Group; and

(iv) personal injury including death or disease or loss of or damage to the property of any third party to the extent that any such injury, loss or damage is caused by the negligence, willful misconduct or breach of duty (whether statutory or otherwise) of the Basin Group. Where personal injury, including death or disease or loss of or damage to property is the result of joint negligence willful misconduct or breach of duty of any member(s) of both the Basin Group and the THPP Group hereto, the Parties expressly agree to defend and indemnify each other in proportion to their respective shares of such joint negligence, willful misconduct or breach of duty. For the purposes of this Article 7(a)(iv) "third party" shall mean any party which is not a member of the Basin Group or the THPP Group.

(b) THPP shall be responsible for and shall save, indemnify, defend and hold harmless the Basin Group from and against all claims, suits, demands, proceedings, judgments, losses, damages, costs (including reasonable attorneys' and legal costs) expenses and liabilities in respect of:

(i) loss of or damage to property of the THPP Group whether owned, hired, leased or otherwise provided by the THPP Group; and

(ii) personal injury including death or disease to any employee or agent of the THPP Group; and

(iii) pollution, spills, leaks or releases of materials emanating from the property of the THPP Group, except to the extent caused by the negligence or misconduct of any member of the Basin Group; and

(iv) personal injury including death or disease or loss of or damage to the property of any third party to the extent that any such injury, loss or damage is caused by the negligence, willful misconduct or breach of duty (whether statutory or otherwise) of the THPP Group. Where personal injury, including death or disease or loss of or damage to property is the result of joint negligence willful misconduct or breach of duty of any member(s) of both the Basin Group and the THPP Group hereto, the Parties expressly

agree to defend and indemnify each other in proportion to their respective shares of such joint negligence willful misconduct or breach of duty. For the purposes of this Article 7(b)(iv) "third party" shall mean any party which is not a member of the Basin Group or the THPP Group.

**(c) Except as otherwise specified herein with respect to liability to a third party, all exclusions and indemnities given under this Article 7 shall apply irrespective of cause and notwithstanding the negligence, willful misconduct or breach of duty (whether statutory or otherwise) of the indemnified Party or any other entity or party and shall apply irrespective of any claim in tort, under contract or otherwise at law.**

(d) For the purposes of this Article 8, "THPP Group" shall mean THPP, its parent, related companies and affiliates, and its/their officers, directors, managers, managing members, members and employees and "Basin Group" shall meanBasin, its parent, related companies and affiliates, and its officers, directors, managers, managing members, members and employees.

(e) If any of Basin or THPP becomes aware of any incident likely to give rise to a claim under the above indemnities, each shall notify the other Parties and the Parties shall promptly do all they reasonably can to prevent any further damage or pollution and the parties shall co-operate fully in investigating the incident.

9. **Insurance**. Each Party shall obtain and furnish to the other Party Certificates of Insurance reflecting that such Party has in full force and effect:

(a) Worker's Compensation Insurance to cover statutory limits of the Worker's Compensation Laws of the state of North Dakota, with Coverage B Employer's Liability in limits not less than $1,000,000;

(b) Employer's Liability Insurance with minimum limits of $1,000,000 per accident covering injury or death to any employee which may be outside the scope of the worker's compensation statute;

(c) Commercial General Liability Insurance with minimum limits of $5,000,000 combined single limit per occurrence for bodily injury and property damage liability. This policy shall include broad form contractual liability insurance coverage which shall specifically apply to the obligations assumed in this Agreement by Basin;

(d) Automobile bodily injury, property damage and environmental restoration liability insurance. This insurance must extend to owned, non-owned and hired motor vehicles used in the performance of this Agreement and must be amended (Form MCS-90) to assure compliance with the Motor Carrier Act, but shall not be less than $5,000,000 combined single limit per occurrence.

(e) Excess (Umbrella) Liability insurance may be utilized to supplement inadequate limits in the primary policies required in Items b, c and d above, and

(f) Pollution Legal Liability Coverage, with limits not less than five million dollars ($5,000,000) combined single limit per occurrence and ten million dollars ($10,000,000) aggregate, or this coverage may be provided as an endorsement to the Commercial General Liability Insurance under (c) above.

Basin shall cause each of its contractors and subcontractors to carry the same insurance required of Basin herein and present THPP with insurance certificates evidencing such coverages.

All insurance policies required hereunder must be endorsed with a Waiver of Subrogation Endorsement, effectively waiving Basin's, Basin's and their respective insurance carrier's right of subrogation with respect to THPP and, with respect to the insurance required in Subparagraphs 9(a) and (b), an Alternate Employer Endorsement. All certificates furnished pursuant to the provisions of this section shall reflect that they are for the benefit of THPP and shall provide that there will be no material change in or cancellation of the policies without providing THPP at least thirty (30) days' prior written notice. The insurance coverage for which provision is made herein shall be maintained by Basin at their sole expense at all times during the term of this Agreement. The Insurance requirements imposed hereby do not in any way limit Basin's responsibility under any other paragraph hereof. All such insurance shall be written using companies with an "A.M. Best" financial strength rating of no less than "A-VII".

