**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GLOBAL PARTNERS LP<br><br>Plaintiff,<br><br>vs.<br><br>TGC, L.P. and MBI HOLDINGS, LLC<br><br>Defendants. | Case No. 1:20-cv-10346 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND IN THE ALTERNATIVE, TO DISMISS**

TGC, L.P. ("TGC") and MBI Holdings, LLC ("MBI") (and collectively with TGC, the "Defendants") move to compel Plaintiff Global Partners LP ("Global Partners" or "Plaintiff") to arbitrate all claims in its Complaint and Jury Demand (Dkt. 1) (the "Complaint") against TGC and MBI.[1,2] Alternatively, Defendants respectfully request this Court dismiss the Complaint for failing to plead a *prima facie* basis for personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## I. PRELIMINARY STATEMENT

Plaintiff's claims are subject to mandatory arbitration. Pursuant to the Limited Liability Company Agreement of Basin Transload, LLC (the "LLC Agreement") between TGC, MBI, and Global Operating LLC ("Global Operating"), Plaintiff's wholly-owned subsidiary, "any claim, counterclaim, demand, cause of action, dispute, disagreement or any other controversy arising out of or relating in any way to [the LLC] Agreement or the transaction contemplated pursuant to [it]" shall be "finally resolved by binding arbitration" (the "Arbitration Agreement") (Ex. A).

[1] By filing this motion, Defendants do not waive any arguments or defenses to Plaintiff's Complaint, including, but not limited to, any and all defenses set forth in Rule 12 of the Federal Rules of Civil Procedure.
[2] This motion is supported by the declaration of James Robert Bennett.

(*See* LLC Agreement § 10.2(a), Ex. A-4.) Plaintiff's attempt to describe the dispute as a dispute over a guarantee side letter that does not have an arbitration clause is meritless.

First, Plaintiff exercises complete control over its subsidiary, Global Operating, and has been running Basin Transload, LLC ("Basin") from day one. Plaintiff itself negotiated the LLC Agreement, its officers are the only officers of Basin, and Plaintiff (rather than its ostensible subsidiary) has significant rights in the LLC Agreement. As the facts explained below will show, Plaintiff's years-long course of conduct causes it to be subject to arbitration because it has been in total control of Basin and should be estopped from denying the arbitrability of this dispute.

Second, the guarantee side letter dispute arises directly out of this very control. In 2014, Basin entered into an agreement with Tesoro High Plains Pipeline Company LLC ("Tesoro") that required Basin to ship at least some oil under the agreement during any 180 days within any period of twelve consecutive months, or else face a significant penalty. Officers of Plaintiff—running Basin—were grossly negligent (or worse) in breaching this agreement and causing Basin to owe $13,142,039.00 to Tesoro under it. As a result, Basin should have been required to pay Tesoro. Under the LLC Agreement, Basin has several mechanisms to pay large debts, including instituting a capital call, which TGC and MBI would have disputed due to Plaintiff's negligent mismanagement of Basin—a dispute that would be subject to arbitration.

However, Plaintiff's officers—again, in control of Basin—simply skipped over Basin's obligations to pay Tesoro (and all corporate formalities), instead causing Tesoro to invoke the guarantee executed with Plaintiff itself without the consent of Basin. The reason why Plaintiff's officers did this is because it benefitted Plaintiff: Plaintiff was attempting to keep large debts off of Basin's books and instead resolve the payment quickly and quietly before year end, to avoid any negative discussions on the market. Plaintiff did this knowing it could turn around and

attempt to seek reimbursement from TGC and MBI under the side agreement, rather than through a capital call. Plaintiff, after committing gross negligence and then running roughshod over Defendants' rights in the LLC Agreement, is now trying to characterize this dispute as completely unrelated to the LLC Agreement. But this dispute is at its core a dispute over the LLC Agreement itself. Had Plaintiff properly managed Basin, or had they caused Basin to pay the Tesoro debt, the guarantee would never have been called and the side letter agreement would not have been invoked. It is precisely Plaintiff's abuse of Basin that has led to the guarantee payment and this side letter dispute, which must be arbitrated.

Alternatively, if the Court finds this dispute is not subject to arbitration, the Court should nonetheless dismiss the Complaint, as Plaintiff fails to make a *prima facie* showing that this Court has personal jurisdiction over either TGC or MBI.

## II. FACTUAL BACKGROUND

### A. Basin Transload, LLC.

Plaintiff is an oil marketer who purchases and ships oil for other energy industry participants. (*See* Decl. ¶ 5.) In order to do so, it requires the assistance of a transloading service. (*See id.*) Basin provides these logistics and transloading services (the transfer of materials from one mode of transportation to another) for crude oil, natural gas liquids, and other industrial materials. (*See id.* ¶ 4.) In fact, prior to the LLC Agreement, Plaintiff often hired Basin as a transloader. (*See id.* ¶ 5.) In 2012, Plaintiff expressed interest in purchasing a portion of Basin, and entered into the LLC Agreement on February 1, 2013. (*See id.* ¶ 7.) Global Operating is Plaintiff's wholly-owned subsidiary and the controlling member of Basin. (*See id.* ¶ 8; LLC Agreement §§ 3.1, 3.4(d), Ex. A-6 (Global Operating owns 60% of Basin).)