10. **Independent Contractor Status**. If any Party performs work on behalf of itself or another Party pursuant to this Agreement, such work will be performed as an independent contractor, and the performing Party shall not be deemed to be an agent or employee of the other Party. No Party shall have the right to control any other Party or its employees or contractors with respect to the detailed means and methods of conducting their activities.

11. (a) Effective Date. The Effective Date of this Agreement shall be the date first stated above.

(b) Term. The Term of this Agreement and the licenses created pursuant hereto shall commence on the Effective Date and shall expire on the date on which the Construction and Indemnity Agreement terminates or expires, provided that if the THPP Facilities and the Basin Facilities remain connected beyond the expiration or termination date of the Construction and Indemnity Agreement, this Agreement shall continue from month to month thereafter until the earlier of the date when the THPP Facilities and the Basin Facilities are permanently disconnected or thirty (30) days after notice of cancellation is provided by either Party.

(c) Survival. The expiration or termination of this Agreement shall be without prejudice to the rights of the Parties arising prior to such expiration or termination, and shall not release any Party from any liability or obligation arising prior to such expiration or termination.

(d) THPP's Rights upon Expiration/Termination. Within one hundred eighty (180) days following the expiration or termination of this Agreement, THPP shall have the right, at THPP's election, cost and expense, to remove any portion or all of the THPP Facilities that are located on property of Basin and/or its Affiliates.

12. **Force Majeure**. No Party shall be liable to any other for failure or delay in performing an obligation under this Agreement, to the extent that such failure or delay may be due to Force Majeure. "Force Majeure" means an event which is beyond the reasonable control of the Parties that prevents the Party from performing an obligation under this Agreement, including Acts of God, earthquakes, floods, landslides, civil disturbances, sabotage, acts of public enemies, war, blockages, insurrections, riots, epidemics, storms, ice, the act of any government or regulatory authority or statutory undertaking, the inability to obtain or the curtailment of electric power, water or fuel, strikes, lockouts or the labor disruptions, fires, explosions, breakdowns or failure of

pipe, plant, machinery or equipment, and other causes whether or not similar to those listed above, beyond the reasonable control of a Party. In the event any Party must invoke the provisions of this Section, such Party shall use its best efforts to provide the other Parties, in writing (telex, fax, or other electronic communications acceptable) with as much advance notice as is possible, stating the underlying circumstances of the particular cause(s) of Force Majeure, and the expected duration thereof. Each Party shall use reasonable diligence to cure or correct any condition of Force Majeure affecting performance by such Party, provided however, that no Party shall be obligated to settle any strikes or labor disputes on terms it deems unsatisfactory.

13. **Assignments**. Except as otherwise expressly provided herein, no Party shall assign or subcontract any rights or delegate any obligations under this Agreement without first obtaining written approval of the other Parties, provided however, that any Party may without consent of the other Parties, (i) assign this Agreement to an Affiliate of such Party, and (ii) engage qualified contractors with respect to construction, installation, repair and maintenance of its facilities, pipelines, machinery and equipment. Approval of any assignment, delegation, or subcontract will not be unreasonably withheld. No consent or approval shall be required for an assignment of any rights or obligations arising under this Agreement that are part of a general assignment or transfer of a Party's interest in the THPP Facilities or the Basin Facilities, and this Agreement shall be binding upon all subsequent owners and operators of the Basin Facilities and the THPP Facilities.

14. **Consequential Damages**. Notwithstanding anything to the contrary contained herein, no Party or its respective officers, directors, managers, managing members, members or employees, shall be liable or responsible to the other Parties or their Affiliates for any consequential, incidental, or punitive damages, or for loss of profits or revenues (collectively referred to as "special damages") incurred by such Party or its Affiliates that arise out of or relate to this Agreement, regardless of whether any such claim arises under or results from contract, tort, or strict liability; *provided* that the foregoing limitation is not intended and shall not affect special damages imposed in favor of unaffiliated Persons that are not Parties to this Agreement.

15. **Governing Law; Jurisdiction and Waiver**. This Agreement and all matters pertaining hereto, including but not limited to, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretations or construction, shall be governed by the laws of the State of Texas, without regard to the conflicts of law principles thereof, provided that any provisions regarding real property rights and interests shall be governed by the law of North Dakota. Each Party consents to the non-exclusive jurisdiction of courts in the State of Texas with respect to disputes arising hereunder, and each Party hereby irrevocably waives its right to a trial by jury in any such dispute.