Plaintiff exercises complete control over Global Operating. Plaintiff and Global Operating share an address in Waltham, Massachusetts. (*See* Decl. ¶ 9.) The two entities share essentially all of their executives. (*See id.* ¶ 10.) Plaintiff negotiates on behalf of Global Operating. (*See id.* ¶ 11.) TGC and MBI receive communications regarding Basin from Plaintiff's representatives on Plaintiff's letterhead and from Plaintiff's email address (not Global Operating's letterhead or email address). (*See id.* ¶ 12.) In fact, TGC and MBI received a letter from Plaintiff, on its letterhead, referring explicitly to the mandatory arbitration clause in the LLC Agreement (Ex. D). (*See id.* ¶ 46.) To make matters even more confusing, Plaintiff and Global Operating pervasively refer to themselves collectively as "Global." (*See id.* ¶ 13.)

**B. Plaintiff's Extensive Involvement in Basin.**

Through its complete control over Global Operating, Plaintiff also controls Basin. Other than limited transition activities, Plaintiff—often acting in its own interest and not that of its subsidiary or Basin—has been running the operations and management of Basin. Upon execution of the LLC Agreement, Global Operating elected Plaintiff's chief executive officer ("CEO") and president as the controlling member of the board of directors of Basin. (*See id.* ¶ 15; LLC Agreement § 3.6 (Plaintiff's CEO has a 60% voting share pursuant to Global Operating's percentage interest in Basin).) Global Operating further elected Plaintiff's own executive team to become the executive team of Basin. (*See* Decl. ¶ 16 (Plaintiff's chief financial officer ("CFO") is the CFO of Basin, Plaintiff's chief operating officer ("COO") is the COO of Basin, and the president of Basin has senior vice president roles with both Plaintiff and Global Operating).) Plaintiff has numerous representatives attend Basin board meetings and even sends out board meeting notices and agendas on behalf of Basin. (*See id.* ¶¶ 17-18 (sometimes as many as ten of Plaintiff's representatives are present at Basin board meetings).)

As part of the LLC Agreement, the parties also entered into a Shared Services Agreement, under which Plaintiff oversees the operation of Basin, including all marketing and legal services. (*See id.* ¶ 19.) As operator and marketer, Plaintiff is tasked with bringing in contracts for Basin. (*See id*.) However, Plaintiff has—in violation to its duties to both Basin and Defendants—abused its voting power under the LLC Agreement to execute contracts that include favorable contract terms and transloading rates for Plaintiff, irrespective of whether the contract is in the best interest of Basin. (*See id.* ¶¶ 20-22.)

For example, Plaintiff, with visibility into Basin's cost structure, will execute contracts with Basin for transloading and storage of Plaintiff's oil for lower rates in order to increase Plaintiff's marketing profits. (*See id*. ¶ 22.) Basin has no visibility into Plaintiff's marketing costs, and Plaintiff provides no documentation that the rates it proposes are comparable to market value. (*See id*.) Plaintiff intentionally seeks out contracts that enables it to run more oil through the Basin site it collects a higher percentage of profits from, again in violation of its duties to both Basin and Defendants. (*See id.* ¶ 21.) Plaintiff forces these contracts on Basin through its majority voting share, often executing the contracts before even informing TGC and MBI's board members. (*See id.* ¶ 23.)

### C. The Tesoro Agreement and Plaintiff's Mismanagement of Basin.

While there are many instances illustrative of the control Plaintiff asserts over both Global Operating and Basin, a concrete example is the dispute central to this case. Plaintiff, on behalf of Basin, executed a Construction and Indemnity Agreement with Tesoro on April 3, 2014 (the "Tesoro Agreement") (Ex. B). The Tesoro Agreement provides, in relevant part, that if no volumes of crude petroleum are delivered to a certain destination during any 180 days within any period of twelve consecutive months, Tesoro has the right to terminate the Tesoro Agreement and demand indemnity payment from Basin. (*See* Tesoro Agreement §§ 7(b)(i), 9(b) (the

"Minimum Volume Obligation").) Plaintiff's general counsel, **who does not have an operational role at Basin**,[3] signed the Tesoro Agreement on behalf of Basin. (*See* Decl. ¶ 25 (Plaintiff's general counsel had never signed a document on behalf of Basin prior to this contract).)