16. **Notices.** Unless otherwise notified by a Party (and except for communications concerning operating or upset/emergency condition matters, which shall be made directly with pipeline control personnel and followed up by written documentation as appropriate), any notice or correspondence to be given under this Agreement shall be deemed made when made in writing and personally delivered, received by overnight mail, received by electronic mail, or received by certified or registered mail, return receipt requested, to the following addresses:

If to Basin:

Basin Transload, LLC
800 South Street, Suite 200
Waltham, MA 02453
Attention: Chief Operating Officer

Phone: 781-398-4000
Fax No.: 781-398-9000

With a copy to:

Basin Transload, LLC
800 South Street, Suite 200
Waltham, MA 02453
Attention: General Counsel
Phone: 781-398-4211
Fax No.: 781-398-9211

If to THPP:

Tesoro High Plains Pipeline Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 778259
Attn: Danielle Mendez, Contracts Administrator-Logistics
Phone: 210-626-6529
Fax: 210-579-4517
Email: danielle.c.mendez@tsocorp.com

With a copy to:

Tesoro High Plains Pipeline Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention: General Counsel
Phone: (210) 283-2280
Fax No.: (210) 283-2833

Operational Communications regarding upsets/emergencies shall be directed:

If to Basin:

Basin Transload, LLC
Attn: Ray Sheldon
3529 Gabel Road
P.O. Box 80284
Billings, MT
Phone: 406-855-5008
Facsimile:
e-mail: rsheldon@basintransload.com

If to THPP:

Tesoro High Plains Pipeline Company LLC
Attention:
Phone:
Fax No.:

Communications concerning other routine operational matters (non-upset/emergency) shall be directed:

If to Basin:
Basin Transload, LLC
Attn: Ray Sheldon
3529 Gabel Road
P.O. Box 80284
Billings, MT
Phone: 406-855-5008
Facsimile:
e-mail: rsheldon@basintransload.com

If to THPP:
Tesoro High Plains Pipeline Company LLC
11071 32nd Street SW
Dickinson, ND 58602
Attention: Greg Andersen
Telephone Number: (701)225-8973/(C) (701)260-2975

**17. CONFIDENTIAL INFORMATION**

(a) "Confidential Information" means all confidential, proprietary or non-public information of a Party relating to or disclosed in connection with the subject matter of this Agreement, whether set forth in a writing, orally or in any other manner, including all non-public information and material of such Party and/or any of its Affiliates (and of companies with which such Party or any of its Affiliates has entered into confidentiality agreements) that another Party obtains knowledge of or access to, including non-public information regarding products, processes, business strategies and plans, facilities, assets, customer lists, research and development programs, computer programs, hardware configuration information, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), trade secrets, schematics and other technical, business, marketing and product development plans, revenues, expenses, earnings projections, forecasts, strategies, and other non-public business, technological, and financial information.

(b) Obligations. Each Party shall use reasonable efforts to retain the other Parties' Confidential Information in confidence and not disclose the same to any third party nor use the same, except as authorized by the disclosing Party in writing or as expressly permitted in this Section 17. Each Party further agrees to take the same care with the other Parties' Confidential Information as it does with its own, but in no event less than a reasonable degree of care. Excepted from these obligations of confidence and non-use is that information which:

(i) is available, or becomes available, to the general public without fault of the receiving Party;

(ii) was in the possession of the receiving Party on a non-confidential basis prior to receipt of the same from the disclosing Party;

(iii) is obtained by the receiving Party without an obligation of confidence from a third party who is rightfully in possession of such information and, to the receiving Party's knowledge, is under no obligation of confidentiality to the disclosing Party;

(iv) is independently developed by the receiving Party without reference to or use of the disclosing Party's Confidential Information; or

(v) is necessary in order to enforce the terms and conditions of this Agreement.

For the purpose of this Section 17, a specific item of Confidential Information shall not be deemed to be within the foregoing exceptions merely because it is embraced by, or underlies, more general information in the public domain or in the possession of the receiving Party.

(c) Required Disclosure. Notwithstanding Section 17(a), if the receiving Party becomes legally compelled to disclose the Confidential Information by a court, Governmental Authority or Applicable Law, or is required to disclose by the listing standards of the New York Stock Exchange, any of the disclosing Party's Confidential Information, the receiving Party shall promptly advise the disclosing Party of such requirement to disclose Confidential Information as soon as the receiving Party becomes aware that such a requirement to disclose might become effective, in order that, where possible, the disclosing Party may seek a protective order or such other remedy as the disclosing Party may consider appropriate in the circumstances. The receiving Party shall disclose only that portion of the disclosing Party's Confidential Information that it is required to disclose and shall cooperate with the disclosing Party in allowing the disclosing Party to obtain such protective order or other relief.

(d) Return of Information. Upon written request by the disclosing Party, all of the disclosing Party's Confidential Information in whatever form shall be returned to the disclosing Party upon termination of this Agreement or destroyed with destruction certified by the receiving Party, without the receiving Party retaining copies thereof except that one copy of all such Confidential Information may be retained by a Party's legal department solely to the extent that such Party is required to keep a copy of such Confidential Information pursuant to Applicable Law and the receiving Party shall be entitled to retain any Confidential Information in the electronic form or stored on automatic computer back-up archiving systems during the period such backup or archived materials are retained under such Party's customary procedures and policies; provided, however, that any Confidential Information retained by the receiving Party shall be maintained subject to confidentiality pursuant to the terms of this Section 17, and such archived or back-up Confidential Information shall not be accessed except as required by Applicable Law.