On the same day, Plaintiff executed a guarantee agreement with Tesoro, "unconditionally and absolutely guarantee[ing] to [Tesoro] the prompt payment when due of all amounts payable by [Basin] under the [Tesoro] Agreement," if Basin itself failed to pay. (*See* Tesoro Agreement add. B § 1 (the "Guaranty Payment").) Plaintiff's general counsel also signed this guarantee agreement, this time on behalf of Plaintiff. While TGC and MBI were informed generally about the transaction, they were not given details and did not realize Plaintiff's general counsel signed both documents until after execution. (*See* Decl. ¶ 27.)

With the representation that Plaintiff would faithfully manage the Tesoro Agreement and Basin's related obligations, TGC, MBI, and Plaintiff entered into a letter agreement providing for TGC and MBI's partial reimbursement of certain Guaranty Payments made by Plaintiff (the "Letter Agreement") (Ex. C). (*See id*. ¶ 28.)

As marketer, Plaintiff controls the oil brought through the sites. (*See id*. ¶ 29.) Although this was Plaintiff's duty, Defendants repeatedly reminded Plaintiff to make sure it fully understood Basin's obligations under the Tesoro Agreement. (*See id*.) However, Plaintiff failed to even read the Tesoro Agreement and therefore did not adequately understand the Minimum Volume Obligation. (*See id*. ¶¶ 30-31 (Plaintiff's COO told Defendants that Plaintiff did not know about the Minimum Volume Requirement in the Tesoro Agreement).) Accordingly,

[3] While he is the corporate secretary, the LLC Agreement provides that the sole duty of the secretary is to prepare the corporate minutes. (*See* LLC Agreement § 3.4(d).)

Plaintiff failed to monitor or adhere to the Minimum Volume Requirements necessary to avoid default under the Tesoro Agreement. (*See id*. ¶ 30.)

TGC, MBI, and Plaintiff became aware of the Minimum Volume Requirement on August 23, 2017, when Tesoro demanded payment from Basin under the Tesoro Agreement. (*See id*. ¶ 31.) One day after the demand letter, Plaintiff ambushed TGC and MBI in an attempt to force them to agree to pay Tesoro. (*See id*. ¶ 33.) TGC and MBI requested more information to better understand how the debt came about. (*See id*.) Plaintiff, however, could not provide this information and was only concerned with making the payment quickly. (*See id.* ¶¶ 33-34 (at that board meeting, Plaintiff's COO and CFO (also Basin's COO and CFO) also clearly did not understand the Minimum Volume Obligation and asked questions about how the Minimum Volume Obligation came about and about when the parties became aware of its existence).)

Basin did not have adequate capital on hand to make the payment and would have required a capital call to fund the demand.[4] (*See id*. ¶ 35.) After forcing the payment on TGC and MBI with no warning or explanation, Plaintiff, in its own self-interest, decided to instead pay Basin's obligation under Plaintiff's guarantee with Tesoro. (*See id*. ¶¶ 37-38.) By doing so, Plaintiff short circuited any possible capital call or resolution under the LLC Agreement, knowing full well it would turn around and seek reimbursement from MBI and TGC pursuant to the Letter Agreement at a later time. (*See id*. ¶¶ 38-39.) Plaintiff treated Basin as its mere instrumentality, completely disregarding the separate finances of the two as well as any semblance of corporate formalities. This is just one of many blatant examples of Plaintiff using

[4] The Tesoro Agreement was in fact breached in early 2017. After the breach but before Tesoro demanded payment, Plaintiff moved to disburse funds from Basin to its members. (*See* Decl. ¶ 32.) Plaintiff clearly did not understand Basin's obligations under the Tesoro Agreement when it made this disbursement.

its control over Basin in its favor, without contemplating the effect its decision could have on Basin.

### D. Failed Negotiations Led TGC and MBI to Initiate Mandatory Arbitration

Unfortunately, the complete mishandling of the Tesoro Agreement was just one of many examples of gross mismanagement of Basin by Plaintiff.[5] (*See id.* ¶ 43.) After this incident, TGC and MBI engaged in negotiations with Plaintiff to resolve their ongoing disagreements. (*See id.*) TGC and MBI engaged in extensive negotiations with Plaintiff's general counsel and CEO, and proposed over the course of two years several buyout or dissolution options that would resolve the Guaranty Payment and fairly unwind the LLC. (*See id.*) However, Plaintiff's counteroffers and proposals failed to implement a good faith valuation of Basin's assets. (*See id*. ¶ 44.) On October 1, 2019, during the ongoing negotiations, Plaintiff sent a letter to Defendants demanding payment under the Letter Agreement. (*See id*.)

Left with no other option, TGC and MBI ultimately sent Global Operating and Plaintiff a notice of arbitration on January 31, 2020, asking the Tribunal to assist in the ongoing negotiations and resolve the continued disputes through equitable dissolution.[6] Plaintiff has refused to participate in the pending arbitration proceeding before the International Institute for Conflict Prevention and Resolution (the "CPR") and instead filed this Complaint against TGC and MBI, **even though it earlier acknowledged the arbitrability of the disputes.** (*See id*. ¶ 46.) Indeed, when TGC and MBI first suggested an equitable dissolution of Basin as part of negotiations, Plaintiff's CEO informed TGC and MBI, by a letter on Plaintiff's (not its

[5] TGC and MBI's Notice of Arbitration further explains Global Operating and Plaintiff's continued mismanagement of Basin (Ex. E). For example, Plaintiff mismanagement of Basin has tainted Basin's reputation in the industry, so much so that Basin struggles to procure any customers at all. (*See* Decl. ¶ 20.)