(e) Receiving Party Personnel. The receiving Party will limit access to the Confidential Information of the disclosing Party to those of its employees, attorneys, and contractors that have a need to know such information in order for the receiving Party to exercise or perform its rights and obligations under this Agreement (the "Receiving Party Personnel"). The Receiving Party Personnel who have access to any Confidential Information of the disclosing Party will be made aware of the confidentiality provision of this Agreement, and will be required to abide by the terms thereof. Any third party contractors that are given access to Confidential Information of a disclosing Party pursuant to the terms hereof shall be required to sign a written agreement pursuant to which such Receiving Party Personnel agree to be bound by the provisions of this Agreement, which written agreement will expressly state that it is enforceable against such Receiving Party Personnel by the disclosing Party.

(f) Survival. The obligation of confidentiality under this Section 17 shall survive the termination of this Agreement for a period of two (2) years.

18. **Entire Agreement; Defined Terms**. This Agreement, together with the Construction and Indemnity Agreement embodies the entire agreement between the Parties in respect of the subject matter hereof. It may not be modified or terminated except as provided herein or by other written agreement duly executed by each of the Parties. If any provision herein is invalid, it shall be considered deleted from this Agreement, and shall not invalidate the remaining provisions of this Agreement. This Agreement may be executed in one or more counterparts (including by facsimile or portable document format (pdf)) for the convenience of the Parties hereto, each of which counterparts will be deemed an original, but all of which counterparts together will constitute one and the same agreement. Capitalized terms used in this Agreement that are not defined herein shall have the meanings given to such terms in the Construction & Indemnity Agreement. This Agreement does not impart enforceable rights upon anyone who is not expressly indemnified hereunder, or is not a Party or successor or permitted assignee of a Party.

[SIGNATURE PAGE FOLLOWS.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth hereinabove.

BASIN TRANSLOAD, LLC

By:______________________________
Printed Name: ~~Mark Romaine~~ Edward J. Faneuil
Title: ~~Chief Operating Officer~~ Executive Vice President

TESORO HIGH PLAINS PIPELINE COMPANY LLC

By: ____________________________
Printed Name: ______________________
Title: ____________________________

# EXHIBIT "A"

To Construction and Indemnity Agreement and Connection Agreement
[Beulah Tie-In]
Between Tesoro High Plains Pipeline Company LLC,
Basin Transload, LLC



**EXHIBIT "B"**
**To Connection Agreement between**
**Basin Transload, LLC and**
**Tesoro High Plains Pipeline LLC**

**EASEMENT AGREEMENT**

When recorded, return to:

Tesoro High Plains Pipeline LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attn: General Counsel

**ACCESS AND EASEMENT AGREEMENT**

This Access and Easement Agreement (this "Agreement") is made and entered into to be effective as of April 3, 2014, by and between BASIN TRANSLOAD, LLC, a Delaware limited liability company ("**Grantor**"), and TESORO HIGH PLAINS PIPELINE COMPANY LLC, a Delaware limited liability company ("**Grantee**").

**RECITALS:**

A. Grantor is the owner of that certain tract of land (the "**Grantor Property**") described in Exhibit "A" attached hereto and incorporated herein by this reference.

B. Grantor has agreed to the installation and construction of Grantee's connecting gathering pipelines and related facilities upon the Grantor Property (the "**Facilities**").

C. Grantor and Grantee desire to enter into this Agreement for the purpose of providing a means of ingress and egress, over, under, upon and across that portion of the Grantor Property (the "**Easement Area**") described and depicted on Exhibit "B" attached hereto and incorporated herein by this reference.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor and Grantee hereby agree as follows:

1. Grant. Grantor has GRANTED, BARGAINED, SOLD and CONVEYED, and does hereby GRANT, BARGAIN, SELL and CONVEY, unto Grantee, a private, non-exclusive and limited easement (the "Easement") over, upon and across the Easement Area for the purposes herein specified; subject, however to any and all current existing title exceptions or other matters of record affecting the Easement Area.

TO HAVE AND TO HOLD said Easement, together with, all and singular, all rights, titles, interests, privileges and hereditaments thereto in anywise belonging, unto Grantee, its successors and assigns, until the termination of the Easement pursuant hereto, and Grantor does hereby bind itself, its

successors and assigns, to WARRANT and FOREVER DEFEND, all and singular, the Easement unto Grantee, its successors and assigns, and against every person whomsoever lawfully claiming or to claim the same or any part thereof.