[6] TGC and MBI were not able to demand dissolution under the LLC Agreement, which requires an affirmative vote of Directors representing at least 67% of the Percentage Interests. TGC and MBI collectively own only 40%. (*See* LLC Agreement § 9.1(a).) Global Operating's appointed director, Plaintiff's CEO, refused to agree to dissolution.

subsidiary's) letterhead, that any disputes must be resolved through binding arbitration pursuant to the LLC Agreement and that Plaintiff "fully expect[ed TGC and MBI] to comply with this section." (*See id.*) Now, when TGC and MBI seek to do exactly what Plaintiff demanded, Plaintiff refuses to participate. Based on their actions, Plaintiffs should be estopped from avoiding arbitration.

## III. ARGUMENTS AND AUTHORITIES

### A. The FAA Mandates Enforcement of the Arbitration Agreement.

This Court should compel arbitration of Plaintiff's claims. The Federal Arbitration Act ("FAA") governs the enforceability of any written arbitration agreement relating to transactions "involving commerce." 9 U.S.C. § 2. Here, the Arbitration Agreement specifically provides for enforcement under the FAA. (*See* LLC Agreement § 10.2(a).)

Under the FAA, there is a strong presumption in favor of enforcing arbitration agreements. *See AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1742 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA "directs courts to treat arbitration agreements as 'valid, irrevocable, and enforceable.'" *See Tissera v. NRT New England*, No. 19-12118-PBS, 2020 WL 610023, at *3 (D. Mass. Feb. 10, 2020) (quoting 9 U.S.C. § 2). As the Supreme Court explained, the FAA "reflects a liberal policy favoring arbitration." *See AT&T Mobility*, 563 U.S. at 339 (quoting *Moses H. Cone*, 460 U.S. at 24). Indeed, the pro-arbitration policy espoused by the FAA is so strong that courts are obligated to resolve any doubts as to the arbitrability of a plaintiff's claim *in favor of arbitration*. *See Moses H. Cone*, 460 U.S. at 34-25 (finding that FAA "establishes that, as a matter of federal law," any doubts concerning scope of arbitrable issues should be resolved in favor of arbitration).

The relevant factors are "(1) that a valid agreement to arbitrate exists, (2) that the movant is entitled to invoke the arbitration clause, (3) that the other party is bound by that clause, and (4)

that the claim asserted comes within the clause's scope." *Commonwealth Equity Serv., LLC v. Ohio Nat'l Life Ins. Co.*, No. 18-cv-12314-DJC, 2019 WL 1470131, at *5 (D. Mass. Apr. 3, 2019). Under the FAA, the Arbitration Agreement is valid and TGC and MBI, as signatories and aggrieved parties, can move for this Court to compel Plaintiff to arbitration. *See* 9 U.S.C. §§ 2, 4. Therefore, the only remaining considerations are whether Plaintiff is bound by the Arbitration Agreement (factor three) and whether Plaintiff's claims fall within its scope (factor four). Each of these factors is met.

1. *Plaintiff is Bound by the Arbitration Agreement.*

Plaintiff is bound by the Arbitration Agreement contained in the LLC Agreement. Although Plaintiff did not sign the LLC Agreement, non-signatories can be bound to arbitrate where state law applicable to the contract would allow it.[7] *See Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (explaining that state law "is applicable to determine which [arbitration] contracts are binding . . . and enforceable"); *Tissera*, 2020 WL 610023, at *5. The LLC Agreement is governed by Delaware law, and thus, Delaware law applies. (*See* LLC Agreement § 10.1(a).) Under Delaware law, there are several theories under which non-signatories to a contract can nevertheless be bound by an arbitration provision therein, including equitable estoppel and alter ego theories. *See Kuroda*, 2010 WL 4880659, at *3. Either theory compels arbitration here.

---

[7] The Court should compel arbitration under either Delaware law or federal common law. Courts in this circuit do not uniformly apply state law principles, instead sometimes applying federal common law to determine whether a non-signatory is bound by an arbitration provision when the parties do not argue otherwise. *See, e.g. Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 39, n.5 (1st Cir. 2019) (noting the discord). *But see Tissera*, 2020 WL 610023, at *5 (applying Massachusetts state law, which recognizes the same theories to bind a non-signatory to a contract as Delaware law). While Delaware law applies pursuant to Supreme Court precedent, Delaware courts themselves often cite to federal common law as support when determining whether a non-signatory is bound by an arbitration clause. *See Kuroda v. SPJS Holdings, L.L.C.*, No. 4030-CC, 2010 WL 4880659, at *3, n.17 (Del. Ch. Nov. 30, 2010) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995), a case commonly relied on for the basis of federal common law, which lists the same theories that can bind non-signatories to an arbitration agreement). Regardless, the result here is the same; Plaintiff should be compelled to arbitrate its claims.

a. Plaintiff is Equitably Estopped from Avoiding Arbitration.