2. Purpose. The Easement is hereby created for the benefit of Grantee, its successors and assigns, and shall be used exclusively for the following purposes:

(a) ingress and egress by vehicle or pedestrian over, upon and across the Easement Area; and

(b) the construction, installation, operation, flow, passage, use, maintenance, connection, inspection, repair, relocation, and removal of crude oil gathering pipelines and appurtenant facilities over, under, across and through the Easement Area, including, by way of example only, piping, meters, samplers, valves, a control building, sanitary sewers, storm drains, sprinkler systems, water, gas, electrical, telephone and communication lines.

3. Duration. The Easement shall be permanent and perpetual for as long as Grantee shall have use of the Easement; provided, however, that upon Grantee's abandonment of the Easement or upon the expiration of the need for the Easement, it shall automatically terminate without further action by either party hereto. Upon the request of Grantor, after the termination of the Easement pursuant hereto, Grantee shall execute and deliver to Grantee a release or termination of the Easement, in recordable form reasonably acceptable to Grantor.

4. Non-Exclusive Right. The Easement herein created is not exclusive, and Grantor hereby expressly reserves the right, for itself and its successors and assigns, without the prior written consent of Grantee, to grant such other, similar or dissimilar, easements, rights, benefits, rights-of-way and privileges to such other persons and for such other purposes, and to make or construct improvements over, across, upon and under the Grantor Property (including the Easement Area), as Grantor may elect; provided, however, any such easements, rights, benefits, rights-of-way and privileges hereafter granted, and such improvements hereafter made or constructed upon, over, across or under such Grantor Property (including the Easement Area) shall not unreasonably interfere with, or unreasonably restrict the use of, the Easement and the other rights and benefits appurtenant thereto or granted herein to Grantee.

5. Indemnification. Grantee agrees to indemnify and hold harmless Grantor from any and all liability or damages which Grantor may suffer as a result of claims, demands, costs, liens, judgments or awards against Grantor arising out of or as a result of any use of the Easement by Grantee, its employees, agents, tenants, licensees, invitees and guests.

6. Rights Reserved. Grantor retains, reserves, and shall continue to enjoy the use of the surface of, subsurface under and air space over the Easement Area for any and all purposes which do not unreasonably interfere with or prevent the reasonable use by Grantee of the Easement for the purposes herein provided and for the duration of said Easement.

7. Dedication Disclaimer. The Easement is not a public easement or right-of-way, but is a private, non-exclusive and limited easement for the exclusive use and benefit of Grantee, its successors and assigns, and this Agreement is not intended, and shall not be construed, to be a dedication to the general public for use of the Easement Area.

8. Maintenance. Grantee shall keep and maintain all alterations, modifications and

improvements erected upon or under the Easement Area in good condition during the term of this Agreement.

9. Subordination. Any and all mortgages, deeds of trust, ground leases or other leases currently in effect or hereafter granted or entered into with respect to the Grantor Property shall be subject, subordinate and inferior to the easements, rights, benefits and obligations created hereby, and the foreclosure under any such mortgage or deed of trust shall not extinguish or impair the easements, rights, benefits and obligations created by this Agreement.

10. Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the state where the Easement is located.

11. Severability. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

12. Multiple Counterparts. To facilitate execution, this instrument may be executed in as many counterparts as may be convenient or required.

13. Entire Agreement. This Agreement contains the entire agreement between the parties relating to the rights herein granted and the obligations herein assumed. Any or all representations or modifications concerning this instrument shall be of no force and effect except for a subsequent modification in writing signed by the parties hereto.

14. Binding Effect. Grantee and Grantor covenant and agree that the servitudes, easements, rights, rights-of-way, privileges, agreements, covenants and restrictions and all other terms, conditions and provisions hereof shall be binding upon their respective successors and assigns and all other persons or entities having or hereafter acquiring any right, title or interest in the Grantor Property or the Grantee Property, and all other persons and entities claiming by, through or under said owners and their respective successors and assigns.

[*The remainder of this page is intentionally left blank.*]

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date first written above.

GRANTOR:

BASIN TRANSLOAD, LLC
a Delaware limited liability company

By:
Name: ~~Mark Romaine~~ Edward J. Fanceuil
Title: ~~Chief Operating Officer~~ Executive Vice President

STATE OF Massachusetts §
§
COUNTY OF Middlesex §

This instrument was acknowledged before me on ____________________ by ________________________________.

[S E A L]

LORI A. WESSELS
MY COMM. EXPIRES NOV. 12, 2015
COMMONWEALTH OF MASSACHUSETTS
NOTARY PUBLIC

Notary Public, State of Massachusetts

GRANTEE:

TESORO HIGH PLAINS PIPELINE COMPANY LLC, a Delaware limited liability company

By:
Name:
Title:

STATE OF ______________ §
§
COUNTY OF ___________ §

This instrument was acknowledged before me on ____________________ by ________________________________.