A non-signatory is bound by an arbitration clause "when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *In re Kaiser Grp. Int'l, Inc.*, 307 B.R. 449, 456 (D. Del. 2004). "The policy driving this theory is that a non-signatory should be prevented from embracing a contract and then turning its back on those portions of the contract which it finds distasteful." *Id*. (citations omitted).

Plaintiff is attempting to do exactly what this policy seeks to prevent: Plaintiff repeatedly and knowingly embraced and exploited the LLC Agreement, in fact even referring to the arbitrability of Defendants' claims pursuant to the LLC Agreement, but now wishes to turn its back on the Arbitration Agreement. Plaintiff exercises complete control over Basin, using it as a pawn to execute contracts that ultimately favor Plaintiff, regardless of whether or not those contracts are in the best interest of Basin. (*See* Decl. ¶¶ 19-23.) When TGC and MBI suggested an equitable dissolution of Basin, Plaintiff's CEO sent TGC and MBI a letter, on Plaintiff's letterhead, informing Defendants that Plaintiff "fully expect[ed TGC and MBI] to comply with" the binding arbitration provision in the LLC Agreement. (*See id.* ¶ 46 (this letter was sent on "Global Partners's" letterhead, and not from Global Operating).) Plaintiff should not be able to now turn its back on the agreement it earlier intended to enforce.

Courts find parties have embraced a contract when they have received a "direct benefit" under the agreement containing the arbitration clause. *See In re Kaiser*, 307 B.R. at 456-57. Plaintiff has received numerous direct benefits from the LLC Agreement. First, Plaintiff has clearly benefited from the LLC Agreement by managing and completely controlling Basin. Plaintiff used the terms of the LLC Agreement to elect its CEO and president to the board of directors of Basin, as the controlling and majority vote. (*See* Decl. ¶ 15.) Plaintiff has used that

role to execute contracts on behalf of Basin in its favor, and has accordingly received favorable rates and contract terms. For example, Plaintiff executes contracts to bring oil through the Basin site it collects increased profits from. (*See id.* ¶ 21.) Plaintiff also uses its insight into Basin's cost structure to effectively lower Plaintiff's marketing costs, even proposing storage contracts to Basin with rates that are below market prices. (*See id.* ¶ 22.) This allows Plaintiff to increase its marketing profits, all at the expense of Basin. (*See id.*)

Plaintiff is also provided with protections and rights under the LLC Agreement. The LLC Agreement expressly states that "each Member *and its Affiliates* may engage, without the consent or approval of any other Member or the Company, in any business . . . that may be competitive with or the same as or similar to the business of the Company." (*See* LLC Agreement § 2.1(a) (emphasis added), Ex. A-1 ("'Affiliate' shall mean with respect to an entity, any other entity controlling, controlled by or under common control with such entity").) Plaintiff even has the right to acquire Global Operating's membership interests in Basin and immediately become a member of Basin without the consent of TGC and MBI. (*See id*. § 6.2.)

Further, the Letter Agreement between TGC, MBI, and Plaintiff incorporates the LLC Agreement and provides Plaintiff with explicit remedies under the LLC Agreement. (*See* Letter Agreement 2.) The Letter Agreement allows Plaintiff to treat TGC and MBI as "Delinquent Members" and force reimbursement pursuant to Section 5.1(a) of the LLC Agreement. (*See id.*) Under the Letter Agreement, Plaintiff also can elect to acquire the entire Membership Interests of TGC and MBI by forcing a sale as provided by Section 6.5 of the LLC Agreement. (*See id.*) The Letter Agreement even notes that the parties' obligations to make payments under the agreement "are predicated on each of their current Percentage Interests (as defined in the LLC

Agreement) in Basin." (*See id.* at 4 (noting that if Plaintiff's interest in Basin change, Plaintiff's obligation under the Letter Agreement will be adjusted accordingly).)

Courts have found direct benefits in far more attenuated circumstances. *See, e.g. Capital Grp. Cos., Inc. v. Armour*, No. Civ. A. 422-N, 2004 WL 2521295, at *7 (Del. Ch. Oct. 29, 2004) (non-signatory gained a beneficial interest because the agreement allowed her to put stock in a trust, a benefit she did not have without the agreement); *In re Kaiser*, 307 B.R. at 456-57 (profits from the underlying agreement to be paid to the non-signatory constituted a direct benefit); *Am. Bureau of Shipping v. Tencara Shipyard SPA*, 170 F.3d 349, 353 (2d Cir. 1999) (non-signatory was bound by a contract under which it received the direct benefits of lower insurance and ability to sail the French flag); *Fluehmann v. Assoc. Fin. Serv.,* No. CIV. A. 01-40076-NMG, 2002 WL 500564, at *7 (D. Mass. Mar. 29, 2002) (relying on the fact that the non-signatory "played no small role" in securing the underlying agreement to estop her from avoiding the arbitration provision therein).