[S E A L]

Notary Public, State of ____________________

Attachments:
Exhibit "A" – Grantor Property

**ADDENDUM "B"**

**To Construction and Indemnity Agreement**
**[Beulah Tie-In]**
**Between Tesoro High Plains Pipeline Company LLC,**
**and Basin Transload, LLC**

**Form of Guaranty**

**IRREVOCABLE LIMITED GUARANTY AGREEMENT**

This Limited Guaranty Agreement (the "Guaranty") is made by Global Partners LP, a Delaware limited partnership (the "Guarantor"), in favor of Tesoro High Plains Pipeline Company LLC, a Delaware limited liability company ("Creditor").

WHEREAS, Guarantor's indirect partially-owned subsidiary, Basin Transload, LLC ("Company"), and Creditor are parties to that certain Construction and Indemnity Agreement (the "Agreement", including all subsequent amendments thereto), pertaining to the construction, by Creditor, of certain facilities that, for the period specified in the Agreement, will enable the delivery of crude oil from Creditor's interstate Pipeline System (as defined in the Agreement) into the Beulah Rail Facility (as defined in the Agreement);

WHEREAS, as an inducement to Creditor to enter into the Agreement and perform its obligations thereunder, and as security for Company's obligation under Section 7 of the Agreement to indemnify THPP for the Actual Costs of the THPP Facilities and an Agreed Return (as such terms are defined in the Agreement), Guarantor has agreed to provide assurance for the payment of Company's obligations under the Agreement, subject to certain limitations provided in this Guaranty; and

WHEREAS, a partial limit on the liability of Guarantor under this Guaranty is TWENTY FIVE MILLION U.S. Dollars ($25,000,000) (the "Guaranty Cap").

For value received and in consideration of the foregoing, receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1. Guaranty. Subject to the terms herein (including applicable limits hereinafter described), Guarantor unconditionally and absolutely guarantees to the Creditor the prompt payment when due of all amounts payable by Company under the Agreement, including but not limited to (a) all expenses, including reasonable attorneys' fees and court costs, incurred by Creditor to enforce its rights against Company under the Agreement, (b) contractual obligations by Company to indemnify Creditor under the terms of the Agreement(s) ("Indemnity Obligations"), and (c) consequential, punitive and special damages to the extent not disallowed to Creditor under the Agreement(s) or applicable law, (all of the foregoing, collectively, the "Obligations"). Guarantor's obligations and liability under this Guaranty shall be limited to payment obligations only. This is a guarantee of payment and performance and not of collection. If Company fails to pay any Obligations, Guarantor will pay such Obligations (subject to certain applicable limits hereinafter described) directly to Creditor upon the Creditor's demand in accordance with the provisions of this Guaranty. Guarantor is not guaranteeing any obligations of Basin pursuant to this Guaranty.

2. Extent of Liability. The Obligations for which Guarantor shall be liable to Creditor under this Guaranty (all of the following collectively, the "Guaranteed Obligations") shall include: (a) all Obligations of the Company that arise under or relate to Agreement, and (b) the following with respect to any of the foregoing Obligations, whether incurred before or after the Termination Date: (i) all expenses, including court costs and reasonable attorneys' fees, incurred by Creditor to enforce its rights against the Company under the Agreement or this Guaranty and (ii) interest to the extent provided in the Agreement(s) with respect to the Obligations; provided, however, that the Guaranteed Obligations will exclude amounts of Obligations that exceed, at any time, the sum of: (A) the Guaranty Cap, and (B) the Obligations described in clauses (b)(i) and b(ii) above, and (C) the amount of Indemnity Obligations payable under the Agreement(s), it being agreed that the amount of the potential Indemnity Obligations were not considered in determining the Guaranty Cap.

3. Term. This is a continuing, irrevocable Guaranty that will remain in full force and effect until the expiration or termination of the Agreement (the "Termination Date"); provided that this Guaranty shall remain in full force and effect thereafter until all Guaranteed Obligations have been indefeasibly satisfied. All payments received by Creditor from Company, from any collateral securing any of the Obligations or from any source, may be applied, at Creditor's election, first to Obligations that are not Guaranteed Obligations and then to Guaranteed Obligations; provided, that after the Termination Date, all payments received by Creditor directly from Guarantor will, upon receipt of contemporaneous written designation from Guarantor to such effect, be applied first to Guaranteed Obligations and then to Obligations that are not Guaranteed Obligations, but absent such a contemporaneous written designation, shall be applied at the discretion of Creditor.

4. Nature of Guaranty. With respect to the Guaranteed Obligations, Guarantor shall be primarily liable, jointly and severally with Company. Guarantor's responsibilities with respect to any Guaranteed Obligations are continuing and will not be affected by the existence, validity, enforceability, perfection, or extent of any collateral for such Guaranteed Obligations or any other Obligations, or by any defects in the perfection or condition of such collateral, or by the release of such collateral. If any payment to Creditor for any of the Obligations is rescinded or must otherwise be returned as a bankruptcy preference or for any reason, Guarantor will remain liable hereunder for any such Obligations (to the extent they are Guaranteed Obligations) as if such payment had not been made, and any prior release or discharge from the terms of this Guaranty given to Guarantor by Creditor shall be without effect.