Accordingly, Plaintiff should not be allowed to disregard the LLC Agreement it has constantly benefited from and invoked in its favor for years. Allowing Plaintiff to "claim the benefit of the contract and simultaneously avoid its burdens is precisely the situation the doctrine of equitable estoppel seeks to prevent." *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 118 (3d Cir. 2015) (citations omitted). Instead, Plaintiff should be estopped from avoiding arbitration of the claims it originally referred to as arbitrable.

b. <u>Plaintiff is Also Bound to Arbitrate Under Alter Ego Principles.</u>

A non-signatory owner can be bound to an arbitration clause when a signatory "is in fact a mere instrumentality or alter ego of its owner." *See Kuroda*, 2010 WL 4880659, at *3; *Shandler v. DLJ Merchant Banking*, C.A. No. 4797-VCS, 2010 WL 2929654, at *15, n.138 (Del.

Ch. July 26, 2010). Here, Global Operating is clearly a "mere instrumentality" of Plaintiff (as is Basin), and thus Plaintiff should be bound to arbitrate its claims pursuant to the LLC Agreement.

Delaware courts look to numerous factors, including common ownership and control, overlapping management and board membership, lack of corporate formalities, and a shared common address, to determine whether a parent company has "total domination or control" over its subsidiary. *See, e.g. Shandler*, 2010 WL 2929654, at *15 (relying on these factors for a "inference that the entities acted jointly together as if they were a single controlling stockholder"); *Microsoft Corp. v. Amphus, Inc.*, C.A. No. 8092-VCP, 2013 WL 5899003, at *6-7 (Del. Ch. Oct. 31, 2013) (these factors, along with confusion as to what capacity directors were signing documents in, was enough to defeat a motion to dismiss).

Each of the alter ego factors apply squarely here. Plaintiff has "total domination or control" over Global Operating and uses this control to manage Basin. Global Operating is Plaintiff's wholly-owned subsidiary. (*See* Decl. ¶ 8.) The entities share the same building address in Waltham, Massachusetts. (*See id.* ¶ 9.) There is a substantial, if not complete, overlap between managers and executives at Plaintiff and Global Operating. (*See id.* ¶ 10.)

Most critically however, there is no actual separation between the entities, including as it relates to this specific dispute over the Guaranty Payment. Plaintiff and Global Operating constantly refer to themselves as "Global," and fully act in the interests of each at the same time. (*See id.* ¶ 13.) Importantly, Plaintiff's general counsel—who has no official role at Basin—apparently signed the Tesoro Agreement in Global Operating's capacity, since he has no signatory role at Basin himself. (*See id.* ¶ 25.) He repeatedly negotiates on behalf of Global Operating, communicating with TGC and MBI regularly during negotiations regarding possible buy outs of TGC, MBI, and Global Operating's membership interests in Basin. (*See id.* ¶ 11.);

*see also Microsoft Corp*., 2013 WL 5899003, at *7 (noting, as support of an alter ego claim, that a general counsel of one entity did not realize she was also general counsel of its alter ego, despite having signed documents in that capacity). Plaintiff's CEO also communicates on behalf of Global Operating and was the final say in negotiations with TGC and MBI regarding the possible buy outs. (*See* Decl. ¶ 11.) Correspondence regarding Basin is sent to TGC and MBI on Plaintiff's letterhead and from Plaintiff's email address. (*See id.* ¶ 12.)

The Letter Agreement itself refers to *Global Partners's* ownership stake in Basin, even though it is Global Operating's ownership stake under the LLC Agreement. (Letter Agreement 4 (noting that "Global's" obligation to pay under the Letter Agreement was predicated on its current Percentage Interests in Basin, defining "Global" as "Global Partners LP").) These repeated failures to distinguish between the entities shows Plaintiff and Global Operating are really functioning "as a single entity." *See Microsoft Corp.*, 2013 WL 5899003, at *7.

Moreover, Plaintiff, through its complete control of Global Operating, is using Basin itself as a "mere instrumentality" to further Plaintiff's interests. Plaintiff uses its visibility into Basin's cost structure to effectively cut Plaintiff's transloading and storage costs, thereby increasing its marketing profits. (*See* Decl. ¶ 22.) Basin, on the other hand, has no visibility into Plaintiff's marketing costs and must rely on Plaintiff's representations that the transloading and storage rates it proposes to Basin are comparable to market rates. (*See id*.) Plaintiff uses Basin to further its interests, without considering whether Basin's interests are adequately protected.