5. Consents, Waivers and Renewals. Guarantor agrees that Company and Creditor may mutually modify the Agreement without the consent of Guarantor and without notice to Guarantor, and Guarantor acknowledges and agrees that such modifications thereof will be binding on Guarantor and will not be a defense to Guarantor's liability under this Guaranty, even if such modifications increase the Guaranteed Obligations. Creditor may resort to Guarantor for payment of any of the Guaranteed Obligations whether or not Creditor has previously resorted to any collateral security or proceeded against Company or any other obligor principally or secondarily obligated for any of the Obligations. Guarantor hereby waives notice of acceptance of this Guaranty, and also presentment, protest and notice of protest, dishonor or default of any evidences of indebtedness guaranteed hereunder. Whether or not Company has existing Agreement(s) with Creditor, Guarantor acknowledges and agrees that this Guaranty does not obligate Creditor to enter into, extend or to renew all or any of the Agreement(s) with the Company or with Guarantor.

6. Demands and Notice. If Creditor elects to exercise its rights under this Guaranty, Creditor shall make a written demand on Guarantor (a "Payment Demand"). A Payment Demand shall identify that the demand is being made under the Agreement(s), identify the amount of the demand, and contain a statement that Creditor is calling upon Guarantor under this Guaranty for payment of Guaranteed Obligations. A Payment Demand conforming to the foregoing requirements will be sufficient notice to Guarantor to pay under this Guaranty within three (3) business days. Notices under this Guaranty will be deemed received if sent to the address specified below: (a) on the day received if sent by overnight express delivery, (b) on the next business day if served by fax when sender has machine confirmation that the fax was transmitted to the correct fax number listed below, or (c) on the next business day after deposit (whether or not actually received) if sent by certified, first-class mail, postage prepaid, return-receipt requested; provided, however, that a notice of termination under Section 3 will not be deemed given or received until the date that it is actually received by Creditor. Any party may change its address to which notice is to be given hereunder by providing notice of same in accordance with this section.

To Creditor:
Tesoro High Plains Pipeline Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attn: Credit Department – Kevin Chandler
Fax: (210) 626-6048

To Guarantor:
Global Partners LP
800 South Street, Suite 200
Waltham, MA 02453
Attn: Chief Operating Officer
Fax: 781-398-9000

7. Representations and Warranties. Guarantor hereby represents and warrants that (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (b) the execution, delivery and performance by Guarantor of this Guaranty have been duly authorized by all necessary action and do not violate Guarantor's charter, by-laws or other governing formation documents, (c) this Guaranty constitutes the legal, valid and binding obligation of Guarantor, enforceable against it in accordance with its terms (except as enforceability may be limited by bankruptcy, insolvency, and other similar laws affecting enforcement of creditors' rights in general and general principles of equity), (d) as of the date hereof, and after giving effect to this Guaranty and the obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities, (e) Guarantor is the parent company of Company and as such will derive direct and indirect economic benefits from the accommodations provided to Company pursuant to the Agreement(s), and (f) Guarantor's correct Federal Employer Identification Number (the "FEIN") is inserted in the blank below Guarantor's signature at the end of this Guaranty. No Creditor has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

8. Governing Law; Submission to Jurisdiction; Venue. This Guaranty shall be governed by and construed in accordance with the laws of the State of Texas and applicable federal law. Guarantor, for itself and its successors and assigns, hereby irrevocably (a) submits to the non-exclusive jurisdiction of the state and federal courts in the State of Texas for the purposes of all legal actions or proceedings arising out of or relating to this Guaranty or the transactions

contemplated hereby, (b) waives, to the fullest extent permitted by applicable law, any objection that it may now or in the future have as to the venue of any action, proceeding or litigation arising out of or in connection with this Guaranty brought in the District Court of Bexar County, Texas, or in the United States District Court for the Western District of Texas, San Antonio Division, whether the objection is based on forum non conveniens or otherwise, and (c) agrees that any legal action or proceeding against Guarantor arising out of or in connection with this Guaranty may be brought in any of the foregoing courts. Guarantor hereby agrees that service of process upon Guarantor may be made by certified or registered mail, return receipt requested, at its address specified herein. Nothing herein shall affect the right of Creditor to serve process in any other manner permitted by applicable law or shall limit the right of Creditor to bring any action or proceeding against Guarantor or with respect to any of Guarantor's property in courts in other jurisdictions. Any action or proceeding by Guarantor against Creditor shall be brought only in a court located in San Antonio, Bexar County, Texas.

9. Miscellaneous. This Guaranty contains the entire agreement of the parties with respect to the subject matter hereof and may not be amended except by a written instrument executed by Guarantor and Creditor. The parties agree that there are no oral agreements, representations, or warranties with respect to the subject matter of this Guaranty that are not expressly set forth in this Guaranty. This Guaranty shall bind the successors and assigns of Guarantor and Creditor. Prompt notice shall be furnished to the other party of any such assignment or succession. This Guaranty shall not be deemed to benefit any person except Creditor and its respective successors and assigns.