And the core of this dispute is Global Partners using its complete control over its subsidiary and Basin to completely disregard corporate formalities by ignoring a debt owned by Basin (and the corresponding protection for Defendants) and instead attempting an end-around through the guarantee. Plaintiff, with itself, and only itself, in mind, completely skipped the

available mechanisms under the LLC Agreement to pay Basin's Tesoro debt. As the Tesoro demand came near year end, Plaintiff was likely concerned about the negative affect the debt would have on its financial relationships with banks and reputation on the market. (*See id.* ¶ 38.) When TGC and MBI requested more information about the debt in response to Plaintiff's ambush to make the Tesoro payment, Plaintiff decided it would be quicker, easier, and in *Plaintiff's* best interest to cause Tesoro to invoke the guarantee agreement between Tesoro and Plaintiff to pay Basin's debt. (*See id.* ¶¶ 33-37.) However, Plaintiff did this knowing it could simply turn around and seek reimbursement from two of Basin's members, TGC and MBI. (*See id.* ¶ 39.) It is clear Plaintiff is using Basin and Global Operating as "instrumentalities operated for the benefit of [Plaintiff]." *See Shandler*, 2010 WL 2929654, at *15.

Plaintiff is operating Basin through a "mere instrumentality": Global Operating. It is furthermore using Basin itself as its instrumentality as well. It would be unjust and unfair to allow Plaintiff to now avoid the Arbitration Agreement in an agreement it has constantly exploited in its favor, through its control over its subsidiary and Basin, solely because of decisions it made to evade the LLC Agreement using this control. Plaintiff and Global Operating are therefore "so closely intertwined that they do not merit treatment as separate entities" for purposes of this arbitration. *Vepco Park, Inc. v. Custom Air Serv., Inc.*, C.A. No. 14C-09-018 RBY, 2016 WL 1613654, at *2-3 (Del. Super. Ct. Feb. 25, 2016). Thus, Plaintiff should be compelled to arbitrate its claims against TGC and MBI.

2. *Plaintiff's Claims Are Within the Scope of the Broad Arbitration Agreement.*

The final factor is also squarely met here because Plaintiff's claims fall within the broad scope of the Arbitration Agreement. The Supreme Court has explained that "there is a presumption of arbitrability in the sense that '[an] order to arbitrate the particular grievance

should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). "Such a presumption is particularly applicable where the clause is [ ] broad." *PaineWebber, Inc. v. Landay*, 903 F. Supp. 193, 197 (D. Mass. 1995) (quoting *AT&T Techs.*, 475 U.S. at 650).

Courts conclude that an arbitration clause covering disputes "arising under" or "in connection with" the agreement constitutes a "broad arbitration clause." *See id.*; *see also CAPROC Manager, Inc. v. Policemen's & Firemen's Ret. Sys. of City of Pontiac*, No. Civ. A. 1059-N, 2005 WL 937613, at *2 (Del. Ch. Apr. 18, 2005) (holding that an arbitration provision that provided for arbitration of "any dispute or controversy" arising under the agreement was broad in scope). Here, the relevant Arbitration Agreement is very broad; it encompasses *any claim* "arising out of or relating in any way to [the LLC] Agreement . . . or the transactions contemplated pursuant to [the LLC] Agreement." (*See* LLC Agreement § 10.2, Ex. A-4.) Thus, any doubts should be resolved in favor of arbitration. *See AT&T Techs.*, 475 U.S. at 650.

Plaintiff has alleged claims that are squarely within the ambit of the Arbitration Agreement.[8] Plaintiff alleges it is entitled to reimbursement under the Letter Agreement, a "transaction contemplated pursuant to [the LLC] Agreement." (*See* Compl. ¶¶ 26-30; *see also* LLC Agreement § 10.2, Ex. A-4.) Indeed, the Letter Agreement explicitly provides Plaintiff with remedies under the LLC Agreement, which obviously would not exist if the LLC Agreement did not itself exist. (*See* Letter Agreement 2.)

[8] While the merits of Plaintiff's claims are not at issue in this Motion, Defendants deny each and every one of Plaintiff's allegations in their entirety.

Further, this entire dispute revolves around *Basin's* obligation under the Tesoro Agreement, an agreement and obligation arising out of or relating to the LLC Agreement. Plaintiff cannot circumvent the Arbitration Agreement when it used its control over Global Operating and Basin to enter into the Tesoro Agreement and to make the Guaranty Payment in a way to benefit itself. This kind of control and general mismanagement of Basin is central to this dispute and central to the claims in the pending arbitration. Accordingly, Plaintiff's claims against TGC and MBI are well within the broad scope of the Arbitration Agreement and Plaintiff should be estopped from avoiding arbitration. *See PaineWebber,* 903 F. Supp. at 197; *Ishimaru v. Fung*, No. Civ. A. 929, 2005 WL 2899680, at *13 (Del. Ch. Oct. 26, 2005).