10. Guarantor Reporting. Within ninety (90) days after the end of each fiscal year of Guarantor, Guarantor shall deliver to Creditor true and correct copies of Guarantor's audited financial statements for that fiscal year certified as true and correct by Guarantor's chief financial officer, which financial statements will include (a) a balance sheet, (b) income statements and reconciliation of cash flow, and (c) statements of contingent liabilities (including all schedules) and will be prepared in accordance with sound accounting principles consistently applied, and will fairly represent the financial condition of the Guarantor as of the respective dates thereof. If Guarantor's audited financial statements are not available or have not been provided to Creditor, then Guarantor shall timely deliver to Creditor such unaudited financial statements certified by such officer, and Guarantor shall also deliver to Creditor copies of Guarantor's federal income tax return filed with the Internal Revenue Service, including all schedules, K-1's and attachments thereto, within thirty (30) days of filing thereof, and if requested by Creditor, copies of any extensions of the filing date(s). In addition, within twenty (20) days after written request from Creditor, Guarantor will furnish to Creditor true and correct copies of such financial statements and other information relating to the financial condition, properties and affairs of Guarantor as Creditor reasonably requests from time to time.

11. Waiver of Subrogation; Subordination of Guarantor Claims. Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Creditor), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from the Company for any payment made by Guarantor to Creditor under or in connection with this Guaranty. Upon the occurrence of any breach of any of the Agreement(s) by Company while any Guaranteed Obligations remain unpaid and upon written notice thereof to Guarantor, Guarantor shall not receive or collect, directly or indirectly, from Company any Guarantor Claims (as hereinafter defined) until ninety-one (91) days after all Obligations have been paid in full. As used herein, the term "Guarantor Claims" shall mean all

debts and liabilities of Company to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Company thereon are direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities are evidenced by note, contract, open account, or otherwise, and including without limitation all rights and claims of Guarantor against Company arising as a result of subrogation as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any such funds, payment, claim or distribution that is prohibited by this Guaranty, Guarantor agrees to hold in trust for Creditor an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Creditor to apply to the Obligations, and Guarantor covenants promptly to pay the same to Creditor.

12. Waiver of Other Rights; Suretyship Laws. This Guaranty shall be effective as an unconditional waiver of, and Guarantor hereby expressly waives unconditionally, any and all rights, defenses, offsets or remedies to which Guarantor may otherwise have been entitled from time to time, including, without limitation, (a) any and all rights, defenses, offsets or remedies arising from the bankruptcy, insolvency, incapacity, dissolution or liquidation of Company, and (b) any rights under Rule 31 of the Texas Rules of Civil Procedure, or Section 17.001 or Chapter 43 of the Texas Civil Practice and Remedies Code, as such rules and statutes may be amended from time to time, or any other surety laws in effect from time to time, except that Guarantor does not waive a contractual defense of Company under the Agreement(s) that would have been available to Guarantor if it were in the contractual position of Company under the Agreement(s), if, and to the limited extent that, Company's defense is based solely upon the non-performance and default of the Creditor under the applicable Agreement(s).

13. Guaranteed Obligations Not Reduced. Guarantor agrees that Guarantor's liability under this Guaranty shall not be discharged, released, reduced or adversely affected by any of the following, it being agreed that Guarantor shall remain liable for Guaranteed Obligations regardless of whether Company or any other person is found not liable on the Guaranteed Obligations or any part thereof for any reason: (a) the reorganization, merger or consolidation of Company into or with any other corporation or entity, (b) the sale, lease or transfer of any or all of the assets of Company or Guarantor, (c) any change in the shareholders, partners, owners or members of Company or Guarantor, (d) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or (e) the unenforceability of any part of the Guaranteed Obligations for any of the following reasons: the officers or representatives executing this Guaranty acted without authority, the act of creating the Guaranteed Obligations or any part thereof was ultra vires, the Guaranteed Obligations violate applicable usury laws, or one or more of the Agreement(s) was signed by an officer acting outside the scope of his authority or was otherwise irregular, not genuine or authentic, or was forged.

14. Severability. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future applicable laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

15. Waiver of Right to Trial by Jury. **GUARANTOR IRREVOCABLY AND VOLUNTARILY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR PROCEEDING RELATING TO THIS GUARANTY.**

16. Rules of Construction. The rule of construction that ambiguities in a document will be construed against the party who drafted it will not be applied in interpreting this Guaranty.

(signature page follows)

**SIGNATURE PAGE TO LIMITED GUARANTY AGREEMENT**

This Guaranty is executed by Guarantor's duly authorized representative to be effective as of April 3, 2014.

GLOBAL PARTNERS LP,
a Delaware limited partnership

By:__________________________
Name: ~~Mark Romaine~~ Edward J. Faneuil
Title: ~~Chief Operating Officer~~ Executive Vice President

FEIN: 74-3140887