## IV. ALTERNATIVE REQUEST TO DISMISS FOR LACK OF PERSONAL JURISDICTION

In the event this Court does not compel Plaintiff to arbitrate its claims, the Complaint should nevertheless be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. The Complaint is fatally defective because it does not plead a basis for this Court to exercise personal jurisdiction over either TGC or MBI. In fact, it makes no jurisdiction-related allegations against either Defendant at all.

It is well-established that "regardless of the nature of the proceedings and the form of the proffers, "the plaintiff has the burden of showing that jurisdiction exists." *Boit v. Gar-Tec Prod., Inc.*, 967 F.2d 671, 674–75 (1st Cir. 1992) (quotations omitted). In order to make a *prima facie* showing of personal jurisdiction, the plaintiff must successfully assert that defendants have "certain 'minimum contacts' with Massachusetts such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Pajak v. Rohm & Haas Co*., 387 F. Supp. 3d 138, 143–44 (D. Mass. 2019). The test includes the following:

> (1) whether the claim directly arises out of, or relates to**, the defendant's forum state activities**; (2) whether **the defendant's in-state contacts** represent a

> purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable; and (3) whether the exercise of jurisdiction is reasonable.

*Id.* (emphasis added). Under these factors, the court must evaluate **the defendant's** connections with the forum state; the plaintiff's asserted connections are irrelevant. *Sawtelle v. Farrell*, 70 F.3d 1381, 1392 (1st Cir.1995) (finding no purposeful availment when "the [defendants'] only connection with [the forum state] was the [plaintiffs'] residence there").

And, when "considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken[.]" *Pajak*, 387 F. Supp. 3d at 144 (citing cases). In other words, Plaintiff is stuck with the allegations in the Complaint it filed, and it cannot amend-through-response if the Complaint is defective.

Here, it is plain from the face of the Complaint itself that Plaintiff makes ***no*** jurisdictional allegations against either Defendant, and therefore, cannot establish the prima facie basis for personal jurisdiction. The Complaint's only allegations relating to the location or purported jurisdiction as it relates to Defendants are that TGC is a "Montana limited partnership with its principal place of business" in Montana, and that MBI "is a North Dakota limited liability company with its principal place of business" in North Dakota. (*See* Compl. ¶¶ 2-3.) No connection to Massachusetts whatsoever is asserted against the Defendants.

Similarly, in the "Jurisdiction and Venue" section, the Complaint only lists connections to Massachusetts **of the Plaintiff or non-party Basin**. (*See id.* ¶¶ 4-5.) It does not allege literally anything about the Defendants' connections to the forum, and therefore it is impossible for Plaintiff to satisfy its *prima facie* burden to establish personal jurisdiction.

Defendants believe that no set of allegations made in good faith can establish personal jurisdiction over them, and that any amendment will fail to satisfy the relevant tests. But there is no serious question that the Complaint as pleaded completely fails to make any showing, much less the required one. The Court should therefore dismiss this Complaint as improperly pleaded.

## V. ALTERNATIVE REQUEST FOR STAY

As another alternative, the Court could should stay this action pending an arbitrator's determination as to the arbitrability. *See* 9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement* . . .") (emphasis added); *Moses H. Cone*, 460 U.S. at 21, n.23 ("In some cases . . . it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration."). Because the arbitration's disposition of the claims in the pending arbitration may affect the disposition of the Plaintiff's claims in this action, the Court should stay this action. *See, e.g. Baggesen v. Am. Skandia Life Assurance Corp.*, 235 F. Supp. 2d 30, 33 (D. Mass. 2002); *Cannavo v. Enter. Messaging Servs., Inc.*, 982 F. Supp. 54, 59-60 (D. Mass. 1997).

## VI. CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, TGC and MBI request that this Court compel arbitration to the pending CPR proceeding, because a valid Arbitration Agreement governs Plaintiff's claims. If this Court does not compel arbitration, TGC and MBI request the Court dismiss this action for lack of personal jurisdiction. Finally, if the Court does not dismiss the Complaint, TGC and MBI request this Court stay this action pending the resolution of the CPR proceeding. TGC and MBI respectfully request any further relief to which they are justly entitled.

Dated: Boston, Massachusetts
March 31, 2020

Respectfully Submitted,

/s/ *Jack W. Pirozzolo*
Jack W. Pirozzolo (BBO # 564879)
**Sidley Austin LLP**
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0300
jpirozzolo@sidley.com

*Counsel for Defendants*

Penny P. Reid
preid@sidley.com
Texas Bar No. 15402570
New York Bar No. 5699
David Y. Sillers
dsillers@sidley.com
Texas Bar No. 24072341
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, TX 75201
(214) 961-3300

*Counsel for Defendants, pro hac motion forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic (NEF) and paper copies will be sent to those indicated as non-registered participants on March 31, 2020.

/s/ *Penny P. Reid*
Penny P. Reid